# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

MARIA IPPOLITO,

  Plaintiff,

vs.

WYETH, INC.; WYETH PHARMACEUTICALS,
INC.; ESI LEDERLE; PFIZER, INC.;
PHARMACIA & UPJOHN COMPANY, LLC;
PHARMACIA & UPJOHN LLC; PHARMACIA
CORPORATION; BRIDGET COMEAUX;
KIMBERLY TUCKIS; MARI WILLIAMS;
KATHERINE VEZIN; MICHAEL SULLIVAN;
CLIFFORD BLOM; TIMOTHY HICKEY;
DONNA MOORES; and LISA GRAHAM,

  Defendants,

Case No.:

# 06-14137
## CIV-GRAHAM

State Case No.: 06 CA 000341 (PL) JUDGE
MAGISTRATE JUDGE
LYNCH

NIGHT BOX
FILED

CLARENCE
CLERK,            /FTL

## NOTICE OF REMOVAL

  PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1441 and 1446, defendants Wyeth (registered to do business in Florida as Wyeth, Inc.), and Wyeth Pharmaceuticals Inc. (incorrectly identified in the Complaint as "Wyeth Pharmaceuticals, Inc.")[1] (collectively "Wyeth"),[2] hereby file this Notice of Removal from the Circuit Court in and for St. Lucie County, Florida to the United States District Court for the Southern District of Florida. The grounds for removal are as follows:

---

[1] Plaintiff also names ESI Lederle as a defendant. *See* Complaint, ¶4. ESI Lederle is a former unincorporated division of Wyeth that was sold in 2002. ESI Lederle does not exist as a separate corporate entity and is not separately amenable to suit.

[2] When Wyeth refers to the individual entity "Wyeth" as opposed to the collective entity, it will place an asterisk behind Wyeth: Wyeth*.



## THE REMOVED CASE

1.     The removed case is a civil action filed on or about March 9, 2006, in the Circuit Court in and for St. Lucie County, Florida, having been assigned Case No. 06 CA 000341 (PL), and captioned, *Maria Ippolito v. Wyeth, et al.*

## PAPERS FROM REMOVED ACTION

2.     As required by 28 U.S.C. § 1446(a), attached as Exhibit 1 are copies of all process, pleadings, orders and other papers or exhibits filed in the state court.

## THE REMOVAL IS TIMELY

3.     Plaintiff commenced this action on or about March 9, 2006, and served defendant Wyeth on April 24, 2006.  Therefore, this Notice of Removal is timely filed within 30 days of receipt of the initial pleading and within one year of commencement of the action.

## CONSENTS TO REMOVAL

4.     Defendants, Pfizer, Inc., Pharmacia & Upjohn Company LLC, Pharmacia & Upjohn LLC, and Pharmacia Corporation, have consented to the removal of this action.  (*See* Exhibit 2).

5.     As set forth more fully below, Defendants Bridget Comeaux, Kimberly Tuckis, Mari Williams, Katherine Vezin, Michael Sullivan, Clifford Blom, Timothy Hickey, Donna Moores, and Lisa Graham (hereinafter "Detailer Defendants") are fraudulently joined in this action. Thus, their consents to this removal are unnecessary. *See United Computer Sys., Inc. v. AT&T Corp.,* 298 F.3d 756, 762 (9th Cir. 2002); *Jernigan v. Ashland Oil, Inc.,* 989 F.2d 812, 815 (5th Cir. 1993); *Clay v. Brown & Williamson Tobacco Corp.,* 77 F. Supp. 2d 1220, 1222 n.3 (M.D. Ala. 1999).  Additionally, Defendants Bridget Comeaux, Kimberly Tuckis, Mari Williams, Katherine

Vezin, Clifford Blom, Timothy Hickey, Donna Moores, Lisa Graham are represented by the undersigned counsel and join in this removal. Also, the consents of Kimberly Tuckis, Michael Sullivan, Donna Moores, and Lisa Graham are not required because they have not been served. *See Paz v. Bonita Tomato Growers, Inc.*, 920 F. Supp. 174 (M.D. Fla. 1996).[3]

## THE VENUE REQUIREMENT IS MET

6.      Venue is proper under 28 U.S.C. § 1441(a) because the Circuit Court of St. Lucie County, Florida is within the Southern District of Florida.

### DIVERSITY OF CITIZENSHIP EXISTS
### BETWEEN THE PROPERLY-JOINED PARTIES

7.      This is a civil action that falls under the Court's original jurisdiction under 28 U.S.C. § 1332 (diversity of citizenship) and is one that may be removed to this Court based on diversity of citizenship under 28 U.S.C. §§ 1441 and 1446.

8.      Upon information and belief, Plaintiff is and was at the commencement of this action a citizen of the State of Florida. *See* Complaint ¶ 2.

9.      Defendant Wyeth* is and was at the commencement of this action a corporation existing under the laws of the State of Delaware, having its principal place of business in the State of New Jersey.

10.     Defendant Wyeth Pharmaceuticals Inc. is and was at the commencement of this action a corporation existing under the laws of the State of Delaware, having its principal place of business in the State of Pennsylvania.

---

[3] If, notwithstanding counsel's efforts to confirm lack of service, it is determined that Michael Sullivan was served prior to removal, Wyeth will file his consent within 10 days of knowledge of service or notify the Court that he does not consent.

11.     Defendant Pfizer Inc. is, and at the time of the filing of this action was, a corporation existing under the laws of the State of Delaware, having its principal place of business in the State of New York.

12.     Defendant Pharmacia & Upjohn Company LLC is, and was at the time of the filing of the complaint, a limited liability company whose sole member is, and was at the time of the filing of the complaint, Pharmacia & Upjohn LLC.  Pharmacia & Upjohn LLC is, and was at the time of the filing of the complaint, a limited liability company whose sole member is, and was at the time of the filing of the complaint, Pharmacia Corporation. Thus, Pharmacia & Upjohn Company LLC and Pharmacia & Upjohn LLC have the same citizenship for purposes of federal diversity jurisdiction as Pharmacia Corporation. Pharmacia Corporation is, and at the time of the filing of this action was, a corporation existing under the laws of the State of Delaware, having its principal place of business in the State of New Jersey.

13.     Defendants Bridget Comeaux, Kimberly Tuckis, Mari Williams, Katherine Vezin, Clifford Blom, Timothy Hickey, Donna Moores, Lisa Graham and upon information and belief, Michael Sullivan, are, and at the time of filing this action were, citizens of Florida.  These defendants are fraudulently joined and their presence in this action does not destroy diversity and prevent removal.  Their citizenship must, therefore, be disregarded for the purposes of diversity analysis. *See Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996).

14.     Because the plaintiff is a citizen of Florida, and the properly-joined defendants are not, complete diversity exists under 28 U.S.C. § 1332.

## THE DETAILER DEFENDANTS
## ARE FRAUDULENTLY JOINED

15.     Because the plaintiff is a citizen of Florida, and the properly-joined defendants are not, complete diversity exists under 28 U.S.C. § 1332.

16.     In determining whether diversity jurisdiction exists, the Court must disregard the citizenship of fraudulently joined parties. *See Tapscott*, 77 F.3d at 1360; *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1561-62 (11th Cir. 1989). A defendant is fraudulently joined where there is no "reasonable basis" for a claim against it. *See Crowe v. Coleman*, 113 F.3d 1536, 1540 (11th Cir. 1997). While cases often say that there must be "no possibility" of a claim, courts have held this language "cannot be taken literally" and that "the standard more accurately is described as requiring a showing that there is '*no reasonable basis*' for predicating liability on the claims alleged." *In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 280 n.4 (S.D.N.Y. 2001) (emphasis added). This standard is applied by the Eleventh Circuit and other Courts of Appeals. *See, e.g., Legg v. Wyeth*, 428 F.3d 1317 (11th Cir. 2005); *Crowe*, 113 F.3d at 1540; *see also BP Chems. Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677, 685 (8th Cir. 2002); *Badon v. RJR Nabisco, Inc.*, 224 F.3d 382, 393 (5th Cir. 2000).

17.     Plaintiff has fraudulently joined the Detailer Defendants, current and former Wyeth sales representatives, who promoted Wyeth's hormone replacement drugs, solely to destroy diversity. This is a common tactic. In fact, the U.S. District Court for the Northern District of Florida recently recognized this tactic, concluded that the sales representatives were fraudulently joined, and dismissed with prejudice those representatives in three diet drug cases. *See Petty v. Wyeth*, No. 3:04-cv-82/MCR, slip op. at 8-9 (N.D. Fla. Apr. 28, 2004) (Ex. 3); *Lewis v. Wyeth*, No. 3:04-cv-81/MCR, slip op. at 8 (N.D. Fla. Apr. 28, 2004) (Ex. 4); *Fowler v. Wyeth*, No. 3:04-cv-83/MCR, slip op. at 10 (N.D. Fla. May 14, 2004) (Ex. 5); *see also Sobkowski v.*

5

*Wyeth*, No. 5:04-cv-96-Oc-10GRJ, slip op. at 2-3 (M.D. Fla. June 24, 2004) (adopting magistrate's May 17, 2004 report and recommendation which stated that "because there is no reasonable basis in the record for predicting that Florida law might impose liability under any of the purported causes of action raised by Plaintiff against the sales representatives . . . the Court concludes that for purposes of diversity the sales representatives should be considered fraudulently joined and therefore may be ignored for purposes of establishing diversity of citizenship.") (collectively Ex. 6).

18.    Recently, the Honorable William R. Wilson, Jr. of the Eastern District of Arkansas, the Judge overseeing the Prempro MDL, denied remand in a Prempro case from Florida. *See Andrade v. Wyeth, Inc., et al.*, 4:03CV1507-WRW (Dec. 21, 2005) (Ex. 7). Explicitly adopting the reasoning of *Soblowski*, Judge Wilson rejected the plaintiff's claim that "remand is appropriate because there is not complete diversity since Defendants Natalie Fosser and Sally Berthiaume, both Wyeth sales representatives, are Florida residents." (*Id.* at 1).

19.    Judge Wilson also recently denied remand and plaintiff's motions for leave to amend to add Wyeth sales representatives in a Prempro case from Alabama, stating, "one would think Plaintiff's Motions to Amend are bottomed upon the primary (if not sole) notion of defeating federal diversity jurisdiction," but noting "it appears that Plaintiff could not maintain a cause of action against these Defendants under Alabama law." *Christiansen v. Wyeth, et al.*, 4:05CV1507-WRW, slip op at 3 (Ex. 8). Other courts similarly have found that pharmaceutical company sales representatives were fraudulently joined. *See, e.g., Dacosta v. Novartis AG*, 180 F. Supp. 2d 1178, 1182-83 (D. Or. 2001); *In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 280-88 (S.D.N.Y. 2001); *Johnson v. Parke-Davis*, 114 F. Supp. 2d 522, 524-25 (S.D. Miss. 2000).

20.     None of Plaintiff's claims muster a reasonable basis for liability against the Detailer Defendants.

## Background

21.     The job of Wyeth's pharmaceutical detailers is to ensure that physicians are aware of Wyeth's products so that they can consider whether to prescribe them for particular patients. *See* Decl. of Bridget Comeaux, ¶3 (Ex. 13); Decl. of Kimberly Tuckis, ¶3 (Ex. 14); Decl. of Mari Williams, ¶3 (Ex. 15); Decl. of Katherine Vezin, ¶3 (Ex. 16); Decl. of Clifford Blom, ¶3 (Ex. 17); Decl. of Timothy Hickey, ¶3 (Ex. 18); Decl. of Donna Moores, ¶3 (Ex. 19); Decl. of Lisa Graham, ¶3 (Ex. 20).

22.     Wyeth's detailers make physicians aware of a company's products by visiting the physicians in their offices.  A detailer's visit with a physician typically lasts only a few minutes, but some physicians refuse to meet with sales representatives at all.  *See* Decl. of Bridget Comeaux, ¶3 (Ex. 13); Decl. of Kimberly Tuckis, ¶3 (Ex. 14); Decl. of Mari Williams, ¶3 (Ex. 15); Decl. of Katherine Vezin, ¶3 (Ex. 16); Decl. of Clifford Blom, ¶3 (Ex. 17); Decl. of Timothy Hickey, ¶3 (Ex. 18); Decl. of Donna Moores, ¶3 (Ex. 19); Decl. of Lisa Graham, ¶3 (Ex. 20).   The package inserts and Wyeth product literature that the detailers provide to physicians during these visits are provided by Wyeth.  *See* Decl. of Bridget Comeaux, ¶4 (Ex. 13); Decl. of Kimberly Tuckis, ¶4 (Ex. 14); Decl. of Mari Williams, ¶4 (Ex. 15); Decl. of Katherine Vezin, ¶4 (Ex. 16); Decl. of Clifford Blom, ¶4 (Ex. 17); Decl. of Timothy Hickey, ¶4 (Ex. 18); Decl. of Donna Moores, ¶4 (Ex. 19); Decl. of Lisa Graham, ¶4 (Ex. 20).

23.     The FDA-approved package insert that detailers provide is a lengthy disclosure of the drug's pharmacological properties, indications and contraindications for use, and known side effects.  The FDA controls the content and format of this document.  21 C.F.R. § 201.10 *et seq*. Although Wyeth detailers deliver the package insert for those products assigned to them, they

have no input into or control over the content of the package insert. Nor do detailers evaluate independently the accuracy of the package insert. *See* Decl. of Bridget Comeaux, ¶¶4-5 (Ex. 13); Decl. of Kimberly Tuckis, ¶¶4-5 (Ex. 14); Decl. of Mari Williams, ¶¶4-5 (Ex. 15); Decl. of Katherine Vezin, ¶¶4-5 (Ex. 16); Decl. of Clifford Blom, ¶¶4-5 (Ex. 17); Decl. of Timothy Hickey, ¶¶4-5 (Ex. 18); Decl. of Donna Moores, ¶¶4-5 (Ex. 19); Decl. of Lisa Graham, ¶¶4-5 (Ex. 20).

24.     Plaintiff purports to assert the following claims against the Detailer Defendants: strict liability; negligence; negligent misrepresentation; and fraud. Taking each in turn, there is no reasonable basis for any of these claims.

### There is No Reasonable Basis for the
### Strict Liability Claim against the Detailer Defendants

25.     Plaintiff has no possibility of recovery against the Detailer Defendants because Florida recognizes no cause of action for strict liability against this type of employee. The Detailer Defendants played no role in the design, manufacture, or testing of the hormone therapy drugs. *See* Decl. of Bridget Comeaux, ¶7 (Ex. 13); Decl. of Kimberly Tuckis, ¶7 (Ex. 14); Decl. of Mari Williams, ¶7 (Ex. 15); Decl. of Katherine Vezin, ¶7 (Ex. 16); Decl. of Clifford Blom, ¶7 (Ex. 17); Decl. of Timothy Hickey, ¶7 (Ex. 18); Decl. of Donna Moores, ¶7 (Ex. 19); Decl. of Lisa Graham, ¶7 (Ex. 20). Nor were they involved in the development of the package inserts or any other information provided to the physicians. *See* Decl. of Bridget Comeaux, ¶4 (Ex. 13); Decl. of Kimberly Tuckis, ¶4 (Ex. 14); Decl. of Mari Williams, ¶4 (Ex. 15); Decl. of Katherine Vezin, ¶4 (Ex. 16); Decl. of Clifford Blom, ¶4 (Ex. 17); Decl. of Timothy Hickey, ¶4 (Ex. 18); Decl. of Donna Moores, ¶4 (Ex. 19); Decl. of Lisa Graham, ¶4 (Ex. 20). In dismissing similar

claims against Wyeth sales representatives in a diet drug case, the Orange County Circuit Court held:

> I . . . am not convinced that an individual person who is an employee of a pharmaceutical manufacturer, as these individuals were alleged to be, can be held liable on either strict liability [failure to warn or defective design]. There are no public policy reasons I can see to hold such individuals strictly liable since I doubt they have any input whatsoever in the design of a prescription drug or the drafting of warnings. If such a cause of action exists, it will have to be declared by an appellate court of this state.

*Geiras v. Am. Home Prods. Corp.*, No. CI 01-10866, slip op. at 2 (Orange Co., Fla. Cir. Ct. Mar. 18, 2003) (Ex. 9); *see Petty*, slip op. at 7-8, n.6 (Ex. 3); *Lewis*, slip op. at 7-8, n.6 (Ex. 4); *Fowler*, slip op. at 8-9, n.7 (Ex. 5). Thus, Plaintiff cannot recover under a theory of strict liability.

### There is No Reasonable Basis for the Negligence and Negligent Misrepresentation Claims against the Detailer Defendants

26.     The Detailer Defendants cannot be liable for negligence and negligent misrepresentation because they owed no independent duty to Plaintiff or her prescriber. *See Petty*, slip op. at 7-8, n.6 (Ex. 3); *Lewis*, slip op. at 7-8, n.6 (Ex. 4); *Fowler*, slip op. at 8-9, n.7 (Ex. 5). As the supplier of hormone therapy drugs, Wyeth owed a duty to disclose and warn about known or foreseeable side effects. It fulfilled this duty with, among other things, detailed warnings in the package inserts and letters sent directly to physicians and other licensed health care providers. Even if Wyeth had not done so, however, a sales representative would not individually be liable for Wyeth's failure to warn or for its negligent misrepresentations.[4]

27.     Wyeth does not contend that an employee is immune from liability for all negligence or other torts committed while on the job. But "[w]ithout the element of duty, there

---

[4] Plaintiff would apparently hold the Detailer Defendants accountable for failing to warn Plaintiff directly, as opposed to warning her physician. *See, e.g.*, Complaint ¶ 80. These claims fail for the additional reason that they are barred by Florida's learned intermediary doctrine. *See Felix v. Hoffman-LaRoche, Inc.*, 540 So. 2d 102, 104 (Fla. 1989).

is no cause of action for negligence." *City of Miami Beach v. Dickerman Overseas Contracting Co.*, 659 So. 2d 1106, 1107 (Fla. 3d DCA 1995). To be individually liable, an employee or agent "must be alleged to have acted tortiously in his individual capacity," *White-Wilson Medical Center v. Dayta Consultants, Inc.*, 486 So. 2d 659, 661 (Fla. 1st DCA 1986) – *i.e.*, to have breached "an independent duty of reasonable care to the injured party apart from the employer's duty." *Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex. 1996). Employees or agents are liable as joint tortfeasors only "[t]o the extent that they aid in producing something which they should realize is likely to harm others." Restatement (Second) of Agency § 350, cmt. c (1958), *cited in Kerry's Bromeliad Nursery v. Reiling*, 561 So. 2d 1305, 1307 (Fla. 3d DCA 1990); *see also* 27 Am. Jur. 2d, Employment Relationship § 488 ("[T]he fact that an employee was acting under directions will . . . protect him from liability for the employer's negligence unless the employee knew or had reason to know that the acts were . . . liable to cause injury.").

28.    In this case, the Detailer Defendants could not possibly have owed an independent duty of reasonable care. They had no control over the content of the FDA-approved (and FDA-mandated) package insert or other warnings and instructions they supplied to physicians on behalf of Wyeth. What they knew about the products, and hence what they could convey to physicians, was what Wyeth told them. They had no reason to doubt the conclusions of Wyeth and FDA medical professionals that hormone therapy drugs were safe and effective. *See* Decl. of Bridget Comeaux, ¶5 (Ex. 13); Decl. of Kimberly Tuckis, ¶5 (Ex. 14); Decl. of Mari Williams, ¶5 (Ex. 15); Decl. of Katherine Vezin, ¶5 (Ex. 16); Decl. of Clifford Blom, ¶5 (Ex. 17); Decl. of Timothy Hickey, ¶5 (Ex. 18); Decl. of Donna Moores, ¶5 (Ex. 19); Decl. of Lisa Graham, ¶5 (Ex. 20).

29.     Every pharmaceutical company employee who promotes a prescription drug represents, explicitly or implicitly, that the drug is safe and effective for its FDA-indicated use. To suggest that field sales representatives have an independent duty to warn physicians and to second-guess the FDA's conclusions – absent any knowledge that the products they detail are unsafe – would expose them to staggering personal liability for doing their jobs.[5]   In sum, Plaintiff has no reasonable basis for her negligence claims against the Detailer Defendants.

### There is No Reasonable Basis for the Fraud Claims against the Detailer Defendants

30.     The fraud count of the Complaint alleges that the Defendants *intentionally* made misrepresentations to plaintiff Patricia Childress' prescribing physician regarding the safety and efficacy of hormone replacement drugs.  This claim, too, fails.   First, plaintiff has failed to plead fraud with particularity.  *See* Fed. R. Civ. P. 9(b); Fla. R. Civ. P. 1.120(b); *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997); *Bankers Mut. Capital Corp. v. U.S. Fidelity and Guar. Co.*, 784 So. 2d 485, 490 (Fla. 4th DCA 2001) (Plaintiff must allege "who made the false statement, the substance of the false statement, the time frame in which it was made and the context in which the statement was made.").  The complaint fails to allege with particularity what statements any of the Detailer Defendants made, to whom, and when.[6]  The MDL Court in *In re Diet Drugs*, on several occasions, has found that such failure to

---

[5] Additionally, the Detailer Defendants are not involved in "marketing" Wyeth's hormone therapy drugs, if the term "marketing" is understood in its customary sense as "selling" a product.  Rather they merely serve as a conduit of information between their employer, Wyeth, and the physicians.

[6] Plaintiff's claim for negligent misrepresentation suffers the same pleading defect.  *See Robertson v. PHF Life Ins. Co.*, 702 So. 2d 555, 556 (Fla. 1st DCA 1997) (plaintiff "fails to specifically identify misrepresentations or omissions of fact, the time, place or manner in which they were made, and how the representations were false or misleading."); *see also Morgan v. W.R. Grace & Co.*, 779 So. 2d 503, 506 (Fla. 2d DCA 2000).

plead these claims with particularity indicates that the sales representatives are fraudulently joined. *See In re Diet Drugs*, 220 F. Supp. 2d at 424-25; *Amiker v. Wyeth*, PTO 3391, slip op. at 10 (E.D. Pa. Apr. 2, 2004) (Ex. 10); *Chambliss v. Wyeth*, PTO 3533, slip op. at 8 (E.D. Pa. May 17, 2004) (Ex. 11); *Bishop v. Wyeth*, PTO 3536, slip op. at 10 (E.D. Pa. May 18, 2004) (Ex. 12). Other courts similarly have relied on such a failure to determine that defendants are fraudulently joined. *See Allen v. Tyson Foods, Inc.*, 153 F. Supp. 2d 886, 889-90 (S.D. Miss. 2001); *In re Rezulin*, 133 F. Supp. 2d at 283; *Jacobson v. Ford Motor Co.*, 1999 WL 966432 at *4 (N.D. Ill. Sep. 30, 1999).

31.     Second, the fraud count fails because the Detailer Defendants have averred not only that they made no misrepresentations regarding hormone therapy drugs, but also that they had no independent basis for knowledge about the drugs apart from the information supplied to them by Wyeth. *See* Decl. of Bridget Comeaux, ¶¶5-7 (Ex. 13); Decl. of Kimberly Tuckis, ¶¶5-7 (Ex. 14); Decl. of Mari Williams, ¶¶5-7 (Ex. 15); Decl. of Katherine Vezin, ¶¶5-7 (Ex. 16); Decl. of Clifford Blom, ¶¶5-7 (Ex. 17); Decl. of Timothy Hickey, ¶¶5-7 (Ex. 18); Decl. of Donna Moores, ¶¶5-7 (Ex. 19); Decl. of Lisa Graham, ¶¶5-7 (Ex. 20).  Plaintiff has not provided, and cannot provide, any evidence to the contrary.

32.     Finally, as found by the Middle and Northern Districts of Florida, there is no reasonable basis for Plaintiff's fraud claims against the Detailer Defendants. The Northern and Middle Districts have held that the plaintiffs did not have a fraudulent misrepresentation or concealment cause of action against the sales representatives because they did not sell or distribute the diet drug. *See generally, Petty*, slip op. at 7-8, n.6 (Ex. 3); *Lewis*, slip op. at 7-8, n.6 (Ex. 4); *Fowler*, slip op. at 8-9, n.7 (Ex. 5); *Sobkowski*, slip op. at 12-13. (Ex. 6).  Like the sales representatives in *Petty, Lewis, Fowler* and *Sobkowski*, the Detailer Defendants here did not sell

or distribute the hormone therapy drug to Plaintiff or her physicians.  Consequently, Plaintiff in this case is no different from the plaintiffs in *Petty, Lewis, Fowler* and *Sobkowski* and there is no reasonable basis for her fraud claims.

## THE AMOUNT-IN-CONTROVERSY
## REQUIREMENT IS SATISFIED

33.    Where, as here, the jurisdictional amount is not alleged, it can nevertheless be determined when it is "facially apparent" from the complaint itself.  *Williams v. Best Buy Co.*, 269 F.3d 1316, 1319 (11th Cir. 2001) (holding that district court may consider whether jurisdictional amount is "facially apparent" from the complaint).  A court may also consider the removal notice and post-removal evidence concerning the amount in controversy.  *See id.*

34.    Plaintiff seeks compensatory damages arising out of the use of hormone therapy drugs.  The face of the Complaint makes clear that plaintiff seeks damages in excess of $75,000, as Plaintiff alleges that she "developed invasive breast cancer requiring a needle biopsy, mastectomy with axillary node dissection, post-surgical complications including pulmonary emboli and oncological treatment as a result of her ingestion of Defendants' hormone replacement drugs."  Complaint, ¶ 63.

35.    Reported verdicts and settlements in cases where the alleged injury is breast cancer indicate that damages in such cases exceed $75,000.  *See Rozar v. Kaiser Foundation Healthcare*, 21 No. 8 Verdict Settlements & Tactics ("VST") 348 (Westlaw 2000) ($842,680 arbitration award for delay in diagnosing breast cancer); *Howstow v. Rosenburg*, 21 No.2 VST 65 (Westlaw 2000) ($750,000 verdict in suit alleging failure to diagnose breast cancer); *Mathews v. Bloy*, 19 No.4 VST 141 (Westlaw 1999) ($400,000 awarded in suit alleging failure to diagnose breast cancer); *Ruffin v. Medical Ctr. Radiology Group*, 15 No.7 VST 238 (Westlaw 1995) ($2.6

million awarded to plaintiff in suit alleging failure to diagnose breast cancer); *Greeley v. Slepian*, 12 No. 8 VST 280 (Westlaw 1992) ($1.4 million arbitration award for failure to diagnose breast cancer).

36.    It is also "facially apparent" that the amount in controversy far exceeds $75,000 due to allegations further in the complaint. Plaintiff avers that she "has suffered and continues to suffer from serious injuries, including, but not limited to, pain and suffering, physical injuries, disability, significant disfigurement, embarrassment, mental anguish, loss of capacity for the enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings, loss of the ability to earn money in the future, and a shortened life span." Complaint, ¶ 65. These alleged injuries are at least as serious as others that have been found to satisfy the amount in controversy. For example, in *Gebbia v. Wal-Mart Stores*, 233 F.3d 880, 888 (5th Cir. 2000), the Fifth Circuit found that alleged damages in a slip and fall case for "medical expenses, physical pain and suffering, mental anguish and suffering, loss of enjoyment of life, loss of wages and earning capacity, and permanent disability and disfigurement" met the jurisdictional amount. S*ee also Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 298 (5th Cir. 1999) (finding damages to property, travel expenses, emergency ambulance trip, 6-day hospitalization, pain and suffering, humiliation, and an inability to do housework met jurisdictional amount).

37.    Thus, the state court action may be removed to this Court by defendant Wyeth in accordance with the provisions of 28 U.S.C. § 1441(a) because (i) this action is a civil action pending within the jurisdiction of the United States District Court for the Southern District of Florida; (ii) excluding the fraudulently joined defendants, this action is between citizens of different states; and (iii) the amount in controversy exceeds $75,000, exclusive of interest and costs.

## MULTIDISTRICT LITIGATION

38.     On March 4, 2003, the Judicial Panel on Multidistrict Litigation granted a motion to consolidate pursuant to 28 U.S.C. § 1407, created *In re Prempro Products Liability Litigation*, MDL-1507, and transferred all Prempro litigation to the Eastern District of Arkansas (Judge William R. Wilson).  Wyeth will identify this removed case as a "tag-along" action, and it can be expected that the Panel will shortly issue a Conditional Transfer Order transferring this case to the Eastern District of Arkansas.

## FILING OF REMOVAL PAPERS

39.     Pursuant to 28 U.S.C. § 1446(d), written notice of the removal of this action will be promptly served to plaintiff's counsel, and a Notice of Filing of Notice of Removal is simultaneously being filed with the Clerk of the Circuit Court in and for St. Lucie County, Florida.

**WHEREFORE**, Wyeth hereby removes the above-captioned action from the Circuit Court in and for St. Lucie County, Florida, and requests that further proceedings be conducted in this Court as provided by law.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was furnished by U. S. Mail on this 24th 23rd day of May, 2006 to: JOYCE & REYES, 307 Hyde Park Avenue, Tampa, FL 33606-2233

and  BRENDA  S.  FULMER,  ESQ.,    ALLEY,  CLARK,  GREIVE    &  FULMER,  701    E.

Washington  Street, P.O. Box 3127, Tampa, FL 33601-3127, Attorneys for Plaintiff.

COONEY,     MATTSON,     LANCE,     BLACKBURN,
RICHARDS & O'CONNOR
Attorneys for Wyeth
1600 W. Commercial Boulevard
Suite 200
Ft. Lauderdale, FL  33309
(954) 568-6669 Telephone
(954) 568-0085 Facsimile

By: _____
ACE J. BLACKBURN, JR., ESQUIRE
FLA. BAR NO. 347140
ablackburn@cmlbro.com

WARREN KWAVNICK, ESQUIRE
FLA. BAR NO. 94684
wkwavnick@cmlbro.com

# EXHIBIT 1

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

      Plaintiff,

vs.

WYETH, INC.; WYETH
PHARMACEUTICALS, INC.;
ESI LEDERLE; PFIZER, INC.;
PHARMACIA & UPJOHN COMPANY
LLC; PHARMACIA & UPJOHN LLC;
PHARMACIA CORPORATION;
BRIDGET COMEAUX; KIMBERLY
TUCKIS; MARI WILLIAMS;
KATHERINE VEZIN; MICHAEL
SULLIVAN; CLIFFORD BLOM;
TIMOTHY HICKEY; DONNA
MOORES; and LISA GRAHAM

      Defendants.

_____/

Case No.: 06CA000341 /AL

Division: _____

**Assigned To
Judge Bryan**

## COMPLAINT

Plaintiff, MARIA IPPOLITO, sues Defendants, WYETH, INC., WYETH PHARMACEUTICALS, INC., ESI LEDERLE, PFIZER, INC., PHARMACIA & UPJOHN COMPANY, LLC, PHARMACIA & UPJOHN LLC, PHARMACIA CORPORATION, BRIDGET COMEAUX; KIMBERLY TUCKIS; MARI WILLIAMS; KATHERINE VEZIN; MICHAEL SULLIVAN; CLIFFORD BLOM; TIMOTHY HICKEY; DONNA MOORES; and LISA GRAHAM, and alleges as follows:

## GENERAL ALLEGATIONS

1.      This is an action for damages in excess of fifteen thousand ($15,000) dollars.

2.      Plaintiff, MARIA IPPOLITO, is currently a resident of St. Lucie West, St. Lucie County, Florida.

3.      Premarin, Provera, Prempro, as well as other name brand and generic drugs containing estrogen, progestin, and/or medroxyprogesterone acetate (hereafter MPA) are hormone replacement drugs (hereafter referred to as "hormone replacement drugs") that were widely advertised and promoted during all relevant times by Defendants in the State of Florida and elsewhere.

4.      Upon information and belief, and at all times material, Defendant WYETH, INC. and its divisions, WYETH PHARMACEUTICALS, INC. and ESI LEDERLE (hereafter "WYETH"), was a Delaware corporation with its principal places of business in Madison, New Jersey and Collegeville, Pennsylvania.  At all times material hereto, Defendant WYETH was authorized to and did conduct business within the State of Florida, and was in the business of developing, manufacturing, selling, distributing, labeling, marketing and/or promoting hormone replacement drugs, including Prempro, Premarin and products containing estrogen, progestin and medroxyprogesterone acetate for consumer use by prescription.

5.      Upon information and belief, and at all times material, Defendant PFIZER, INC. (hereafter "PFIZER") was a Delaware corporation with its principal place of business in New York, New York.  At all times material hereto, Defendant PFIZER was authorized to and did conduct business within the State of Florida, and was in the business of developing, manufacturing, selling, distributing, labeling, marketing and/or promoting hormone replacement drugs, including products containing estrogen, progestin, and/or medroxyprogesterone acetate

for consumer use by prescription, including Provera.  Upon information and belief PFIZER has merged with PHARMACIA & UPJOHN COMPANY LLC, PHARMACIA & UPJOHN LLC and PHARMACIA CORPORATION and, as a result PFIZER is legally and factually responsible for all obligations, debts and liabilities of these three entities.  PFIZER is the successor in interest (and therefore the real party in interest) to the three companies.  More specifically, PFIZER wholly owns PHARMACIA CORPORATION, which is the sole member of the limited liability company, PHARMACIA & UPJOHN LLC, which is the sole member of the limited liability company, PHARMACIA & UPJOHN COMPANY LLC.  The term "PFIZER," when used herein, refers to PFIZER, Inc and each of these related companies.

6.      Upon information and belief, and at all times materials, Defendant PHARMACIA & UPJOHN COMPANY LLC (hereafter "PHARMACIA") was a Delaware corporation with its principal place of business in New York.  Defendant, PHARMACIA, is a limited liability company whose sole member is PHARMACIA & UPJOHN LLC, which is a limited liability company whose sole member is PHARMACIA CORPORATION, which is a subsidiary of PFIZER, INC.  At all times material hereto, Defendant PHARMACIA was authorized to and did conduct business within the State of Florida, and was in the business of developing, manufacturing, selling, distributing, labeling, marketing and/or promoting hormone replacement drugs, including medroxyprogesterone acetate for consumer use by prescription, including Provera.

7.      Defendant PHARMACIA & UPJOHN LLC, is a limited liability company whose sole member is PHARMACIA CORPORATION, which is a subsidiary of PFIZER, INC. PHARMACIA & UPJOHN LLC is the sole member of the limited liability company PHARMACIA & UPJOHN COMPANY LLC.  PHARMACY & UPJOHN LLC is a Delaware

3

company with its principal place of business in New York. PHARMACIA & UPJOHN LLC, at all relevant times, was licensed to do business in all states of the United States of America. At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs including the drug Provera, generic estrogen (including but not limited to FemHrt and Vagifem), and generic medroxyprogesterone acetate (MPA) and combination products (including Activella) for ultimate sale and/or use in the United States of America.

8. Defendant PHARMACIA CORPORATION is a wholly owned subsidiary of PFIZER, INC. and is the sole member of the limited liability company PHARMACIA & UPJOHN LLC, which is a sole member of the limited liability company PHARMACIA & UPJOHN COMPANY LLC. PHARMACIA CORPORATION is a New York corporation with its principal place of business in the state of New York. PHARMACIA CORPORATION, at all relevant times, was licensed to do business in all states of the United States of America. At all relevant times, this Defendant was engaged in the design, manufacture, production, testing, inspection, mixture, labeling, marketing, advertising, sales, promotion and/or distribution of hormone therapy drugs including the drug Provera, generic estrogen (including but not limited to FemHrt and Vagifem), and generic medroxyprogesterone acetate (MPA) and combination products (including Activella) for ultimate sale and/or use in the United States of America.

9. Upon information and belief, Defendants, BRIDGET COMEAUX, a resident of Florida; KIMBERLY TUCKIS, a resident of Pinellas County, Florida; MARI WILLIAMS, a resident of Brevard County, Florida; KATHERINE VEZIN, a resident of Florida; MICHAEL SULLIVAN, a resident of Florida; CLIFFORD BLOM, a resident of Florida; TIMOTHY HICKEY, a resident of Florida; DONNA MOORES, a resident of Florida; and LISA

4

GRAHAM, a resident of Florida, were sales representatives employed by Defendants WYETH, WYETH PHARMACEUTICALS, and/or its subsidiaries or divisions to promote, market, sell, distribute, and warn of the risks of Premarin, Prempro, Provera as well as other name brand and generic drugs containing estrogen, progestin, and/or medroxyprogesterone acetate to physicians in the State of Florida, including Plaintiff's prescribing physician.

10.     Hormone Therapy medication is marketed to women who are going through menopause or have become fully menopausal. Menopause is part of the natural aging process when a woman's body produces a significantly reduced volume of natural hormones including Progesterone and estrogens. The physical symptoms of menopause created by decreased levels of estrogen and progesterone include mood swings, hot flashes, loss of bone density, depression, irritability, night sweats and forgetfulness. These symptoms range from being disabling for some women to a minor inconvenience for other women.

11.     In 1942, Ayerst, the predecessor to Wyeth and Wyeth Pharmaceuticals, (hereafter collectively Wyeth) received approval for Premarin. Premarin is a conjugated equine estrogen made from the urine of pregnant mares. Premarin has remained chemically unchanged to this day. At all material times, Wyeth has marketed Premarin as a hormone "replacement" product, as it was intended to restore the natural human ovarian hormones, which include several forms of estrogen.

12.     Since 1942, Wyeth has vigorously promoted its menopausal hormone therapy products using a variety of marketing messages that emphasize long-term use of these medications.

13.     By way of example, the 1973 key marketing statement for Premarin was "start her on, keep her on." Even as late as 1991, Wyeth still represented that "protection continued only as long as estrogen therapy continued."

14.     To deliver this message to patients and doctors, Wyeth has used at least the following marketing methods:

    A.     Sponsoring medical journal articles;
    B.     Having detailing/sales representatives call on physicians;
    C.     Sponsoring continuing medical education programs;
    D.     Hiring doctors to speak to other doctors one on one or in small group meetings;
    E.     Issuing press releases;
    F.     Advertising directly to consumers;
    G.     Advertising to physicians in medical journals and materials; and
    H.     Sponsoring medical and pseudo-medical organizations to make statements.

15.     Defendants have also extensively represented through the methods listed above, the negative health effects of menopause ranging from symptoms like hot flashes, night sweats and mood changes to an increased risk of life changing and life threatening conditions like cardiovascular problems, osteoporosis and dementia. Through their marketing and advertising efforts, Defendants have convinced doctors and patients that menopause was not the natural process of aging, but instead turned this process into a disease in need of drug treatment.

16.     Wyeth's attempts to disguise menopause as a disease started decades ago. In 1962, Dr. Robert Wilson, a New York gynecologist, published an article in the *Journal of the American Medical Association (JAMA)* that claimed estrogen taken during menopause could *reduce* breast and genital cancers.

17.     In 1966, Dr. Wilson also published a best-selling book entitled *Feminine Forever*, where he described estrogen as the "cure" for "the tragedy of menopause." Dr. Wilson asserted

that estrogen *prevents* breast and genital cancers.  There was no reliable science to support his assertions.

18.     Unbeknownst to readers, Dr. Wilson was paid by Wyeth to write, publish, promote and market *Feminine Forever,* and the book was nothing more than a promotional piece for Wyeth's estrogen products.

19.     Soon after the publication, Wyeth's sales force began to distribute Dr. Wilson's book to physicians throughout the country, and Wyeth spent thousands of dollars supporting Dr. Wilson's promotional tour.  As a result of Wyeth's covert and overt marketing efforts, sales of Premarin increased dramatically.

20.     In 1974 and 1975, Wyeth also advertised that Premarin could be used as an alternative to tranquilizers for treating mild depression caused by menopause.  No clinical studies or reliable science supported these representations.

21.     Further, in a print advertisement that Wyeth published in the October 13, 1975, edition of JAMA, Wyeth claimed that Premarin can relieve "tension, irritability, headaches, undue fatigue, depression and insomnia" caused by declining menopausal estrogen levels.  At the top of the advertisement, in large print, Wyeth advised doctors, "Almost any tranquilizer might calm her down... but at her age, estrogen may be what she really needs."  The 1975 advertisements also stated: "In the treatment of middle-aged depression, there may be one thing to add... Premarin."  No clinical studies or reliable science supported these representations.

22.     In 1977, the Food & Drug Administration (FDA) issued a statement confirming that estrogen therapy should not be used to treat simple nervousness during menopause and that there was no scientific support for any representation that such therapy could keep a woman feeling young or keep her skin soft.

23.     By the mid-1970s, more than thirty million prescriptions for Premarin were being written every year, later making it the fifth most frequently prescribed drug in the United States.

24.     During the same period, a hormone health epidemic arose.  Two 1975 articles in the *New England Journal of Medicine* linked estrogen therapy to a significantly increased risk of endometrial cancer.  Doctors stopped prescribing Premarin to any woman with an intact uterus.  Estrogen sales plummeted.  By 1979, the only approved use of estrogen was for treatment of hot flashes and vaginal dryness.

25.     In 1979, Dr. Robert Greenblatt published an article in the *Journal of Geriatric Society* that reported that "estrogen related uterine cancer can be avoided if progesterone is added to the regimen."  Wyeth and the other drug manufacturers immediately started promoting estrogen with an added progesterone component that together are know as combination hormone therapy.

26.     To obtain a patent on prescription progesterone, Pfizer developed a synthetic hormone product called medroxyprogesterone acetate ("MPA") that Pfizer marketed under the brand name Provera.  MPA has a different chemical makeup and a different effect than the natural hormone, progesterone, which is not patentable.

27.     Pfizer (and later generic MPA manufacturers) knew that Provera (and subsequent generic MPAs) did not have the same benefits as progesterone but had dramatically greater risks.  Nevertheless, at least from the early 1980s until 1995, Defendants promoted, marketed and encouraged the prescribing of Premarin or a generic estrogen in combination with Provera or a generic MPA.  For instance, in 1985, Pfizer's advertising campaign for Provera included a color advertisement featuring Premarin and Provera as the preferred hormone therapy combination.

28.     Defendants created generic estrogen products as well as generic MPA products for use in combination hormone therapy.  Despite having sufficient information to know that combination hormone therapy exposed patients to even greater risks than either prescription drug alone, Defendants avoided fully studying the risks and therefore never had enough information to tell doctors or the public the truth about these risks.

29.     Defendants represented to doctors, patients and the public that estrogen and combination hormone therapy drugs could prevent or reduce cardiovascular disease. Defendants' sales representatives encouraged doctors to prescribe hormone therapy even if a woman was not having menopausal symptoms because of the therapy's purported cardiac benefits.

30.     In fact, reliable scientific evidence has never supported these supposed benefits. Nevertheless, Defendants have recommended that physicians prescribe these hormone drugs in order to provide patients with purported cardiac protection.

31.     As a result of Wyeth's marketing efforts, between 1990 and 1995, Premarin became the most frequently dispensed prescription drug in the United States.  All Defendants saw dramatic increases in sales and profits.  Increased sales arose from marketing efforts aimed at promoting combination use of hormone therapy drugs without ever adequately warning of the risks.

32.     For example in 1991, Defendants were aware that patients with a family history of breast cancer had a greater than three-fold increased risk of developing breast cancer from combination hormone therapy.  Defendants took steps to suppress the publication of this data and never publicly informed physicians of these statistics.   No defendant ever put a warning or

contraindication in their hormone drugs' labeling to advise doctors of this dramatically increased risk for their patients with a family history of breast cancer.

33.     Another example of over-promotion occurred around 1993 when Wyeth distributed a videotape to consumers entitled, "*What every woman should know about Estrogen.*" This videotape claimed to be a "seminar for women." It depicted a female doctor advising women about menopause and hormone therapy. Wyeth's video "seminar" warned of a wide variety of illnesses and ailments purportedly associated with menopause. Among other things, Wyeth represented that estrogen loss causes bones to become "brittle," skin to become "dryer" and sexual intercourse to become "painful and irritating." While Wyeth's video was exhaustive in its warnings about menopause, it glossed over the dangers and risks associated with hormone therapy. In its video, Wyeth also represented that estrogen provides "long-term health protection" and should be continued indefinitely, even after short-term menopausal symptoms, such as hot flashes, have subsided. When asked in the video how long Premarin should be taken, a Wyeth doctor/spokesperson responded "anywhere from five to ten years in order to get protection from long-term problems." Regarding breast cancer risk, Wyeth told women that the benefits of taking estrogen "far outweigh" the risks for women, unless they faced a particularly high risk of breast cancer.

34.     In 1985, Wyeth put a new spin on the marketing of hormone therapy drugs by claiming that the drugs could help prevent bone loss. Wyeth hired a public relations firm to create public awareness of osteoporosis. After Wyeth learned that 77% of women had never heard of osteoporosis, Wyeth's public relations campaign moved into high gear to persuade women that osteoporosis is a devastating disease they should treat with Wyeth's drug, Premarin.

35.     Wyeth's public relations campaign created support for a National Osteoporosis Week and eventually for a National Osteoporosis Foundation (to which Wyeth financially contributed.).

36.     In 1994, Wyeth got approval for its next marketing blockbuster: combination hormone therapy in a single pill. Prempro is an oral medication that combines the estrogenic compound CEE with the progestin MPA in a single pill taken one time per day. A similar Wyeth product containing the same combination of compounds is brand named Premphase. Premphase delivers both CEE and MPA for only part of the monthly regime and then CEE alone without the MPA component for the rest of the month. Wyeth now had multiple hormone therapies in the "Premarin family of products" to market and promote.

37.     Defendants have consistently downplayed studies isolating risks of hormone therapy. For example, in 1996, European scientists and researchers found that women with vertebral fractures had a 4.6 times (460%) increased risk of developing breast cancer if they took combination hormone therapy. These scientists felt that the risk of breast cancer associated with hormone replacement therapy had been substantially underestimated since osteoporosis is a primary indication for its use. Defendants started a "dismissive strategy" to "dismiss and distract" the U.S. Press from covering these findings and made concerted efforts to keep the study results isolated in Europe. Defendants never informed physicians about this dramatically increased risk for patients with bone mass density problems, fractures or osteoporosis. Instead, Defendants promoted hormone therapy as something that could prevent osteoporosis and encouraged doctors to prescribe the drugs to these high risk patients.

38.     Soon after the introduction of Prempro, Wyeth agreed to fund a four-year heart disease prevention trial called "HERS: Heart and Estrogen/Progestin Replacement Study."

Wyeth touted the study as one that would show that Prempro prevents heart disease in women who are at high risk.  Wyeth was seeking FDA approval of the use of Prempro to prevent or reduce the risk of heart disease.  But in 1998, the HERS investigators reported that hormone therapy did not reduce the rate of coronary heart disease events in women with heart disease.  In fact, HERS demonstrated that hormone therapy dramatically increases the risk of heart disease and heart attacks in those women, especially during the first year.  Wyeth and its sales representatives responded by minimizing or ignoring the HERS results and failing to inform Plaintiff, her doctors or the public of this important safety information.

39.     With no reliable science to support its assertions, Wyeth continued an aggressive marketing plan by promoting hormone therapy directly to women.  For example, beginning in early 1999, Wyeth distributed a brochure to women through the waiting rooms of physicians' offices that claimed, "Menopause isn't gone in a flash – its debilitating consequences can affect the rest of your life."  The promotional brochure also directed women to "take a few minutes to think about the rest of your life" and listed a number of conditions which neither Prempro nor Premarin had been approved by the FDA to treat, including Alzheimer's disease, vision problems, tooth loss, heart disease and colon cancer.

40.     By the late 1990s and early in 2000, Defendants knew about studies showing a significantly increased risk of breast cancer for women using combination hormone therapy.  Indeed, studies showed a greater than four-fold (400%) increased risk of breast cancer.  Despite this knowledge, defendants (including Wyeth) minimized the risk in their package insert by assuring doctors the risk was modest at most, with some studies showing no risk.  Defendants' representations were false and misleading and were intended to downplay the cancer risks associated with hormone therapy.

12

41.     A cornerstone of Wyeth's marketing program was the promotion of hormone therapy for long-term use in indefinite duration.  Specifically *JAMA* reported that:

> In 2000, 46 million prescriptions were written for Premarin (conjugated estrogens), making it the second most frequently prescribed medication in the United States and accounting for more than $1 billion in sales, and 22.3 million prescriptions were written for Prempro (conjugated estrogens plus medroxyprogesterone acetate).   While US Food and Drug Administration-approved indications for hormone therapy include relief of menopausal symptoms and prevention of osteoporosis, *long-term use has been in vogue to prevent arrange of chronic conditions, especially heart disease* (emphasis added).

42.     Wyeth continually pressed the FDA to approve the use of Prempro to prevent or reduce the progression of heart disease in post-menopausal women.  The FDA denied Wyeth's requests because the Agency did not believe there was sufficient scientific evidence to support such an indication/use of the drug, given the absence of reliable science from a controlled study to support Wyeth's assertions.  Even though the FDA refused to approve the use of Prempro to prevent development of heart disease, Wyeth continued to promote Prempro as having this benefit and even represented to physicians that Prempro reduced cardiovascular mortality by 50%.

43.     In the early 1990s, the Women's Health Initiative ("WHI") Study began. Conducted by the National Institutes of Health (NHI) and supported by Wyeth, this large-scale, controlled study was undertaken to confirm Prempro's heart, osteoporosis and mental cognition benefits.

44.     While Wyeth waited for the WHI study researchers to collect their data and reach their conclusions, Wyeth's overzealous hormone therapy marketing effort continued.   For instance, at least until mid-2002, Wyeth distributed a hormone therapy promotional brochure

targeted to women.  The front cover states: "Starting your Hormone Replacement Therapy (HRT)" and encouraged a woman to "Say yes to PREMPRO."  The brochure featured testimonial statements from women taking Prempro, such as "I wanted an HRT that was established, time tested, and had successful track record.  I'm delighted with PREMPRO" and "With PREMPRO, I know I've taken action to protect my health – and that's truly empowering." The unbalanced nature of Wyeth's marketing efforts is seen in the inadequate warnings contained in the "Side Effects" section of Wyeth's "Say yes to PREMPRO" brochure.  In the warnings section, Wyeth describes only the risk of uterine cancer (associated with estrogen-only therapy), worsening diabetes, nausea, abdominal pain, irregular bleeding, headache, hair loss and breast tenderness.

45.    On July 9, 2002, the National Heart, Lung and Blood Institute ("NHLBI"), a federal agency and part of the National Institutes of Health ("NIH"), halted the WHI study because the investigators concluded that, under the circumstances, the risks of taking Prempro outweighed its benefits.  The scientific papers discussing the results of the WHI study provided the most comprehensive published data evaluating the risks and benefits of this drug combination of CEE and MPA.  In July 2002, the published results of the WHI provided the scientific and medical communities with important (although preliminary) information as to the varied and overwhelming risks associated with hormone therapy.  Since July 2002, there have been a number of additional findings and studies published.  Other studies evaluating these risks are currently ongoing.

46.    The Women's Health Initiative (WHI) focused on defining the risks and benefits of strategies that could potentially reduce the incidence of heart disease, breast and colorectal cancer, and fractures in post-menopausal women.  Between 1993 and 1998, the WHI enrolled

161,809 post-menopausal women volunteers between 50 and 79 years old. The study was conducted at 40 clinical centers in the United States and was scheduled to last for 15 years. Participants in the combination therapy arm of the WHI study received Prempro because it contained both the progestin MPA as well as the estrogenic compound Premarin. The Prempro arm of the WHI involved 16,608 women, ages 50 and 79 years, with an intact uterus. An important objective of the trial was to examine the effect of this combination pill on the prevention of heart disease and hip fractures, and any associated change in risk for breast and colon cancer.

47. In both 2000 and 2001, WHI investigators complied with a recommendation from the study's Data and Safety Monitoring Board (DSMB) to inform participants of a small increase in heart attacks, strokes, and blood clots in women taking hormones. The DSMB, an independent advisory committee charged with reviewing results and ensuring participant safety, found that the actual number of women having anyone of these events was small and did not cross the statistical boundary established to ensure participant safety. Therefore, the group recommended continuing the trial.

48. At the DSMB's meeting on May 31, 2002, the data review confirmed that the number of cases of invasive breast cancer in the estrogen plus progestin group had crossed the boundary established as a signal of increased risk. The DSMB recommended on May 31, 2002 that the trial be stopped. This decision was based on the finding of increased breast cancer risk, supported by the evidence of overall health risks exceeding any benefits. Beginning July 8, 2002, participants received letters about the results, telling them they should stop ingesting study medications.

49.    The WHI Study found that, for the Prempro arm, when compared to placebo, there was an overall risk of the following adverse events:

      A. 41 percent increased in strokes;

      B. 29 percent increase in heart attacks;

      C. 200 percent increase in venous thromboembolism (blood clots);

      D. 22 percent increase in total cardiovascular disease; and

      E. 26 percent increase in breast cancer.

50.    The WHI Study concluded that the "overall health risks exceeded benefits from use of combined estrogen plus progestin for an average 5.2 year follow-up among health post-menopausal US women." The Study also found that the combination hormone regimen should not be initiated or continued for the primary prevention of coronary artery disease.

51.    The report from the WHI investigators on the estrogen plus progestin study was also important that it was quickly released to the public on July 9, 2002, as an expedited article on the *JAMA* website. In commenting on the study's findings, NHLBI Director, Dr. Claude Lenfant, was unequivocal in his own conclusions:

> The cardiovascular and cancer risks of estrogen plus progestin outweigh any benefits – and a 26 percent increase in breast cancer risk is too high a price to pay, even if there were a heart benefit. Similarly, the risks outweigh the benefits of fewer hip fractures.

52.    Dr. Jacques Rossouw, acting director of the WHI and lead author of the JAMA article, gave a straightforward summary of the risks of combination hormone therapy:

> The WHI results tell us that during 1 year, amount 10,000 post-menopausal women with a uterus who are taking estrogen plus progestin, *8 more will have invasive breast cancer, 7 more will have a heart attack, 8 more will have a stroke, and 18 more will have blood clots, including 8 with blood clots in the lungs,* than will a similar group of 10,000 women not taking these

hormones. This is a relatively small annual increase in risk for an individual woman. Individual women who have participated in the trial and women in the populations who have been on estrogen and progestin should not be unduly alarmed. However, even small individual risks over time, and on a population-wide basis, add up to **tens of thousands of these serious adverse health events** (emphasis added).

53.     Hormone drug therapy poses substantial health risks with little or no corresponding benefit. This is especially true of the use of estrogen combined with synthetic progestin. Manufacturing Defendants that sold only one part of the combination therapy (either an estrogen drug or generic MPA) promoted and marketed the combination therapy while knowing there was no scientific evidence supporting the safety or efficacy of the combination. Indeed, all Defendants knew (or should have known) of the significant risks associated with the combination therapy. However, all Manufacturing Defendants intentionally and knowingly marketed, promoted and encouraged the combination use of these two hormone drugs. No Defendant ever conducted a controlled, long-term or well-designed study to monitor or evaluate the risks of combination hormone therapy. No Defendant ever adequately or competently studied the relative effectiveness versus the risk of lowering the recommended dose of the combination drugs or of encouraging such combination use only for short durations. Defendants that manufactured generic estrogen or MPA drugs relied upon Wyeth's and Pfizer's research, representations and promotion, failed to conduct their own studies or research to establish the safety or efficacy of these drugs and failed to provide complete and accurate information about their products. Every defendant knew of the significant risks associated with combination therapy but failed to appropriately warn of such risks. These risks include breast cancer, ovarian cancer, heart attacks, strokes, deep vein thromboemboli, pulmonary emboli, gallbladder cancer and non-Hodgkin's lymphoma, among other side effects.

54.    Defendants had control over the design, assembly, packaging, marketing, advertising, manufacturing, labeling, warning, promotion, direct-to-consumer advertising, and/or sale of Premarin, Provera, Prempro, medroxyprogesterone acetate, and other hormone replacement drugs.

55.    Although Defendants knew or should have known that dangerous risks were associated with the use of Premarin, Provera, Prempro, medroxyprogesterone acetate, and other hormone replacement drugs, Defendants continued to manufacture, package, distribute, promote, sell and distribute these drugs without adequate warnings of the serious side effects and risks, so as to maximize sales and profits.

56.    The harm caused by the use of Premarin, Provera, Prempro, medroxyprogesterone acetate, and other hormone replacement drugs is a foreseeable harm based on the medical studies, and the Defendants' conduct exhibits such an entire want to care as to establish that their actions were a result of fraud, ill will, recklessness, gross negligence, or willful and intentional disregard of the Plaintiff's individual rights.

57.    Defendants provided inadequate warnings concerning hormone therapy as to breast cancer.  For instance, the Prempro warning mentioned the risk of breast cancer with conjugated estrogens (the Premarin component of Prempro) but emphasized that, with the addition of progestin, "the overall incidence of breast cancer does not exceed that expected in the general population."  The WHI study plainly reveals this warning is false, and Wyeth and all other Defendants knew or should have known it to be false for decades.  Sales representatives or detailers for Defendants falsely represented there was no cancer risk or a minimal risk associated with hormone therapy drugs.

58.     Substantial scientific evidence supports the link between hormone therapy and breast cancer.  For instance, in addition to the WHI study results, a United Kingdom study found the same connection.  The August 9, 2003 issue of *Lancet,* reported the conclusions reached by *The Million Women Study*, a major research effort funded by Cancer Research UK, that confirmed that current and recent hormone therapy increases a woman's chance of developing breast cancer, and that the risk increases with duration of use.  Scientists at the Cancer Research UK analyzed data from over one million women between the ages of 50 and 64.  Researchers found that post-menopausal women using combination hormone therapy were twice as likely to develop breast cancer as non-users (a 100% increase).  Using *The Million Women Study* data, it is estimated that hormone therapy has caused more than 100,000 additional and unnecessary breast cancers in the United States of America alone.

59.     Further, an article published in *JAMA* on June 25, 2003 supplemented the initial WHI results.  The data reveal that in addition to stimulating the growth of breast cancer, combination hormone therapy makes breast tumors harder to detect, leading to dangerous delays in diagnosis.  Breast abnormalities can develop soon after a woman starts taking hormone therapy.  Consequently, the study's findings raise questions about the safety of even short-term hormone use.  The same issue of *JAMA* featured an editorial by Dr. Peter H. Gann, a cancer epidemiologist at Northwestern University, who stated that this study represents "further compelling evidence against the use of combination estrogen plus progestin hormone therapy."

60.     In addition to the studies published in *JAMA, NEJM,* and other medical journals, a recent federal agency report also revealed that estrogen could be dangerous to women taking it as hormone therapy.  On December 11, 2002, the National Institute of Environmental Health

Sciences released its tenth annual report on carcinogens, which confirmed that estrogen is a "known human carcinogen."

61. Defendants never adequately or appropriately warned physicians or users that hormone therapy could cause or contribute to the risk of breast cancer. To this day, Defendants have never warned or advised of the link between hormone therapy and specific types of breast cancer, including ductal and lobular cancer.

62. Upon information and belief, Plaintiff ingested Premarin, Provera, Prempro, and medroxyprogesterone acetate, hormone replacement drugs manufactured by Defendants, for approximately nineteen years for relief of menopausal symptoms and for other purported health benefits.

63. Plaintiff developed invasive breast cancer requiring a needle biopsy, mastectomy with axillary node dissection, post-surgical complications including pulmonary emboli and oncological treatment as a result of her ingestion of Defendants' hormone replacement drugs.

64. Defendants encouraged the use of Premarin, Provera, Prempro, and medroxyprogesterone acetate through aggressive marketing campaigns, including detailing of physicians by their respective sales representatives and direct-to-consumer advertising. As such, Defendants had a duty not only to provide Plaintiff's physician(s) with adequate warnings, but also to provide Plaintiff with adequate warnings regarding Premarin, Provera, Prempro, and medroxyprogesterone acetate. Defendants misrepresented the safety and effectiveness of these drugs and concealed or understated their dangerous side effects.

65. As a direct and legal result of the defective condition of Defendants' hormone replacement drugs that were ingested by Plaintiff, Plaintiff has suffered and continues to suffer from serious injuries, including, but not limited to, pain and suffering, physical injuries,

disability, significant disfigurement, embarrassment, mental anguish, loss of capacity for the enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of earnings, loss of the ability to earn money in the future, and a shortened life span.

66.     In addition to breast cancer, Plaintiff's injuries relating to her ingestion of Defendants' hormone replacement drugs are likely to continue into the future and to require significant additional medical treatment, further surgeries, hospitalizations and medical treatment and Plaintiff will likely incur significant additional medical expenses and economic losses in the future.

## COUNT I – STRICT LIABILITY

Plaintiff adopts by reference all of the General Allegations contained in Paragraphs 1 through 66 above, each inclusive, as though fully set forth herein, pursuant to Rule 1.130(b), Florida Rules of Civil Procedure.

67.     The hormone replacement drugs manufactured and marketed by Defendants were defective and unreasonably dangerous when they left the possession of the respective Defendants in that:

> A.     When placed in the stream of commerce, the drugs contained unreasonably dangerous design defects and were not reasonably safe as intended to be used, subjecting Plaintiff to risks which exceeded the benefits of the drugs;
>
> B.     When placed into the stream of commerce, they were defective in design and formulation, making use of the drugs more dangerous than an ordinary consumer would expect and more dangerous that other risks associated with Plaintiff's ailment;
>
> C.     Each of these drug products contained insufficient warnings to alert consumers, the consumer's prescribing physician(s) and users of severe and life threatening complications and side effects including, but not limited to breast cancer, ovarian cancer, heart attacks, strokes, and thromboembolic events;

D.   Defendants' respective advertising and promotion were misleading with regard to the benefits of using their hormone replacement drugs;

E.   There were inadequate post-marketing warnings or instructions because, after these Defendants knew or should have known of the significant risks associated with the use of these drugs, the Defendants failed to provide adequate warnings to Plaintiff, consumers in general, the consumers' prescribing physician(s), and continued to aggressively promote and advertise both to physicians and directly to the public the sale and use of these drugs; and

F.   The aforesaid drugs had not been materially altered or modified prior to the use of said drugs by Plaintiff.

68.   Plaintiff used Defendants' respective hormone replacement drugs for their intended purpose: hormone replacement therapy.

69.   Defendants, as manufacturers of prescription drugs, are held to the level of knowledge of experts in the field.

70.   Plaintiff's prescribing physician(s) did not have substantially the same knowledge as Defendants, or knowledge that would have been gleaned from an adequate warning from the manufacturers of Defendants' respective hormone replacement drugs.

71.   The warnings that were given by Defendants to Plaintiff's prescribing physician(s) with regard to their respective hormone replacement drugs were not accurate, clear, and/or unambiguous.

72.   Defendants had a continuing duty to warn the Plaintiff and/or her prescribing physician(s) of the dangerous risks and reactions associated with their respective hormone therapy drugs.

73.   Plaintiff could not have discovered any defect in the hormone therapy drugs that she ingested through the exercise of care.

74.     As a direct and legal result of the defective condition of the hormone therapy drugs ingested by Plaintiff, Plaintiff suffered serious injury and Plaintiff seeks all damages allowed under the law.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, as well as costs of this action and a trial by jury of all issues to be tried.

## COUNT II - NEGLIGENCE

Plaintiff adopts by reference all the General Allegations contained in Paragraphs 1 through 66 above, each inclusive, as though fully set forth, pursuant to Rule 1.130 (b), Florida Rules of Civil Procedure.

75.     At all times material hereto, Defendants had a duty to Plaintiff to exercise reasonable care in the design, manufacture, testing, processing, advertising, marketing, labeling, assembling, packaging, distribution and sale of their respective hormone therapy drugs.

76.     Defendants knew, or in the exercise of reasonable care, should have known that their hormone therapy drugs were of such a nature that, if not properly prepared, designed, researched, developed, manufactured, inspected, labeled, marketed, promoted and sold, they were likely to cause injury to those who took them.

77.     Defendants negligently provided inadequate and inaccurate warnings and information to the medical community and the public at large, including Plaintiff, by making false representations about the safety of their products.

78.     Defendants downplayed, understated and disregarded their knowledge of the serious and permanent side effects associated with the use of their hormone therapy drugs despite available information demonstrating that their products were likely to cause serious and sometimes fatal side effects to users.

23

79.     Defendants were negligent in their actions, misrepresentations, and omissions toward Plaintiff and Plaintiff's prescribing physician with regard to their respective hormone therapy drugs in the following ways:

      A.      Each Defendant failed to include adequate warnings regarding their respective hormone therapy drugs that would have alerted consumers and physicians to the potential risks and serious side effects of the drugs; and

      B.      Each Defendant failed to adequately and properly test their respective hormone therapy drugs before placing the drugs on the market.

80.     Further, Defendants were negligent in the preparation, design, research, development, manufacturing, inspection, labeling, marketing, promotion, and selling of their hormone therapy drugs, in that Defendants:

      A.      Failed to use due care in the preparation of the hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

      B.      Failed to use due care in the design of the hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

      C.      Failed to conduct adequate pre-clinical testing and research to determine the safety of the hormone therapy drugs;

      D.      Failed to conduct adequate post-marketing surveillance to determine the safety of the hormone therapy drugs;

      E.      Failed to accompany the hormone therapy products with proper warnings regarding all possible adverse side effects associated with the use of such products and the comparative severity and duration of such adverse effects;

      F.      Failed to use due care in the development of the hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

      G.      Failed to use due care in the manufacture of the hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

H.   Failed to use due care in the inspection of the hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

I.   Failed to use due care in the labeling of the hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

J.   Failed to use due care in the marketing of the hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

K.   Failed to use due care in the promotion of the hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

L.   Failed to use due care in the selling of the hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

M.   Failed to provide adequate training and information to healthcare providers for the appropriate use of the hormone therapy drugs;

N.   Failed to warn Plaintiff and her healthcare providers, prior to, during and after actively encouraging and promoting the sale of the hormone therapy drugs, either directly or indirectly, orally or in writing, about the following:

1.   the need for comprehensive, regular medical monitoring to ensure early discovery of potentially fatal strokes, heart attacks, venous thromboembolism, pulmonary embolism, cardiovascular disease, breast cancer, ovarian cancer, gallbladder cancer, non-Hodgkins lymphoma and other adverse side effects;

2.   the possibility of becoming disabled as a result of the use of the drugs; and

3.   the adverse side effects associated with the use of the drug, including, but not limited to, strokes, heart attacks, venous thromboembolism, cardiovascular disease, breast cancer, and ovarian cancer, gallbladder cancer, non-Hodgkins lymphoma and other adverse side effects; and,

O.   Failed to conduct any long-term animal studies in appropriate species to evaluate the risks of the new combination therapy in the 1970's and thereafter.

25

P.      Failed to conduct any long-term studies in women volunteers to evaluate the risks and claimed benefits of the new combination therapy in the 1970's and thereafter.

Q.      Failed to monitor cancer registries for signals of new types of cancer appearing in post-menopausal women.

R.      Failed to refrain from engaging in off-label promotion of benefits the FDA did not approve for promotion; and

S.      Failed otherwise to act as a reasonably prudent pharmaceutical manufacturer and distributor would.

81.     Defendants knew or should have known that their respective hormone replacement drugs caused unreasonably dangerous risks and serious side effects of which Plaintiff was unaware. Defendants nevertheless aggressively advertised, marketed, sold and distributed their respective hormone therapy drugs knowing that there were safer methods and products for treatment of Plaintiff's condition.

82.     As a direct and legal result of the negligence of Defendants, Plaintiff suffered serious injury, and Plaintiff seeks all damages allowed under the law.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, as well as costs of this action and a trial by jury of all issues to be tried.

## COUNT III - NEGLIGENT MISREPRESENTATION

Plaintiff adopts by reference all of the General Allegations contained Paragraphs 1 through 66 above, each inclusive, as though fully set forth, pursuant to Rule 1.130 (b), Florida Rules of Civil Procedure.

83.     Defendants owed a duty to prescribing physicians and ultimate end users of their products, including Plaintiff, to accurately and truthfully represent the risks and benefits of hormone therapy drugs. Defendants breached that duty by misrepresenting and/or failing to

adequately warn of the risks of, and lack or exaggerated benefits of, hormone therapy drugs – effects of which Defendants knew or in the exercise of due care should have known -- to the prescribing physicians and ultimate users, including Plaintiff.

84.     Defendants negligently misrepresented to the Plaintiff and Plaintiff's prescribing physician(s) the safety and effectiveness of their respective hormone therapy drugs.

85.     Defendants' negligent misrepresentations were communicated to Plaintiff's prescribing physician(s) with the intent that they reach the Plaintiff and were also communicated directly to Plaintiff and other consumers with direct-to-consumer advertising with the intent that such misrepresentations result in prescriptions being issued and patients, such as Plaintiff, ingesting the Defendants' respective hormone replacement drugs.

86.     Defendants misrepresented information regarding the safety and efficacy of their respective hormone therapy drugs with the intention and specific desire that Plaintiff, Plaintiff's prescribing physician or other dispensing entities and the consuming public would rely on such information in selecting, requesting, or prescribing hormone replacement drugs and treatment.

87.     Defendants misrepresented material, adverse information regarding the safety and effectiveness of their respective hormone replacement drugs.

88.     Defendants made these misrepresentations and actively concealed adverse information at a time when the Defendants knew, or should have known, that their respective hormone replacement drugs had defects, dangers, and characteristics that were other than what the Defendants had represented to prescribing doctors or other dispensing entities, the FDA and the consuming public, including the Plaintiff herein.

89.     The misrepresentations of the Defendants with regard to the safety and efficacy of their respective hormone replacement drugs were perpetuated directly and/or indirectly by the Defendants and their respective employees, agents and/or other detail persons.

90.     The misrepresentations of the Defendants with regard to the safety and efficacy of their respective hormone replacement drugs constitute a continuing tort.

91.     Through the Defendants' respective product inserts, the Defendants continued to misrepresent the safety and efficacy of their respective hormone replacement drugs before, during, and after Plaintiff's ingestion.

92.     Defendants misrepresented the safety and efficacy of their respective hormone replacement drugs in their labeling, advertising, product inserts, promotional materials, and other marketing efforts.

93.     Plaintiff and/or Plaintiff's prescribing physician(s) and/or other dispensing entities justifiably relied on and/or were induced by the misrepresentations of Defendants with respect to the safety and efficacy of their respective hormone replacement drugs to Plaintiff's detriment.

94.     As a direct and legal result of the negligent misrepresentations of Defendants with regard to their respective hormone replacement drugs, Plaintiff suffered serious injuries.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, as well as all costs of this action and a trial by jury of all issues to be tried.

## <u>COUNT IV – FRAUD</u>

Plaintiff adopts by reference all of the General Allegations contained Paragraphs 1 through 66 above, each inclusive, as though fully set forth, pursuant to Rule 1.130 (b), Florida Rules of Civil Procedure.

95.     Defendants fraudulently or intentionally misrepresented or concealed adverse information from Plaintiff and her prescribing physician(s) regarding the safety and effectiveness of their respective hormone replacement drugs.

96.     Defendants' fraudulent or intentional misrepresentations regarding the safety and efficacy of their respective hormone replacement drugs were communicated to Plaintiff's prescribing physician(s) with the intent that they reach the Plaintiff and were also communicated directly to Plaintiff through direct-to-consumer advertising.

97.     Defendants knew that their representations regarding the safety and efficacy of their respective hormone replacement drugs were false.

98.     Defendants made the fraudulent or intentional misrepresentations and/or actively concealed adverse information regarding the safety and efficacy of their respective hormone replacement drugs with the intention and specific desire that the Plaintiff, the Plaintiff's prescribing physician(s), dispensing entities, and the consuming public would rely on such false information in selecting hormone replacement therapy and ingesting Defendants' respective hormone replacement drugs.

99.     Defendants intentionally concealed material, adverse information regarding the safety and effectiveness of their respective hormone replacement drugs.

100.    Defendants made these fraudulent or intentional misrepresentations and actively concealed adverse information regarding the safety and efficacy of their respective hormone replacement drugs at a time when the Defendants each knew that their respective hormone replacement drugs had defects, dangers, and characteristics that were other than what the Defendants had represented to the prescribing doctors, other dispensing entities, the FDA and the consuming public, including the Plaintiff herein.  Specifically, the Defendants fraudulently or

intentionally misrepresented to and/or actively concealed from Plaintiff, Plaintiff's prescribing physician(s), other dispensing entities, the FDA, and the consuming public the following adverse information regarding their respective hormone replacement drugs:

    A.    That their hormone replacement drugs carried significant risks of breast cancer, ovarian cancer, heart attacks, strokes, thromboembolic events, and other serious adverse events;

    B.    Despite knowing that there were serious risks of breast cancer, ovarian cancer, heart attacks, strokes, thromboembolic events, and other serious adverse events, the Defendants aggressively marketed, promoted, advertised direct to consumers, and/or sold the drug as if there was little or no risk;

    C.    Failed to advise Plaintiff, Plaintiff's prescribing physician(s), and others that prior studies, research, reports and/or testing had been conducted linking the use of these drugs to breast cancer, ovarian cancer, heart attacks, strokes, thromboembolic events, and other serious adverse events; and

    D.    That the drug should not be utilized on a long-term basis, ingested at high doses, or used for indications and conditions for which it had no demonstrated efficacy and/or for which it had not been studied or approved.

101.    The fraudulent or intentional misrepresentations and/or active concealment by the Defendants with regard to the safety and efficacy of their respective hormone replacement drugs were perpetuated directly and/or indirectly by the Defendants and their respective employees, agents and/or other detail persons.

102.    The fraudulent or intentional misrepresentations and/or concealment by the Defendants with regard to the safety and efficacy of their respective hormone replacement drugs constitute a continuing tort.

103.    Through the Defendants' respective product inserts, each Defendant continued to fraudulently or intentionally misrepresent the safety and efficacy of their respective hormone replacement drugs.

104.    Defendants had a post-sale duty to warn Plaintiff and Plaintiff's prescribing physician(s) about the lack of efficacy, potential risks and complications associated with their respective hormone replacement drugs, and failed to do so.

105.    Defendants fraudulently or intentionally misrepresented the safety and efficacy of their respective hormone replacement drugs in their labeling, advertising, product inserts, promotional materials, direct-to-consumer advertising, and other marketing efforts.

106.    Plaintiff's prescribing physician(s), and other dispensing entities justifiably relied on and/or were induced by the fraudulent or intentional misrepresentations and/or active concealment of Defendants to prescribe their respective hormone replacement drugs, and Plaintiff justifiably relied on and/or was induced by the fraudulent or intentional misrepresentations and/or active concealment of Defendants to ingest their respective hormone replacement drugs to Plaintiff's detriment.

107.    As a direct and legal result of the fraudulent or intentional misrepresentations of and/or active concealment by Defendants regarding the safety and efficacy of their respective hormone replacement drugs, Plaintiff suffered serious injuries.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, as well as all costs of this action and a trial by jury of all issues to be tried.

### JURY TRIAL DEMANDED ON ALL ISSUES

Dated this the _5TH_ day of March, 2006.

> JOYCE & REYES
> 307 Hyde Park Avenue
> Tampa, FL 33606-2233
> (813) 251-2007 Tele.
> (813) 251-5808 Fax
>
> and

ALLEY, CLARK, GREIWE & FULMER
701 E. Washington Street
P. O. Box 3127
Tampa, Florida 33601-3127
(813) 222-0977 Tele.
(813) 224-0373 Fax
Attorneys for Plaintiff

By: _____

Brenda S. Fulmer, Esq.
Fla. Bar No. 999891
C. Todd Alley, Esq.
Fla. Bar No. 321788
Amy D. Prevatt, Esq.
Fla. Bar No. 13858

Form 1.997
**Civil Cover Sheet**

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form is required for the use of the Clerk of Court for the purpose of reporting judicial workload data pursuant to Florida Statute 25.075.

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA, IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION.

MARIA IPPOLITO,

    Plaintiff,

Case No.:

vs

Division:

WYETH, INC., et al.

    Defendants.

_____/

---

II.    TYPE OF CASE:    (Place an x in one box only.  If the case fits more than one type of case, select the most definitive.)

Domestic Relations
__ Simpl. dissolution
__ Dissolution
__ Support - IV-D
__ Support - Non IV-D
__ URESA - IV-D
__ URESA - Non IV-D
__ Domestic violence
__ Other domestic relations

Torts
__ Prof. Mal.
_X_ **Prod. Liab.**
__ Auto Negl.
__ Other Negl.

Other Civil
_ Contracts
    __ Condominium
__ Real Property/Mtg. Forecl.
__ Eminent domain
_ Other

---

III.    Is Jury Trial Demanded in Complaint?
    **X**    **Yes**
    _    No

---

Date: _3/8/-4_

Signature of attorney for
party initiating action



IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

      Plaintiff,

vs.

Case No.: 06-CA-000641

WYETH, INC., et al.,

      Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

      YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**LISA GRAHAM**
**4721 Roosevelt Avenue**
**Lake Wales, FL 33859**

      Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida 33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

      WITNESS my hand and seal of said Court on _____, 2006.

Edwin M. Fry, Jr.
Clerk of Court

(Court Seal)

By:_____
              Deputy Clerk



IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

      Plaintiff,

                                        Case No.: 06-CA-000641

vs.

WYETH, INC., et al.,

      Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

      YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**TIMOTHY HICKEY**
**3122 N E Ivy Lane**
**Jensen Beach, FL 34957**

      Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida 33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

      WITNESS my hand and seal of said Court on April 15, 2006.

                              Edwin M. Fry, Jr.
                              Clerk of Court

(Court Seal)

                              By:_____
                                    Deputy Clerk

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

     Plaintiff,                                Case No.: 06-CA-000641

vs.

WYETH, INC., et al.,

     Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

     YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**MICHAEL SULLIVAN**
**106 Gardenia Avenue**
**Fort Pierce, FL  34982**

     Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida 33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter.  If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

     WITNESS my hand and seal of said Court on _____, 2006.

                                 Edwin M. Fry, Jr.
                                 Clerk of Court

(Court Seal)

                                 By:_____
                                     Deputy Clerk

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

      Plaintiff,

vs.

WYETH, INC., et al.,

      Defendants.

_____/

Case No.: 06-CA-000641

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

      YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**MARI WILLIAMS**
**312 – 2ND Avenue**
**Melbourne Beach, FL  32951**

      Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida  33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter.  If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

      WITNESS my hand and seal of said Court on _____, 2006.

Edwin M. Fry, Jr.
Clerk of Court

(Court Seal)

By:_____
                Deputy Clerk

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

      Plaintiff,

vs.

                                  Case No.: 06-CA-0006-41

WYETH, INC., et al.,

      Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

      YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**Pfizer, Inc.**
**RA: CT Corporation System**
**1200 South Pine Island Road**
**Plantation, FL  33324**

      Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida  33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter.  If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

      WITNESS my hand and seal of said Court on _____, 2006.

                              Edwin M. Fry, Jr.
                              Clerk of Court

(Court Seal)

                              By:_____
                                    Deputy Clerk

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

      Plaintiff,                           Case No.: 06-CA-000641

vs.

WYETH, INC., et al.,

      Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

      YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**Pharmacia & Upjohn Company LLC**
**RA: CT Corporation System**
**1200 South Pine Island Road**
**Plantation, FL  33324**

      Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida  33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter.  If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

      WITNESS my hand and seal of said Court on _____, 2006.

                                        Edwin M. Fry, Jr.
                                        Clerk of Court

(Court Seal)

                                        By:_____
                                            Deputy Clerk

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

     Plaintiff,

vs.

WYETH, INC., et al.,

     Defendants.

_____/

Case No.: 06-CA-000641

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

     YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**Pharmacia & Upjohn LLC**
**Registered Agent:**
**The Corporation Trust Company**
**1209 Orange Street**
**Wilmington, DE  19801**

     Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida 33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter.  If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

     WITNESS my hand and seal of said Court on _April 15_, 2006.

Edwin M. Fry, Jr.
Clerk of Court

By:_____
            Deputy Clerk

(Court Seal)

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

      Plaintiff,

vs.

WYETH, INC., et al.,

      Defendants.

_____/ .

Case No.: 06-CA-000641 *341*

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

      YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**Pharmacia Corporation
RA: CT Corporation System
1200 South Pine Island Road
Plantation, FL 33324**

      Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida 33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

      WITNESS my hand and seal of said Court on *April 5*, 2006.

Edwin M. Fry, Jr.
Clerk of Court

(Court Seal)

By:_____

Deputy Clerk

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

      Plaintiff,

vs.

Case No.: 06-CA-000641

WYETH, INC., et al.,

      Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

      YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**BRIDGET COMEAUX**
**36328 Fox Wood Drive**
**Eustis, FL  32736**

      Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida  33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter.  If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

      WITNESS my hand and seal of said Court on _April 15_, 2006.

                        Edwin M. Fry, Jr.
                        Clerk of Court

(Court Seal)

                        By:_____
                              Deputy Clerk

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

     Plaintiff,

Case No.: 06-CA-000641  *341*

vs.

WYETH, INC., et al.,

     Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

     YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**KIMBERLY TUCKIS**
**3196 Valemoor Drive**
**Palm Harbor, FL 34685**

     Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida 33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

     WITNESS my hand and seal of said Court on _April 5_, 2006.

Edwin M. Fry, Jr.
Clerk of Court

(Court Seal)

By:_____
             Deputy Clerk

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

     Plaintiff,

vs.

Case No.: 06-CA-000641

WYETH, INC., et al.,

     Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

     YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**ESI Lederle**
**Registered Agent:**
**Corporation Service Company**
**1201 Hays Street**
**Tallahassee, FL  32301**

     Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida  33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter.  If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

     WITNESS my hand and seal of said Court on _April 5_, 2006.

              Edwin M. Fry, Jr.
              Clerk of Court

(Court Seal)

              By:_____
                    Deputy Clerk

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

      Plaintiff,

vs.

WYETH, INC., et al.,

      Defendants.

Case No.: 06-CA-000641

_____/

### SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

      YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**KATHERINE VEZIN**
**181 Florence Drive**
**Jupiter, FL  33458**

      Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida 33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter.  If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

      WITNESS my hand and seal of said Court on _____, 2006.

Edwin M. Fry, Jr.
Clerk of Court

(Court Seal)

By:_____
          Deputy Clerk

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

     Plaintiff,

                                  Case No.: 06-CA-000641

vs.

WYETH, INC., et al.,

     Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

     YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**CLIFFORD BLOM**
**1035 Cherry Lane**
**Wellington, FL 33414**

     Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida 33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

     WITNESS my hand and seal of said Court on _April 15_, 2006.

                          Edwin M. Fry, Jr
                          Clerk of Court

(Court Seal)

                          By:_____
                                 Deputy Clerk

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO.

     Plaintiff,

vs.

WYETH, INC., et al.,

     Defendants.

_____/

Case No.: 06-CA-000641

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

     YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**DONNA MOORES**
**16829 98TH Way Lane**
**Jupiter, FL  33478**

     Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida  33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter.  If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

     WITNESS my hand and seal of said Court on _____, 2006.

                  Edwin M. Fry, Jr.
                  Clerk of Court

(Court Seal)

                  By:_____
                      Deputy Clerk

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

       Plaintiff,

                                     Case No.: 06-CA-000641 *341*

vs.

WYETH, INC., et al.,

       Defendants.

_____/

### SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

       YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**Wyeth Pharmaceuticals Inc.**
**Registered Agent:**
**Corporation Service Company**
**2711 Centerville Road, Suite 400**
**Wilmington, DE 19808**

       Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida 33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

       WITNESS my hand and seal of said Court on _April 5_, 2006.

                                  Edwin M. Fry, Jr.
                                  Clerk of Court

(Court Seal)

                                  By:_____
                                      Deputy Clerk

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR ST. LUCIE COUNTY.
CIVIL DIVISION

MARIA IPPOLITO,

      Plaintiff,                        Case No.: 06-CA-000641

vs.

WYETH, INC., et al.,

      Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:
GREETINGS:

      YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint or petition in the above styled cause upon the Defendant(s)

**Wyeth, Inc.**
**Registered Agent:**
**Corporation Service Co.**
**1201 Hays Street**
**Tallahassee, FL  32301**

      Each Defendant is hereby required to serve written defenses to said Complaint or petition on Plaintiff's attorney, whose name and address is

**BRENDA S. FULMER, Esq.**
Alley, Clark, Greiwe & Fulmer
P.O. Box 3127
Tampa, Florida 33601-3127
813-222-0977

within twenty (20) days after service of this Summons upon that Defendant exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter.  If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

      WITNESS my hand and seal of said Court on _____, 2006.

                     Edwin M. Fry, Jr.
                     Clerk of Court

(Court Seal)

                     By:_____
                              Deputy Clerk

# EXHIBIT 2

## DEFENDANTS' CONSENT TO REMOVAL TO
## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Defendants, Pfizer Inc. (incorrectly named in the complaint as "Pfizer, Inc."), Pharmacia

& Upjohn Company LLC, Pharmacia & Upjohn LLC and Pharmacia Corporation, by counsel,

hereby consent to the removal of this action, which is entitled *Maria Ippolito v. Wyeth, Inc., et*

*al.,* and which is pending in the Circuit Court of the 19th Judicial Circuit in and for St. Lucie

County, Case No.:  06-CA-000341.  The Court has jurisdiction over this action pursuant to 28

U.S.C. §§ 1332 and 1441.

Respectfully submitted,

By: _____
**Eric L. Lundt**
Florida Bar No.:  0861715

**GORDON HARGROVE & JAMES, P.A.**
Attorneys for Defendants Pfizer Inc.,
Pharmacia & Upjohn Company LLC,
Pharmacia & Upjohn LLC
  and Pharmacia Corporation
2400 East Commercial Boulevard
Suite 1100
Fort Lauderdale, FL  33308
Telephone:        (954) 958-2500
Facsimile:        (954) 958-2513

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BARBARA PETTY,

     Plaintiff,

v.                          Case No. 3:04-cv-82/MCR

WYETH, f/k/a American Home Products
Corporation; WYETH PHARMACEUTICALS,
f/k/a Wyeth-Ayerst Labs, Inc.; RICHARD COE;
and DEBRA BERRY,

     Defendants.

_____/

### ORDER DENYING PLAINTIFF'S MOTION TO REMAND

On February 5, 2004, Plaintiff BARBARA PETTY ("Petty") filed a tort action in the Circuit Court in and for Escambia County, Florida seeking damages that allegedly resulted from her ingestion of the prescription diet drug Pondimin. (Doc. 1, Exh. 1). Petty's Complaint for Damages asserts the following five causes of action against all Defendants: (1) Count I - strict products liability, defective design; (2) Count II - strict products liability, failure to warn; (3) Count III - negligence; (4) Count IV - fraudulent misrepresentation and fraudulent concealment; and (5) Count V - civil conspiracy. (Id.). On March 8, 2004, Defendants WYETH and WYETH PHARMACEUTICALS (collectively referred to as "Wyeth") filed a Notice of Removal in this Court based on diversity jurisdiction, see 28 U.S.C. § 1332. (Doc. 1). Although Petty and Defendants RICHARD COE ("Coe") and DEBRA BERRY ("Berry") are Florida residents, Wyeth's Notice asserts that Petty fraudulently joined Coe and Berry in this case so as to prevent federal diversity jurisdiction. (Id.).

On the day of removal, Wyeth also filed a Motion to Stay All Proceedings (see doc. 5) pending a final ruling from the Judicial Panel on Multi-District Litigation regarding transfer of this case to MDL-1203, and Defendants Coe and Berry each filed an Answer and Affirmative Defenses (see docs. 3 and 4). On April 7, 2004, Petty filed a Motion to Remand (see doc. 18) along with supporting documents (see doc. 19). The next day, Petty filed a response, along with supporting documents, in opposition to the motion to stay. (Docs. 20 and 21). On April 21, 2004, Wyeth filed a response, along with supporting documents, in opposition to Petty's motion to remand. (Doc. 24).

## A. Facts

Petty alleges, in her complaint, that she sustained serious and permanent injuries as a result of her ingestion of the prescription diet drug Pondimin. Wyeth distributed and sold Pondimin, as well as another diet drug, Redux, which is not at issue in this case. Wyeth promoted and distributed both drugs to physicians. When Pondimin or Redux is combined with another diet drug called phentermine, the resulting combination is popularly known as "fen-phen." In September 1997, both Pondimin and Redux were voluntarily withdrawn from the market due to concerns about heart valve damage associated with their usage.

The following facts are derived from the declarations of Defendants Coe and Berry. (Doc. 1, Exhs. 14 and 15). In the 1990s, Coe and Berry worked as sales representatives for A.H. Robins Co. and American Home Products Corp. (which are now known as Wyeth). As sales representatives, they visited physicians' offices educating them about Redux so that the physicians could consider whether to prescribe Redux to their patients.[1] On these visits, Coe and Berry gave the physicians FDA-approved package inserts about Wyeth's products. Typically, these

---

[1] As sales representatives, neither Coe nor Berry "dispensed, supplied, designed, detailed, promoted, marketed, advertised, distributed, or sold Pondimin." (Doc. 1, Exhs. 14, ¶ 3, and 15, ¶ 3).

visits lasted less than five minutes. Neither Coe nor Berry had any specialized medical or pharmacological training, except that which was provided by Wyeth. Their knowledge of Redux was derived exclusively from the training provided by Wyeth. Furthermore, neither Coe nor Berry had involvement in the preparation or development of package inserts for any drugs, and had no control over content or other written warnings. In fact, they had no knowledge concerning the association of Redux to valvular heart disease prior to that relationship being first acknowledged and publicized.

## B. Motion to Remand

In the motion to remand, Petty asserts that Wyeth has not demonstrated that Coe and Berry were fraudulently joined in the current lawsuit. Petty claims that there is a possibility that she has a cause of action against Coe and Berry under Florida law, and because of that possibility, Petty argues that Coe and Berry are not fraudulently joined. If Petty is correct, then complete diversity will not exist, and the this case should be remanded to the Circuit Court in and for Escambia County, Florida. In opposition to Petty's motion to remand, Wyeth asserts that Petty has no reasonable basis for the claims asserted against Coe and Berry, thereby making them fraudulently joined.

### 1. Removal Jurisdiction

A party may remove any case from a state court which could have been brought in federal court, see 28 U.S.C. § 1441(a), but the removing party bears the burden of establishing jurisdiction, see University of S. Ala. v. The Amer. Tobacco Co., 139 F. 3d 1368, 1373 (11th Cir. 1998) (citing Diaz v. Sheppard, 85 F. 3d 1502, 1505 (11th Cir. 1996)). To satisfy its burden as the removing party, Wyeth argues that the Court has removal jurisdiction over this case because Petty's complaint could have been originally filed in federal court pursuant to diversity jurisdiction. See 28 U.S.C.

Case No. 3:04-cv-82/MCR

§ 1332 (West 2004).  Diversity jurisdiction is an adequate ground for removal, see Pancho de Perez, 139 F. 3d at 1373, but diversity jurisdiction only exists when there is complete diversity amongst the parties, see Triggs v. John Crump Toyota, Inc., 154 F. 3d 1284, 1287 (11th Cir. 1998).  Complete diversity requires that all defendants have diverse citizenship from all plaintiffs.  See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806), overruled on other grounds, Louisville C. & C.R. Co. v. Letson, 43 U.S. (2 How.) 497, 11 L. Ed. 353 (1844); Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1542 (11th Cir. 1993).

The procedure to remove a case to federal court is relatively simple, requiring only that a defendant file a notice of removal containing "a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant." 28 U.S.C.A. § 1446(a) (West 2004).  However, a court must continue to scrutinize its jurisdiction subsequent to removal.  "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C.A. § 1447(c) (West 2004); see also FED. R. CIV. P. 12(h)(3) (2004). Once a court's jurisdiction is questioned—either by the court sua sponte or the plaintiff—the defendant, as the party invoking jurisdiction, has the burden of proving that federal jurisdiction is appropriate.  See McNutt v. Gen. Motors Acceptance Corp. of Ind., Inc., 298 U.S. 178, 184–90, 56 S. Ct. 780, 782–85, 80 L. Ed. 1135 (1936); Village Fair Shopping Ctr., Co. v. Sam Broadhead Trust, 588 F.2d 431, 433 (5th Cir. 1979).[2]

As noted, Wyeth's notice of removal bases this Court's jurisdiction solely on diversity grounds.  Plaintiff Petty is a Florida resident, and Defendant Wyeth is a Delaware corporation with its principal place of business in New Jersey.  However, Defendants Coe and Berry, like Petty, are Florida residents, which would normally

_____

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

destroy complete diversity under 28 U.S.C. § 1332, unless Coe and Berry were fraudulently joined in the lawsuit.

### 2. Fraudulent Joinder

Courts recognize an exception to the complete diversity requirement for cases in which a nondiverse party has been fraudulently joined. See Crowe v. Coleman, 113 F. 3d 1536, 1538 (11th Cir. 1997). The Eleventh Circuit has acknowledged three situations in which joinder is deemed fraudulent. The first situation is when there is no possibility that the plaintiff can prove a cause of action against the non-diverse defendant. See Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998)(citing Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir. 1983), superceded by statute on other grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533 (11th Cir. 1993)). The second is where there is outright fraud in the plaintiff's pleading of jurisdictional facts. See Triggs, 154 F.3d at 1287; Coker, 709 F.2d at 1440. The third is where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several, or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant. See Triggs, 154 F.3d at 1287; Tapscott v. MS Dealer Serv. Corp., 77 F.3d 1353, 1355 (11th Cir. 1996), abrogated on other grounds by Cohen v. Office Depot, Inc., 204 F.3d 1069 (11th Cir. 2000). The type of fraudulent joinder pertinent to the matter sub judice is the first type.

Wyeth, as the removing party, bears the burden of establishing fraudulent joinder. See Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989). The burden is a "heavy one," because Petty need not have a winning case against the nondiverse Defendants. See Triggs, 154 F. 3d at 1287. Rather, "[i]f there is even a possibility that a state court would find that the complaint states a cause of action against any one of the [nondiverse Defendants, the Court] must find that the joinder

Case No. 3:04-cv-82/MCR

was proper and remand the case to the state court." <u>Coker v. Amoco Oil Co.,</u> 709
F.2d 1433, 1440-41 (11th Cir. 1983), <u>superceded by statute on other grounds by</u>
<u>Wilson v. Gen. Motors Corp.,</u> 888 F.2d 779, 782 n. 3 (11th Cir. 1989).[3]  A district court
"must evaluate the factual allegations in the light most favorable to the plaintiff and
must resolve any uncertainties about state substantive law in favor of the plaintiff."
<u>Crowe,</u> 113 F.3d at 1538. This determination is based on the plaintiff's pleadings at
the time of removal. <u>See Id.</u>  However, a district court "may consider affidavits and
deposition transcripts submitted by the parties." <u>Id.</u>[4]

"While the proceeding appropriate for resolving a claim of fraudulent joinder
is similar to that used for ruling on a motion for summary judgment under
Fed.R.Civ.P. 56(b), the jurisdictional inquiry must not subsume substantive
determination." <u>Id.</u> (citation and internal quotations omitted). "When considering
a motion to remand, [the district court should] not weigh the merits of a plaintiff's
claim beyond determining whether it is an arguable one under state law."  <u>Id.</u>
Regarding a district court's determination of an arguable claim, the Eleventh Circuit
has stated:

> For a [p]laintiff to present an arguable claim against an in-state
> [*i.e.*, nondiverse] defendant and, therefore, to require a case

---

[3] Plaintiff Petty argues that Wyeth must demonstrate fraudulent joinder with clear and convincing
evidence.  The former Fifth Circuit appears to have required that a defendant's evidence in support of a
fraudulent joinder claim be clear and convincing. <u>See</u> <u>Parks v. New York Times Co.,</u> 308 F. 2d 474, 478 (5th
Cir. 1962).  Because former Fifth Circuit opinions are binding precedent for Eleventh Circuit courts, some
district courts in the Eleventh Circuit have adopted the clear and convincing standard.  <u>See e.g.,</u> <u>Lane v.</u>
<u>Champion Int'l Corp.,</u> 827 F. Supp. 701, 710 (S.D. Ala. 1993); <u>Katz v. Costa Armatori, S.P.A.,</u> 718 F. Supp.
1508, 1510 (S.D. Fla. 1989).  On the other hand, some district courts have questioned whether <u>Parks</u> remains
good law in light of numerous Eleventh Circuit opinions which have failed to enunciate a clear and convincing
requirement.  <u>See e.g.,</u> <u>Campana v. American Home Products Corp.,</u> Case No. 1:99-cv-250/MMP, p. 7 n. 5
(N.D. Fla. March 7, 2000).  However, this Court need not determine whether the clear and convincing standard
is applicable, because assuming *arguendo* that it is, the evidence presented by Wyeth is clear and convincing.

[4] The evidence in question in this case are declarations as opposed to affidavits; however,
declarations have the same legal effect as affidavits. <u>See</u> 28 U.S.C. § 1746 (West 2004).  A "declaration" is
"[a] formal, written statement--resembling an affidavit but not notarized or sworn to--that attests under penalty
of perjury, to facts known by the declarant.  Such a declaration, if properly prepared, is admissible in federal
court with the same effect as an affidavit."  BLACK'S LAW DICTIONARY 415 (7th ed. 1999) (citing 28 U.S.C. §
1746).

removed to federal court to be remanded to state court, the plaintiff need not show that he could survive in the district court a motion for summary judgment filed by that in-state defendant. For a remand, the plaintiff's burden is much lighter than that: after drawing all reasonable inferences from the record in the plaintiff's favor and then resolving all contested issues of fact in favor of the plaintiff, there need only be "a reasonable basis for predicting that the state law *might* impose liability on the facts involved."

Id., at 1541-42 (quoting B. Inc. v. Miller Brewing Co., 663 F.. 2d 545, 549 (5th Cir. Unit A 1981)) (emphasis in original).[5] Furthermore, because "[f]ederal courts are courts of limited jurisdiction,...there is a presumption against the exercise of federal jurisdiction, such that all uncertainties as to removal are to be resolved in favor of remand." Russell Corp. v. American Home Assurance Co., 264 F. 3d 1040, 1050 (11th Cir. 2001) (citing Burns v. Windsor Ins. Co., 31 F. 3d 1092, 1095 (11th Cir. 1994)).

In the instant case, Wyeth, the removing party, has affirmatively presented evidence to demonstrate that Defendants Coe and Berry were fraudulently joined by Petty. The declarations of Coe and Berry show that they did not market, advertise, sell, distribute, promote, dispense, supply, detail, or design Pondimin, which was the diet drug allegedly ingested by Petty. Moreover, Defendants Coe and Berry had no independent knowledge or control over the messages that Wyeth provided to physicians about Pondimin. Based on the declarations, Petty cannot maintain any of her asserted causes of action against Coe and Berry.[6] Once Wyeth presented the

---

[5] The Eleventh Circuit has cautioned that "district courts must exercise extraordinary care to avoid jumbling up motions for remand and motions for summary judgment that come before them. In the remand context, the district court's authority to look into the ultimate merit of the plaintiff's claims must be limited to checking for obviously fraudulent or frivolous claims." Crowe, 113 F. 3d at 1542.

[6] Regarding the causes of action in Petty's complaint, Florida law requires:

(1)Counts I & II - strict liability - "In order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish the manufacturer's relationship to the product in question, the defect and unreasonable dangerous condition of the product, and the existence of a proximate causal connection between such condition and the user's injuries or damage." Siemens Energy & Automation, Inc. v. Medina, 719 So., 2d 312, 315 (citations omitted) "Florida courts have expanded the doctrine of strict liability to others in the distributive

Case No. 2:04-cv-02/MCR

declarations to the Court, Petty could not continue to rely upon her unsupported allegations in the complaint. Petty had to put forth evidence to refute the statements in the declarations. See Campana v. American Home Products, 1:99-cv-250/MMP, pp. 7-8 (N.D. Fla. March 7, 2000).

Petty's evidence in support of the motion to remand does not refute the evidence in the Coe and Berry declarations concerning their non-involvement with the drug Pondimin. None of Petty's evidence shows that Coe and Berry promoted Pondimin to Petty's prescribing physician. Thus, the uncontroverted declarations

---

chain including retailers, wholesalers, and distributors." Id. (citations omitted). In the case at hand, it is clear that Coe and Berry were neither manufacturers of Pondimin nor within the drug's distributive chain. Furthermore, unlike the defendant in Medina, neither Coe nor Berry were brokers of Pondimin who served as the conduit of information between Wyeth and physicians. Thus, there is no possibility that a Florida court could determine that Petty states a claim for strict liability against Coe and Berry.

(2) Count III - negligence (based on a failure to warn and misrepresentation) - Because Defendants Coe and Berry had no knowledge about Pondimin and did not distribute, sell, market, etc. it to physicians, Petty fails to state a claim for negligence. See Cooper Hotel Servs., Inc. v. MacFarland, 662 So. 2d 710, 712 (Fla. 2nd DCA 1995) (Under Florida law, the elements for negligence are: "(1) the defendant had a duty to protect the plaintiff; (2) the defendant breached that duty; and (3) the defendant's breach was the proximate cause of the plaintiff's injuries and resulting damages.") (citation omitted). Coe and Berry owed no duty to Petty, and they could not be the legal or proximate cause of Petty's alleged injuries. Thus, there is no possibility that a Florida court could determine that Petty states a claim for negligence against Coe and Berry.

(3) Count IV - fraudulent misrepresentation and fraudulent concealment - Under Florida law, a fraudulent misrepresentation claim has four elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." Johnson v. Davis, 480 So. 2d 625, 627 (Fla. 1985) (citing Huffstetler v. Our Home Life Ins. Co., 65 So. 1 (Fla. 1914)). "As for fraudulent concealment, "[a] defendant's knowing concealment or non-disclosure of a material fact may only support an action for fraud where there is a duty to disclose. Such duty arises when one party has information that the other party has a right to know because of a fiduciary or other relation of trust or confidence between them." TransPetrol, Ltd. v. Radulovic, 764 So. 2d 878, 879-80 (Fla. 4th DCA 2000) (citations omitted). Because Coe and Berry did not sell, distribute, etc. Pondimin, Petty cannot state a claim for fraudulent misrepresentation or fraudulent concealment against them.

(4) Count V - civil conspiracy - "Ordinarily, [under Florida law], a corporation cannot conspire with its own directors, officers, or employees since the corporation acts through these individuals. However, an exception exists when the individual has an independent personal stake, apart from that of the corporation, in achieving the object of the conspiracy." Greenberg v. Mount Sinai Med. Ctr., 629 So. 2d 252, 256 (Fla. 3rd DCA 1993) (citations omitted). Petty cannot state a claim for civil conspiracy against Coe and Berry because they did not have a personal stake in misrepresenting Pondimin to physicians, a drug with which they were not involved, and without an independent personal stake in the misrepresentation, they could not have conspired with Wyeth.

Case No. 3:04-cv-82/MCP

of Coe and Berry are sufficient to demonstrate that they were fraudulently joined in this lawsuit.[7] See e.g., Kearney v. Wyeth, Case No. 6:03-cv-288-Orl-31KRS (M.D. Fla. May 13, 2003) (An uncontroverted affidavit of a sales representative that she did not promote, sell, etc. Pondimin, the drug that allegedly injured the plaintiff, was enough to establish fraudulent joinder as the court determined that plaintiff could not state a claim against her.); Long v. Wyeth, Case No. 6:03-cv-421-OrlJGG (M.D. Fla. May 15, 2003) (same); Campana v. American Home Products, 1:99-cv-250/MMP (N.D. Fla. March 7, 2000) (same). As a result, after drawing all reasonable inferences from the record in Petty's favor, there is no reasonable basis for predicting that Florida law might impose liability on Coe and Berry based upon the facts involved in this case. Therefore, Wyeth's removal of this case was proper, and Petty's motion to remand (see doc. 18) is DENIED. Because Coe and Berry were fraudulently joined in the instant action, all claims against them are DISMISSED WITH PREJUDICE, and the Clerk shall enter judgment for Defendants Coe and Berry. The dismissal of the nondiverse Defendants results in achieving complete diversity in this case, and as such, the Court has subject matter jurisdiction.

---

[7] In her motion to remand, Petty also argues that Coe and Berry admit in their answers to having provided adequate and complete warnings to physicians regarding Pondimin. According to Petty, such admissions "are evidence that Defendants Coe and Berry detailed Pondimin." Contrary to Petty's position, in Florida, a statement in a pleading that is meant as an alternative allegation in the event that a plaintiff successfully pleads a prima facie case does not constitute an admission. See Booker v. Sarasota, Inc., 707 So. 2d 886, 888-89 (Fla. 1st DCA 1998) (citations omitted). Thus, the statement that "Defendant provided adequate warnings and complete warnings to Plaintiff's prescribing physicians" does not constitute an admission by either Coe or Berry, because they were pleading in the alternative in the event that Petty pleaded a prima facie case against them. Furthermore, in their answers, Coe and Berry denied specific allegations, in the complaint, such as: (1) "Pondimin was widely advertised and/or promoted by Defendants[;]" and (2) they had control over the "design, assembly, packaging, marketing, advertising, manufacturing, labeling, testing, promoting, distribution, and/or sale of...Pondimin."

Case No. 3:04-cv-82/MCR

Accordingly, it is hereby ordered:

1.     Plaintiff BARBARA PETTY's motion to remand (see doc. 18) is DENIED.

2.     Defendants RICHARD COE and DEBRA BERRY have been fraudulently joined in this lawsuit; therefore, all claim against Defendants Coe and Berry are DISMISSED WITH PREJUDICE. The Clerk shall enter judgment for Defendants Coe and Berry.

ORDERED on this 28th day of April, 2004.


s/ *M. Casey Rodgers*

M. CASEY RODGERS
United States District Judge

Case No. 3:04-cv-62/MCR

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

SHERRILEE H. LEWIS,

      Plaintiff,

v.

WYETH, f/k/a American Home Products
Corporation; WYETH PHARMACEUTICALS,
f/k/a Wyeth-Ayerst Labs, Inc.; and LEROY R.
PEACOCK,

      Defendants.

Case No. 3:04-cv-81/MCR

_____/

### ORDER DENYING PLAINTIFF'S MOTION TO REMAND

On February 5, 2004, Plaintiff SHERRILEE H. LEWIS ("Lewis") filed a tort action in the Circuit Court in and for Escambia County, Florida seeking damages that allegedly resulted from her ingestion of the prescription diet drug Pondimin. (Doc. 1, Exh. 1). Lewis's Complaint for Damages asserts the following five causes of action against all Defendants: (1) Count I - strict products liability, defective design; (2) Count II - strict products liability, failure to warn; (3) Count III - negligence; (4) Count IV - fraudulent misrepresentation and fraudulent concealment; and (5) Count V - civil conspiracy. (Id.). On March 8, 2004, Defendants WYETH and WYETH PHARMACEUTICALS (collectively referred to as "Wyeth") filed a Notice of Removal in this Court based on diversity jurisdiction, see 28 U.S.C. § 1332. (Doc. 1). Although Lewis and Defendant LEROY PEACOCK ("Peacock") are Florida residents, Wyeth's Notice asserts that Lewis fraudulently joined Peacock in this case so as to prevent federal diversity jurisdiction. (Id.).

On the day of removal, Wyeth also filed a Motion to Stay All Proceedings (see doc. 4) pending a final ruling from the Judicial Panel on Multi-District Litigation regarding transfer of this case to MDL-1203, and Defendant Peacock filed an Answer

and Affirmative Defenses (see doc. 3). On April 7, 2004, Lewis filed a Motion to Remand (see doc. 16) along with supporting documents (see doc. 17). The next day, Lewis filed a response, along with supporting documents, in opposition to the motion to stay. (Doc. 19). On April 21, 2004, Wyeth filed a response, along with supporting documents, in opposition to Lewis's motion to remand. (Doc. 21).

*A. Facts*

Lewis alleges, in her complaint, that she sustained serious and permanent injuries as a result of her ingestion of the prescription diet drug Pondimin. Wyeth distributed and sold Pondimin, as well as another diet drug, Redux, which is not at issue in this case. Wyeth promoted and distributed both drugs to physicians. When Pondimin or Redux is combined with another diet drug called phentermine, the resulting combination is popularly known as "fen-phen." In September 1997, both Pondimin and Redux were voluntarily withdrawn from the market due to concerns about heart valve damage associated with their usage.

The following facts are derived from the declaration of Defendant Peacock. (Doc. 1, Exh. 14). Peacock worked as a sales representative Wyeth from 1977 until 2003. As a sales representative, he visited physicians' offices educating them about Redux so that the physicians could consider whether to prescribe Redux to their patients.[1] On these visits, Peacock gave the physicians FDA-approved package inserts about Wyeth's products. Typically, these visits lasted less than five minutes. Peacock did not have any specialized medical or pharmacological training, except that which was provided by Wyeth. His knowledge of Redux was derived exclusively from the training provided by Wyeth. Furthermore, Peacock had no involvement in the preparation or development of package inserts for any drugs, and had no control over content or other written warnings. In fact, he had no knowledge concerning the

---

[1] As a sales representative, Peacock had not "dispensed, supplied, designed, detailed, promoted, marketed, advertised, distributed, or sold Pondimin." (Doc. 1, Exhs. 14, ¶ 3, and 15, ¶ 3).

association of Redux to valvular heart disease prior to that relationship being first acknowledged and publicized.

## B. Motion to Remand

In the motion to remand, Lewis asserts that Wyeth has not demonstrated that Peacock was fraudulently joined in the current lawsuit. Lewis claims that there is a possibility that she has a cause of action against Peacock under Florida law, and because of that possibility, Lewis argues that Peacock is not fraudulently joined. If Lewis is correct, then complete diversity will not exist, and the this case should be remanded to the Circuit Court in and for Escambia County, Florida. In opposition to Lewis's motion to remand, Wyeth asserts that Lewis has no reasonable basis for the claims asserted against Peacock, thereby making him fraudulently joined.

### 1. Removal Jurisdiction

A party may remove any case from a state court which could have been brought in federal court, see 28 U.S.C. § 1441(a), but the removing party bears the burden of establishing jurisdiction, see University of S. Ala. v. The Amer. Tobacco Co., 139 F. 3d 1368, 1373 (11th Cir. 1998) (citing Diaz v. Sheppard, 85 F. 3d 1502, 1505 (11th Cir. 1996)). To satisfy its burden as the removing party, Wyeth argues that the Court has removal jurisdiction over this case because Lewis's complaint could have been originally filed in federal court pursuant to diversity jurisdiction. See 28 U.S.C. § 1332 (West 2004). Diversity jurisdiction is an adequate ground for removal, see Pancho de Perez, 139 F. 3d at 1373, but diversity jurisdiction only exists when there is complete diversity amongst the parties, see Triggs v. John Crump Toyota, Inc., 154 F. 3d 1284, 1287 (11th Cir. 1998). Complete diversity requires that all defendants have diverse citizenship from all plaintiffs. See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806), overruled on other grounds, Louisville C. & C.R. Co.

v. Letson, 43 U.S. (2 How.) 497, 11 L. Ed. 353 (1844); Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1542 (11th Cir. 1993).

The procedure to remove a case to federal court is relatively simple, requiring only that a defendant file a notice of removal containing "a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant." 28 U.S.C.A. § 1446(a) (West 2004). However, a court must continue to scrutinize its jurisdiction subsequent to removal. "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C.A. § 1447(c) (West 2004); see also Fed. R. Civ. P. 12(h)(3) (2004). Once a court's jurisdiction is questioned—either by the court sua sponte or the plaintiff—the defendant, as the party invoking jurisdiction, has the burden of proving that federal jurisdiction is appropriate. See McNutt v. Gen. Motors Acceptance Corp. of Ind., Inc., 298 U.S. 178, 184–90, 56 S. Ct. 780, 782–85, 80 L. Ed. 1135 (1936); Village Fair Shopping Ctr., Co. v. Sam Broadhead Trust, 588 F.2d 431, 433 (5th Cir. 1979).[2]

As noted, Wyeth's notice of removal bases this Court's jurisdiction solely on diversity grounds. Plaintiff Lewis is a Florida resident, and Defendant Wyeth is a Delaware corporation with its principal place of business in New Jersey. However, Defendant Peacock, like Lewis, is a Florida resident, which would normally destroy complete diversity under 28 U.S.C. § 1332, unless Peacock was fraudulently joined in the lawsuit.

### 2. Fraudulent Joinder

Courts recognize an exception to the complete diversity requirement for cases in which a nondiverse party has been fraudulently joined. See Crowe v. Coleman, 113 F. 3d 1536, 1538 (11th Cir. 1997). The Eleventh Circuit has

_____

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

Case No. 3:04-cv-81/MCR

acknowledged three situations in which joinder is deemed fraudulent. The first situation is when there is no possibility that the plaintiff can prove a cause of action against the non-diverse defendant. See Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998)(citing Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir. 1983), superceded by statute on other grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533 (11th Cir. 1993)). The second is where there is outright fraud in the plaintiff's pleading of jurisdictional facts. See Triggs, 154 F.3d at 1287; Coker, 709 F.2d at 1440. The third is where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several, or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant. See Triggs, 154 F.3d at 1287; Tapscott v. MS Dealer Serv. Corp., 77 F.3d 1353, 1355 (11th Cir. 1996), abrogated on other grounds by Cohen v. Office Depot, Inc., 204 F.3d 1069 (11th Cir. 2000). The type of fraudulent joinder pertinent to the matter sub judice is the first type.

Wyeth, as the removing party, bears the burden of establishing fraudulent joinder. See Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989). The burden is a "heavy one," because Lewis need not have a winning case against the nondiverse Defendant. See Triggs, 154 F.3d at 1287. Rather, "[I]f there is even a possibility that a state court would find that the complaint states a cause of action against [the nondiverse Defendant, the Court] must find that the joinder was proper and remand the case to the state court." Coker v. Amoco Oil Co., 709 F.2d 1433, 1440-41 (11th Cir. 1983), superceded by statute on other grounds by Wilson v. Gen. Motors Corp., 888 F.2d 779, 782 n. 3 (11th Cir. 1989).[3] A district court "must evaluate

---

[3] Plaintiff Lewis argues that Wyeth must demonstrate fraudulent joinder with clear and convincing evidence. The former Fifth Circuit appears to have required that a defendant's evidence in support of a fraudulent joinder claim be clear and convincing. See Parks v. New York Times Co., 308 F.2d 474, 478 (5th Cir. 1962). Because former Fifth Circuit opinions are binding precedent for Eleventh Circuit courts, some district courts in the Eleventh Circuit have adopted the clear and convincing standard. See e.g., Lane v. Champion Int'l Corp., 827 F. Supp. 701, 710 (S.D. Ala. 1993), Katz v. Costa Armatori, S.P.A., 718 F. Supp.

the factual allegations in the light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in favor of the plaintiff." Crowe, 113 F.3d at 1538. This determination is based on the plaintiff's pleadings at the time of removal. See id. However, a district court "may consider affidavits and deposition transcripts submitted by the parties." Id.[4]

"While the proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed.R.Civ.P. 56(b), the jurisdictional inquiry must not subsume substantive determination." Id. (citation and internal quotations omitted). "When considering a motion to remand, [the district court should] not weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." Id. Regarding a district court's determination of an arguable claim, the Eleventh Circuit has stated:

> For a [p]laintiff to present an arguable claim against an in-state [i.e., nondiverse] defendant and, therefore, to require a case removed to federal court to be remanded to state court, the plaintiff need not show that he could survive in the district court a motion for summary judgment filed by that in-state defendant. For a remand, the plaintiff's burden is much lighter than that: after drawing all reasonable inferences from the record in the plaintiff's favor and then resolving all contested issues of fact in favor of the plaintiff, there need only be "a reasonable basis for predicting that the state law *might* impose liability on the facts involved."

---

1508, 1510 (S.D. Fla. 1989). On the other hand, some district courts have questioned whether Parks remains good law in light of numerous Eleventh Circuit opinions which have failed to enunciate a clear and convincing requirement. See e.g., Campana v. American Home Products Corp., Case No. 1:99-cv-250/MMP, p. 7 n. 5 (N.D. Fla. March 7, 2000). However, this Court need not determine whether the clear and convincing standard is applicable, because assuming *arguendo* that it is, the evidence presented by Wyeth is clear and convincing.

[4] The evidence in question in this case are declarations as opposed to affidavits; however, declarations have the same legal effect as affidavits. See 28 U.S.C. § 1746 (West 2004). A "declaration" is "[a] formal, written statement—resembling an affidavit but not notarized or sworn to—that attests under penalty of perjury, to facts known by the declarant. Such a declaration, if properly prepared, is admissible in federal court with the same effect as an affidavit." BLACK'S LAW DICTIONARY 415 (7th ed. 1999) (citing 28 U.S.C. § 1746).

Id., at 1541-42 (quoting B. Inc. v. Miller Brewing Co., 663 F.. 2d 545, 549 (5th Cir. Unit A 1981)) (emphasis in original).[5] Furthermore, because "[f]ederal courts are courts of limited jurisdiction,...there is a presumption against the exercise of federal jurisdiction, such that all uncertainties as to removal are to be resolved in favor of remand." Russell Corp. v. American Home Assurance Co., 264 F. 3d 1040, 1050 (11th Cir. 2001) (citing Burns v. Windsor Ins. Co., 31 F. 3d 1092, 1095 (11th Cir. 1994)).

In the instant case, Wyeth, the removing party, has affirmatively presented evidence to demonstrate that Defendant Peacock was fraudulently joined by Lewis. Peacock's declaration shows that he did not market, advertise, sell, distribute, promote, dispense, supply, detail, or design Pondimin, which was the diet drug allegedly ingested by Lewis. Moreover, Peacock had no independent knowledge or control over the messages that Wyeth provided to physicians about Pondimin. Based on the declaration, Lewis cannot maintain any of her asserted causes of action against Peacock.[6] Once Wyeth presented the declaration to the Court, Lewis

---

[5] The Eleventh Circuit has cautioned that "district courts must exercise extraordinary care to avoid jumbling up motions for remand and motions for summary judgment that come before them. In the remand context, the district court's authority to look into the ultimate merit of the plaintiff's claims must be limited to checking for obviously fraudulent or frivolous claims." Crowe, 113 F.3d at 1542.

[6] Regarding the causes of action in Lewis's complaint, Florida law requires:

(1) Counts I & II - strict liability - "in order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish the manufacturer's relationship to the product in question, the defect and unreasonable dangerous condition of the product, and the existence of a proximate causal connection between such condition and the user's injuries or damage." Siemens Energy & Automation, Inc. v. Medina, 719 So. 2d 312, 316 (citations omitted). "Florida courts have expanded the doctrine of strict liability to others in the distributive chain including retailers, wholesalers, and distributors." Id. (citations omitted). In the case at hand, it is clear that Peacock was neither a manufacturer of Pondimin nor within the drug's distributive chain. Furthermore, unlike the defendant in Medina, Peacock was not even a broker of Pondimin who served as the conduit of information between Wyeth and physicians. Thus, there is no possibility that a Florida court could determine that Lewis states a claim for strict liability against Peacock.

(2) Count III - negligence (based on a failure to warn and misrepresentation) - Because Defendant Peacock had no knowledge about Pondimin and did not distribute, sell, market, etc. it to physician Lewis fails to state a claim for negligence. See Cooper Hotel Servs., Inc. v. MacFarland, 662 So. 2d 710, 712 (Fla. 2nd DCA 1995) (Under Florida law, the elements for negligence are: "(1) the defendant had a duty to protect the plaintiff; (2) the defendant breached that duty; and (3) the defendant's breach was the proximate cause of the plaintiff's injuries and resulting damages.") (citation omitted). Peacock owed no duty to Lewis, and he could not be the legal or proximate cause of Lewis's alleged injuries. Thus, there is no possibility that a Florida court could

could not continue to rely upon her unsupported allegations in the complaint. Lewis had to put forth evidence to refute the statements in the declaration. See Campana v. American Home Products, 1:99-cv-250/MMP, pp. 7-8 (N.D. Fla. March 7, 2000).

Lewis's evidence in support of the motion to remand does not refute the evidence in Peacock's declaration concerning his non-involvement with the drug Pondimin. None of Lewis's evidence shows that Peacock promoted Pondimin to Lewis's prescribing physician. Thus, Peacock's uncontroverted declaration is sufficient to demonstrate that he was fraudulently joined in this lawsuit.[7] See e.g., Kearney v. Wyeth, Case No. 6:03-cv-288-Orl-31KRS (M.D. Fla. May 13, 2003) (An

---

determine that Lewis states a claim for negligence against Peacock.

(3) Count IV - fraudulent misrepresentation and fraudulent concealment - Under Florida law, a fraudulent misrepresentation claim has four elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." Johnson v. Davis, 480 So. 2d 625, 627 (Fla. 1985) (citing Huffstaler v. Our Home Life Ins. Co., 65 So. 1 (Fla. 1914)). "As for fraudulent concealment, "[a] defendant's knowing concealment or non-disclosure of a material fact may only support an action for fraud where there is a duty to disclose. Such duty arises when one party has information that the other party has a right to know because of a fiduciary or other relation of trust or confidence between them." TransPetrol, Ltd. v. Radulovic, 764 So. 2d 878, 879-80 (Fla. 4th DCA 2000) (citations omitted). Because Peacock did not sell, distribute, etc. Pondimin, Lewis cannot state a claim for fraudulent misrepresentation or fraudulent concealment against him.

(4) Count V - civil conspiracy - "Ordinarily, [under Florida law], a corporation cannot conspire with its own directors, officers, or employees since the corporation acts through these individuals. However, an exception exists when the individual has an independent personal stake, apart from that of the corporation, in achieving the object of the conspiracy." Greenberg v. Mount Sinai Med. Ctr., 629 So. 2d 252, 256 (Fla. 3rd DCA 1993) (citations omitted). Lewis cannot state a claim for civil conspiracy against Peacock because he did not have a personal stake in misrepresenting Pondimin to physicians, a drug with which they were not involved, and without an independent personal stake in the misrepresentation, he could not have conspired with Wyeth.

[7] In her motion to remand, Lewis also argues that Peacock admits in his answer to having provided adequate and complete warnings to physicians regarding Pondimin. According to Lewis, such admissions "are evidence that Defendant Peacock detailed Pondimin." Contrary to Lewis's position, in Florida, a statement in a pleading that is meant as an alternative allegation in the event that a plaintiff successfully pleads a prima facie case does not constitute an admission. See Booker v. Sarasota, Inc., 707 So. 2d 886, 888-89 (Fla. 1st DCA 1998) (citations omitted). Thus, the statement that "Defendant provided adequate warnings and complete warnings to Plaintiff's prescribing physicians" does not constitute an admission by Peacock, because he was pleading in the alternative in the event that Lewis pleaded a prima facie case against him. Furthermore, in his answer, Peacock denied specific allegations in the complaint, such as: (1) "Pondimin was widely advertised and/or promoted by Defendants[;]" and (2) he had control over the "design, assembly, packaging, marketing, advertising, manufacturing, labeling, testing, promoting, distribution, and/or sale of...Pondimin."

Case No. 3:04-cv-81/MCR

uncontroverted affidavit of a sales representative that she did not promote, sell, etc. Pondimin, the drug that allegedly injured the plaintiff, was enough to establish fraudulent joinder as the court determined that plaintiff could not state a claim against her.); Long v. Wyeth, Case No. 6:03-cv-421-OrlJGG (M.D. Fla. May 15, 2003) (same); Campana v. American Home Products, 1:99-cv-250/MMP (N.D. Fla. March 7, 2000) (same). As a result, after drawing all reasonable inferences from the record in Lewis's favor, there is no reasonable basis for predicting that Florida law might impose liability on Peacock based upon the facts involved in this case. Therefore, Wyeth's removal of this case was proper, and Lewis's motion to remand (see doc. 16) is DENIED. Because Peacock was fraudulently joined in the instant action, all claims against him are DISMISSED WITH PREJUDICE, and the Clerk shall enter judgment for Defendant Peacock. The dismissal of the nondiverse Defendant results in achieving complete diversity in this case, and as such, the Court has subject matter jurisdiction.

Accordingly, It is hereby ordered:

1.     Plaintiff SHERRILEE H. LEWIS's motion to remand (see doc. 16) is DENIED.

2.     Defendant LEROY PEACOCK has been fraudulently joined in this lawsuit; therefore, all claim against Defendant Peacock are DISMISSED WITH PREJUDICE. The Clerk shall enter judgment for Defendant Peacock.

ORDERED on this 28th day of April, 2004.


_s/ M. Casey Rodgers_

M. CASEY RODGERS
United States District Judge


Case No. 5:04-cv-81/MCR

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

EARLIE J. FOWLER, and SOLOMON
FOWLER, JR.,

      Plaintiffs,

v.                               Case No. 3:04-cv-83/MCR

WYETH, f/k/a American Home Products
Corporation; WYETH PHARMACEUTICALS,
f/k/a Wyeth-Ayerst Labs, Inc.; RICHARD COE;
and DEBRA BERRY,

      Defendants.

_____/

## ORDER DENYING PLAINTIFFS' MOTION TO REMAND AND TEMPORARILY STAYING THE CASE

On February 5, 2004, Plaintiffs EARLIE J. FOWLER and SOLOMON FOWLER, JR. ("Plaintiffs") filed a tort action in the Circuit Court in and for Escambia County, Florida seeking damages that allegedly resulted from Earlie Fowler's ingestion of the prescription diet drug Pondimin. (Doc. 1, Exh. 1). Plaintiffs' Complaint for Damages asserts the following six causes of action against all Defendants: (1) Count I - strict products liability, defective design; (2) Count II - strict products liability, failure to warn; (3) Count III - negligence; (4) Count IV - fraudulent misrepresentation and fraudulent concealment; (5) Count V - civil conspiracy; and (6) Count VI - loss of consortium. (Id.). On March 8, 2004, Defendants WYETH and WYETH PHARMACEUTICALS (collectively referred to as "Wyeth") filed a Notice of Removal in this Court based on diversity jurisdiction, see 28 U.S.C. § 1332. (Doc. 1). Although Plaintiffs and Defendants RICHARD COE ("Coe") and DEBRA BERRY

("Berry") are Florida residents, Wyeth's Notice asserts that Plaintiffs fraudulently joined Coe and Berry in this case so as to prevent federal diversity jurisdiction. (Id.).

On the day of removal, Wyeth also filed a Motion to Stay All Proceedings (see doc. 5) pending a final ruling from the Judicial Panel on Multi-District Litigation regarding transfer of this case to MDL-1203, and Defendants Coe and Berry each filed an Answer and Affirmative Defenses (see docs. 3 and 4). On March 17, 2004, Plaintiffs filed a Motion to Remand (see doc. 16) along with supporting documents (see doc. 17); however, due to a clerical error, the motion to remand and supporting documents were not reflected on the docket until April 5, 2004. Also on March 17, 2004, Plaintiffs filed a response in opposition to the motion to stay requesting that the Court consider their motion to remand before ruling on the motion to stay. (Doc. 5). Because of the clerical error, the Court was unaware that the motion to remand had been misfiled and granted the motion to stay. (Doc. 14). The clerical error was discovered shortly thereafter, and the Court lifted the stay. (Doc. 19). Defendants failed to timely respond in opposition to Plaintiffs' motion to remand.[1]

A. *Facts*

Plaintiffs allege, in their complaint, that Earlie J. Fowler sustained serious and permanent injuries as a result of her ingestion of the prescription diet drug Pondimin. Wyeth distributed and sold Pondimin, as well as another diet drug, Redux, which is not at issue in this case. Wyeth promoted and distributed both drugs to physicians. When Pondimin or Redux is combined with another diet drug called phentermine, the resulting combination is popularly known as "fen-phen." In September 1997, both Pondimin and Redux were voluntarily withdrawn from the market due to concerns about heart valve damage associated with their usage.

---

[1] Defendant Wyeth did file a Consent Motion for Leave to Respond to Plaintiffs' Motion to Remand Out of Time (doc. 20) which is rendered moot by this order.

The following facts are derived from the declarations of Defendants Coe and Berry. (Doc. 1, Exhs. 14 and 15). In the 1990s, Coe and Berry worked as sales representatives for A.H. Robins Co. and American Home Products Corp. (which are now known as Wyeth). As sales representatives, they visited physicians' offices educating them about Redux so that the physicians could consider whether to prescribe Redux to their patients.[2] On these visits, Coe and Berry gave the physicians FDA-approved package inserts about Wyeth's products. Typically, these visits lasted less than five minutes. Neither Coe nor Berry had any specialized medical or pharmacological training, except that which was provided by Wyeth. Their knowledge of Redux was derived exclusively from the training provided by Wyeth. Furthermore, neither Coe nor Berry had involvement in the preparation or development of package inserts for any drugs, and had no control over content or other written warnings. In fact, they had no knowledge concerning the association of Redux to valvular heart disease prior to that relationship being first acknowledged and publicized.

## B. *Motion to Remand*

In the motion to remand, Plaintiffs assert that Wyeth has not demonstrated that Coe and Berry were fraudulently joined in the current lawsuit. Plaintiffs claim that there is a possibility that they have a cause of action against Coe and Berry under Florida law, and because of that possibility, Plaintiffs argue that Coe and Berry are not fraudulently joined. If Plaintiffs are correct, then complete diversity will not exist, and the this case should be remanded to the Circuit Court in and for Escambia County, Florida. In opposition to Plaintiffs' motion to remand, Wyeth asserts that Plaintiffs have no reasonable basis for the claims asserted against Coe and Berry, thereby making them fraudulently joined.

---

[2] As sales representatives, neither Coe nor Berry "dispensed, supplied, designed, detailed, promoted, marketed, advertised, distributed, or sold Pondimin." (Doc. 1, Exhs. 14, ¶ 3. and 15, ¶ 3).

Case No. 3:04-cv-83/MCR

## 1. Removal Jurisdiction

A party may remove any case from a state court which could have been brought in federal court, see 28 U.S.C. § 1441(a), but the removing party bears the burden of establishing jurisdiction, see University of S. Ala. v. The Amer. Tobacco Co., 139 F. 3d 1368, 1373 (11th Cir. 1998) (citing Diaz v. Sheppard, 85 F. 3d 1502, 1505 (11th Cir. 1996)).  To satisfy its burden as the removing party, Wyeth argues that the Court has removal jurisdiction over this case because Plaintiffs' complaint could have been originally filed in federal court pursuant to diversity jurisdiction. See 28 U.S.C. § 1332 (West 2004).  Diversity jurisdiction is an adequate ground for removal, see Pancho de Perez, 139 F. 3d at 1373, but diversity jurisdiction only exists when there is complete diversity amongst the parties, see Triggs v. John Crump Toyota, Inc., 154 F. 3d 1284, 1287 (11th Cir. 1998).  Complete diversity requires that all defendants have diverse citizenship from all plaintiffs. See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806), overruled on other grounds, Louisville C. & C.R. Co. v. Letson, 43 U.S. (2 How.) 497, 11 L. Ed. 353 (1844); Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1542 (11th Cir. 1993).

The procedure to remove a case to federal court is relatively simple, requiring only that a defendant file a notice of removal containing "a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant." 28 U.S.C.A. § 1446(a) (West 2004).  However, a court must continue to scrutinize its jurisdiction subsequent to removal. "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C.A. § 1447(c) (West 2004); see also FED. R. CIV. P. 12(h)(3) (2004). Once a court's jurisdiction is questioned—either by the court sua sponte or the plaintiff—the defendant, as the party invoking jurisdiction, has the burden of proving that federal jurisdiction is appropriate. See McNutt v. Gen. Motors Acceptance Corp. of Ind., Inc., 298 U.S. 178, 184–90, 56 S. Ct.

780, 782–85, 80 L. Ed. 1135 (1936); Village Fair Shopping Ctr., Co. v. Sam Broadhead Trust, 588 F.2d 431, 433 (5th Cir. 1979).[3]

As noted, Wyeth's notice of removal bases this Court's jurisdiction solely on diversity grounds.  Plaintiffs are Florida residents, and Defendant Wyeth is a Delaware corporation with its principal place of business in New Jersey. However, Defendants Coe and Berry, like Plaintiffs, are Florida residents, which would normally destroy complete diversity under 28 U.S.C. § 1332, unless Coe and Berry were fraudulently joined in the lawsuit.

### 2. Fraudulent Joinder

Courts recognize an exception to the complete diversity requirement for cases in which a nondiverse party has been fraudulently joined. See Crowe v. Coleman, 113 F. 3d 1536, 1538 (11th Cir. 1997).  The Eleventh Circuit has acknowledged three situations in which joinder is deemed fraudulent.  The first situation is when there is no possibility that the plaintiff can prove a cause of action against the non-diverse defendant. See Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998)(citing Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir. 1983), superceded by statute on other grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533 (11th Cir. 1993)).  The second is where there is outright fraud in the plaintiff's pleading of jurisdictional facts. See Triggs, 154 F.3d at 1287; Coker, 709 F.2d at 1440.  The third is where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several, or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant. See Triggs, 154 F.3d at 1287; Tapscott v. MS Dealer Serv. Corp., 77 F.3d 1353, 1355 (11th Cir. 1996), abrogated on other grounds by Cohen v. Office Depot, Inc., 204 F.3d 1069 (11th Cir.

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

Case No. 3:04-cv-83/MCR

2000). The type of fraudulent joinder pertinent to the matter *sub judice* is the first type.

Wyeth, as the removing party, bears the burden of establishing fraudulent joinder. See Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989). The burden is a "heavy one," because Plaintiffs need not have a winning case against the nondiverse Defendants. See Triggs, 154 F. 3d at 1287. Rather, "[i]f there is even a possibility that a state court would find that the complaint states a cause of action against any one of the [nondiverse Defendants, the Court] must find that the joinder was proper and remand the case to the state court." Coker v. Amoco Oil Co., 709 F.2d 1433, 1440-41 (11th Cir. 1983), superceded by statute on other grounds by Wilson v. Gen. Motors Corp., 888 F.2d 779, 782 n. 3 (11th Cir. 1989).[4] A district court "must evaluate the factual allegations in the light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in favor of the plaintiff." Crowe, 113 F.3d at 1538. This determination is based on the plaintiff's pleadings at the time of removal. See id. However, a district court "may consider affidavits and deposition transcripts submitted by the parties." Id.[5]

_____

[4] Plaintiffs argue that Wyeth must demonstrate fraudulent joinder with clear and convincing evidence. The former Fifth Circuit appears to have required that a defendant's evidence in support of a fraudulent joinder claim be clear and convincing. See Parks v. New York Times Co., 308 F. 2d 474, 478 (5th Cir. 1962). Because former Fifth Circuit opinions are binding precedent for Eleventh Circuit courts, some district courts in the Eleventh Circuit have adopted the clear and convincing standard. See e.g., Lane v. Champion Int'l Corp., 827 F. Supp. 701, 710 (S.D. Ala. 1993); Katz v. Costa Armatori, S.P.A., 718 F. Supp. 1508, 1510 (S.D. Fla.1989). On the other hand, some district courts have questioned whether Parks remains good law in light of numerous Eleventh Circuit opinions which have failed to enunciate a clear and convincing requirement. See e.g., Campana v. American Home Products Corp., Case No. 1:99-cv-250/MMP, p. 7 n. 5 (N.D. Fla. March 7, 2000). However, this Court need not determine whether the clear and convincing standard is applicable, because assuming *arguendo* that it is, the evidence presented by Wyeth is clear and convincing.

[5] The evidence in question in this case are declarations as opposed to affidavits; however, declarations have the same legal effect as affidavits. See 28 U.S.C. § 1746 (West 2004). A "declaration" is "[a] formal, written statement--resembling an affidavit but not notarized or sworn to--that attests under penalty of perjury, to facts known by the declarant. Such a declaration, if properly prepared, is admissible in federal court with the same effect as an affidavit." BLACK'S LAW DICTIONARY 415 (7th ed. 1999) (citing 28 U.S.C. § 1746).

Case No. 3:04-cv-83/MCR

"While the proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed.R.Civ.P. 56(b), the jurisdictional inquiry must not subsume substantive determination." Id. (citation and internal quotations omitted). "When considering a motion to remand, [the district court should] not weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." Id. Regarding a district court's determination of an arguable claim, the Eleventh Circuit has stated:

> For a [p]laintiff to present an arguable claim against an in-state [i.e., nondiverse] defendant and, therefore, to require a case removed to federal court to be remanded to state court, the plaintiff need not show that he could survive in the district court a motion for summary judgment filed by that in-state defendant. For a remand, the plaintiff's burden is much lighter than that: after drawing all reasonable inferences from the record in the plaintiff's favor and then resolving all contested issues of fact in favor of the plaintiff, there need only be "a reasonable basis for predicting that the state law *might* impose liability on the facts involved."

Id., at 1541-42 (quoting B. Inc. v. Miller Brewing Co., 663 F.. 2d 545, 549 (5th Cir. Unit A 1981)) (emphasis in original).[6] Furthermore, because "[f]ederal courts are courts of limited jurisdiction,...there is a presumption against the exercise of federal jurisdiction, such that all uncertainties as to removal are to be resolved in favor of remand." Russell Corp. v. American Home Assurance Co., 264 F. 3d 1040, 1050 (11th Cir. 2001) (citing Burns v. Windsor Ins. Co., 31 F. 3d 1092, 1095 (11th Cir. 1994)).

In the instant case, Wyeth, the removing party, has affirmatively presented evidence to demonstrate that Defendants Coe and Berry were fraudulently joined by Plaintiffs.  The declarations of Coe and Berry show that they did not market,

---

[6] The Eleventh Circuit has cautioned that "district courts must exercise extraordinary care to avoid jumbling up motions for remand and motions for summary judgment that come before them. In the remand context, the district court's authority to look into the ultimate merit of the plaintiff's claims must be limited to checking for obviously fraudulent or frivolous claims." Crowe, 113 F. 3d at 1542.

Case No. 3:04-cv-83/MCR

advertise, sell, distribute, promote, dispense, supply, detail, or design Pondimin, which was the diet drug allegedly ingested by Earlie J. Fowler. Moreover, Defendants Coe and Berry had no independent knowledge or control over the messages that Wyeth provided to physicians about Pondimin. Based on the declarations, Plaintiffs cannot maintain any of their asserted causes of action against Coe and Berry.[7] Once Wyeth presented the declarations to the Court,

---

[7] Regarding the causes of action in Plaintiffs' complaint, Florida law requires:

(1) Counts I & II - strict liability - "In order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish the manufacturer's relationship to the product in question, the defect and unreasonable dangerous condition of the product, and the existence of a proximate causal connection between such condition and the user's injuries or damage." Siemens Energy & Automation, Inc. v. Medina, 719 So. 2d 312, 315 (citations omitted). "Florida courts have expanded the doctrine of strict liability to others in the distributive chain including retailers, wholesalers, and distributors." Id. (citations omitted). In the case at hand, it is clear that Coe and Berry were neither manufacturers of Pondimin nor within the drug's distributive chain. Furthermore, unlike the defendant in Medina, neither Coe nor Berry were brokers of Pondimin who served as the conduit of information between Wyeth and physicians. Thus, there is no possibility that a Florida court could determine that Plaintiff Earlie J. Fowler states a claim for strict liability against Coe and Berry.

(2) Count III - negligence (based on a failure to warn and misrepresentation) - Because Defendants Coe and Berry had no knowledge about Pondimin and did not distribute, sell, market, etc. it to physicians, Plaintiff Earlie J. Fowler fails to state a claim for negligence. See Cooper Hotel Servs., Inc. v. MacFarland, 662 So. 2d 710, 712 (Fla. 2nd DCA 1995) (Under Florida law, the elements for negligence are: "(1) the defendant had a duty to protect the plaintiff; (2) the defendant breached that duty; and (3) the defendant's breach was the proximate cause of the plaintiff's injuries and resulting damages.") (citation omitted). Coe and Berry owed no duty to Earlie J. Fowler, and they could not be the legal or proximate cause of her alleged injuries. Thus, there is no possibility that a Florida court could determine that Plaintiff Earlie J. Fowler states a claim for negligence against Coe and Berry.

(3) Count IV - fraudulent misrepresentation and fraudulent concealment - Under Florida law, a fraudulent misrepresentation claim has four elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." Johnson v. Davis, 480 So. 2d 625, 627 (Fla. 1985) (citing Huffstetler v. Our Home Life Ins. Co., 65 So. 1 (Fla. 1914)). "As for fraudulent concealment, "[a] defendant's knowing concealment or non-disclosure of a material fact may only support an action for fraud where there is a duty to disclose. Such duty arises when one party has information that the other party has a right to know because of a fiduciary or other relation of trust or confidence between them." TransPetrol, Ltd. v. Radulovic, 764 So. 2d 878, 879-80 (Fla. 4th DCA 2000) (citations omitted). Because Coe and Berry did not sell, distribute, etc. Pondimin, Plaintiff Earlie J. Fowler cannot state a claim for fraudulent misrepresentation or fraudulent concealment against them. Thus, there is no possibility that a Florida court could determine that Plaintiff Earlie J. Fowler states a claim for fraudulent misrepresentation against Coe and Berry.

(4) Count V - civil conspiracy - "Ordinarily, [under Florida law], a corporation cannot conspire with its own directors, officers, or employees since the corporation acts through these individuals. However, an exception exists when the individual has an independent personal stake, apart from that of the corporation, in achieving

Case No. 3:04-cv-83/MCR

Plaintiffs could not continue to rely upon their unsupported allegations in the complaint. Plaintiffs had to put forth specific evidence to refute the statements in the declarations. See Campana v. American Home Products, 1:99-cv-250/MMP, pp. 7-8 (N.D. Fla. March 7, 2000).

Plaintiffs' evidence in support of the motion to remand does not refute the evidence in the Coe and Berry declarations concerning their non-involvement with the drug Pondimin. None of Plaintiffs' evidence shows that Coe and Berry promoted Pondimin to Earlie J. Fowler's prescribing physician. Thus, the uncontroverted declarations of Coe and Berry are sufficient to demonstrate that they were fraudulently joined in this lawsuit.[5] See e.g., Kearney v. Wyeth, Case No. 6:03-cv-288-Orl-31KRS (M.D. Fla. May 13, 2003) (An uncontroverted affidavit of a sales representative that she did not promote, sell, etc. Pondimin, the drug that allegedly injured the plaintiff, was enough to establish fraudulent joinder as the court

---

the object of the conspiracy." Greenberg v. Mount Sinai Med. Ctr., 629 So. 2d 252, 256 (Fla. 3rd DCA 1993) (citations omitted). Plaintiff Earlie J. Fowler cannot state a claim for civil conspiracy against Coe and Berry because they did not have a personal stake in misrepresenting Pondimin to physicians, a drug with which they were not involved, and without an independent personal stake in the misrepresentation, they could not have conspired with Wyeth. Thus, there is no possibility that a Florida court could determine that Plaintiff Earlie J. Fowler states a claim for civil conspiracy against Coe and Berry

(5) Count V - loss of consortium - A spouse's claim for loss of consortium is a derivative claim. See ACandS, Inc. v. Redd, 703 So. 2d 492, 493-94 (Fla. 3rd DCA 1997) (citation omitted). For example, a husband may only recover on such a claim only if his wife has a cause of action against the same defendant. See Id. Because the Court has determined that Plaintiff Earlie J. Fowler did not state a claim against Coe and Berry, Plaintiff Solomon Fowler likewise cannot state a derivative claim for loss of consortium against them. Thus, there is no possibility that a Florida court could determine that Plaintiff Solomon Fowler could state a claim for loss of consortium against Coe and Berry.

[6] In their motion to remand, Plaintiffs also argue that Coe and Berry admit in their answers to having provided adequate and complete warnings to physicians regarding Pondimin. According to Plaintiffs, such admissions "are evidence that Defendants Coe and Berry detailed Pondimin." Contrary to Plaintiffs' position, in Florida, a statement in a pleading that is meant as an alternative allegation in the event that a plaintiff successfully pleads a prima facie case does not constitute an admission. See Booker v. Sarasota, Inc., 707 So. 2d 886, 888-89 (Fla. 1st DCA 1998) (citations omitted). Thus, the statement that "Defendant provided adequate warnings and complete warnings to Plaintiffs' prescribing physicians" does not constitute an admission by either Coe or Berry, because they were pleading in the alternative in the event that Plaintiffs pleaded a prima facie case against them. Furthermore, in their answers, Coe and Berry denied specific allegations, in the complaint, such as: (1) "Pondimin was widely advertised and/or promoted by Defendants[;]" and (2) they had control over the "design, assembly, packaging, marketing, advertising, manufacturing, labeling, testing, promoting, distribution, and/or sale of...Pondimin."

Case No. 3:04-cv-83/MCR

determined that plaintiff could not state a claim against her.); Long v. Wyeth, Case No. 6:03-cv-421-OrlJGG (M.D. Fla. May 15, 2003) (same); Campana v. American Home Products, 1:99-cv-250/MMP (N.D. Fla. March 7, 2000) (same). As a result, after drawing all reasonable inferences from the record in Plaintiffs' favor, there is no reasonable basis for predicting that Florida law might impose liability on Coe and Berry based upon the facts involved in this case. Therefore, Wyeth's removal of this case was proper, and Plaintiffs' motion to remand (see doc. 16) is DENIED. Because Coe and Berry were fraudulently joined in the instant action, all claims against them are DISMISSED WITH PREJUDICE, and the Clerk shall enter judgment for Defendants Coe and Berry. The dismissal of the nondiverse Defendants results in achieving complete diversity in this case, and as such, the Court has subject matter jurisdiction. In addition, the Court's previous Order temporarily staying the case (see doc. 14) is hereby reinstated, and all proceedings in this case are temporarily STAYED for four (4) months from the date that this Order is signed, pending a decision by the Judicial Panel on Multi-District Litigation on whether to transfer this action to MDL-1203.

Accordingly, it is hereby ordered:

1.  Plaintiffs EARLIE J. FOWLER and SOLOMON FOWLER's motion to remand (see doc. 16) is DENIED.

2.  Defendants RICHARD COE and DEBRA BERRY have been fraudulently joined in this lawsuit; therefore, all claims against Defendants Coe and Berry are DISMISSED WITH PREJUDICE. The Clerk shall enter judgment for Defendants Coe and Berry.

3.  The Court's previous Order temporarily staying the case (see doc. 14) is hereby reinstated, and all proceedings in this case are temporarily

Case No. 3:04-cv-83/MCR

STAYED for four (4) months from the date that this Order is signed, pending a decision by the Judicial Panel on Multi-District Litigation on whether to transfer this action to MDL-1203.

ORDERED on this 14th day of May, 2004.

s/ M. Casey Rodgers

**M. CASEY RODGERS**
**United States District Judge**

Case No. 3:04-cv-83/MCR

# EXHIBIT 6

5-18-04; 3:28PM;                                    ;4074266343              # 4/ 22

FILED



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

17  9: 21

CLE        COURT
OCALA

LORI SOBKOWSKI,

        Plaintiff,

v.                                              Case No.  5:04-cv-96-Oc-10GRJ

WYETH, INC. f/k/a American Home Products
Corporation, WYETH-AYERST
LABORATORIES, INC., WYETH
PHARMACEUTICALS, INC., INDEVUS
PHARMACEUTICALS, INC. f/k/a Interneuron
Pharmaceuticals, Inc., PAUL W. PORTIER,
ANGELA KIRBY, M. ALYSEN TROY,

        Defendants.

---

### REPORT AND RECOMMENDATION[1]

    Pending before the Court is Plaintiff's Motion to Remand (Doc. 9) in which

Plaintiff requests the Court to remand this action to the Circuit Court for the Fifth

Judicial Circuit in and for Lake County, Florida. Defendants Wyeth, Portier, Kirby,

and Troy have filed a memorandum in opposition to Plaintiff's Motion (Doc. 20),

and the matter is now ripe for the Court's consideration. For the reasons discussed

below, the Court finds that Plaintiff's Motion to Remand (Doc. 9) is due to be

DENIED.

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule
6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation.
Failure to file timely objections shall bar the party from a de novo determination by a district judge
and from attacking factual findings on appeal.

## I. BACKGROUND & FACTS

On October 30, 2003, Plaintiff, a resident of Florida, filed this action in Florida state court against four companies,[2] each of which is considered a foreign entity for the purposes of diversity. Plaintiff also named as defendants Wyeth sales representatives Paul Potier, Angela Kirby (now known as Angela Richards), and Alysen Troy ("sales representatives").[3] While Potier and Kirby are Florida residents,[4] Ms. Troy avers in a sworn affidavit that she has been a resident of Illinois at all times since May 1998 - well before Plaintiff filed her Complaint in October 2003.[5] Plaintiff has provided nothing to rebut such evidence. Because "diversity is determined when the suit is instituted and not when a cause of action arose,"[6] Troy is deemed a diverse party for the purposes of the Court's resolution of Plaintiff's motion to remand.

According to the allegations contained in Plaintiff's First Amended Complaint[7] ("Complaint"), Plaintiff developed Primary Pulmonary Hypertension

---

[2] Hereinafter, "Wyeth."

[3] According to Wyeth, "The job of sales representatives, also known as 'detailers,' is to ensure that physicians are aware of Wyeth's products so they can consider whether to prescribe them. Among other things, detailers deliver FDA-approved package inserts and other FDA-approved information [...] The FDA-approved inserts that the detailers provide disclose the drug's pharmacological properties, indications and contraindications, and known side effects." See Wyeth's Notice of Removal, Doc. 1, ¶24.

[4] See Wyeth's Memorandum in Opposition to Plaintiff's Motion to Remand, Doc. 20 at 8.

[5] Id. at Ex. 12.

[6] Jones v. Law Firm of Hill and Ponton, 141 F. Supp. 2d 1349, 1354-55 (M.D. Fla. 2001).

[7] Doc. 2.

2

5-10-04; 3:28PM;                                    ;4074286343                # 6/ 22

("PPH")[9] as a result of ingesting Redux[8] diet pills which were prescribed by her physician in 1996.[10] In brief summary, Plaintiff claims that the sales representatives promoted Redux and encouraged Plaintiff's physician to prescribe the drug to his patients even though the sales representatives were aware that the drug caused PPH and other life-threatening conditions and was otherwise ineffective.[11]

Counts six through eleven of the Amended Complaint purport to allege claims against the sales representatives for civil conspiracy, misrepresentation by seller of chattel, negligence, fraud, breach of express warranty, and breach of implied warranty.[12]

Wyeth removed the case to this Court on March 15, 2004, pursuant to 28 U.S.C. §1441.[13] In its Notice of Removal, Wyeth claimed that the sales representatives have been fraudulently joined and that their presence in this action,

---

[8] Primary pulmonary hypertension is a condition where pulmonary capillaries in the lungs constrict, thereby elevating blood pressure. The signs and symptoms include fatigue, dizziness, syncope (fainting), dyspnea (labored breathing), swelling of ankles or legs, chest pain, and palpitations. It may be treated with drug therapy involving calcium-channel blockers or vasodilators, but a lung transplant is required for patients with severe PPH. See J.E. Schmidt, Attorneys' Dictionary of Medicine Vol. 4 (2003).

[9] Redux is the popular/brand name for dexfenfluramine. See Complaint, Doc. 2 at p.2. According to Plaintiff, Redux is designed to suppress one's appetite by increasing blood levels of the neurotransmitter, serotonin. Serotonin is a chemical that makes a person feel full after eating. (Id. at p. 7.)

[10] Plaintiff's Amended Complaint, Doc. 2. at p. 2.

[11] Id. at 1-61.

[12] Id.

[13] Notice of Removal, Doc. 1.

3

therefore, does not destroy diversity of citizenship.[14] Wyeth claims that the sales representatives were fraudulently joined because "[p]laintiff has no reasonable possibility of prevailing on any of the claims pled against them, and no good faith intent to pursue them to judgment."[15]

Plaintiff filed her motion to remand on March 22, 2004, claiming that the case should be remanded because she has stated several viable causes of action against Wyeth and its sales representatives under Florida state law and thus joinder of the sales representatives was not fraudulent joinder.[16]

## II. LEGAL STANDARD

A party may remove any case from a state court which originally could have been brought in federal court,[17] but the removing party bears the burden of establishing subject matter jurisdiction.[18] Any doubts regarding the existence of removal jurisdiction should be resolved in favor of the non-removing party.[19]

To satisfy its burden, Wyeth claims that, pursuant to 28 U.S.C. §1332, the Court has diversity jurisdiction over this case because the sales representatives, the only non-diverse defendants, have been fraudulently joined by Plaintiff.

---

[14] *Id.* at ¶10.

[15] *Id.* at ¶3.

[16] Plaintiff's Emergency Motion to Remand, Doc. 9.

[17] *See* 28 U.S.C. §1441(a)

[18] University of Alabama v. The American Tobacco Co., 168 F. 3d 405, 410 (11th Cir. 1999).

[19] Pacheco de Perez v. AT&T Co., 139 F. 3d 1368, 1373 (11th Cir. 1998).

4

Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity.[20] The Eleventh Circuit has recognized three situations in which fraudulent joinder arises.[21] The first is when there is no possibility that the plaintiff can prove a cause of action against the resident defendant.[22] The second is when there is outright fraud in the plaintiff's pleading of jurisdictional facts.[23] Finally, fraudulent joinder arises where a diverse defendant is joined with a non-diverse defendant as to whom there is no joint, several or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the non-diverse defendant.[24]

As to the first type of fraudulent joinder, which is the only type relevant to the Court's resolution of the instant motion to remand, "If there is even a possibility that a state court would find the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper

---

[20] Triggs v. John Crump Toyota, Inc., 154 F. 3d 1284, 1287 (11th Cir. 1998).

[21] Id. at 1287.

[22] Id. Citing Coker v. Amoco Oil Co., 709 F. 2d 1433, 1440 (11th Cir. 1983), superceded by statute on other grounds, see Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F. 2d 1533 (11th Cir. 1993).

[23] Triggs at 1287 citing Coker at 1440.

[24] Id. Citing Tapscott v. MS Dealer Service Corp., 77 F. 3d 1353, 1355 (11th Cir. 1996). Defendant also claims that joinder of the detailer defendants was fraudulent because Plaintiff lacks the intent to obtain judgment against them. This basis for fraudulent joinder has been mentioned by the other district courts. See Samples v. Conoco, Inc., 165 F. Supp 2d 1303, 1319-1320 (N.D. Fla. 2001)(Plaintiff must have a real intention to obtain judgment against the non-diverse defendant as long as the potential for joint liability exists.) Citing Triggs at 1291. See Also Chicago Rock Island & Pac. Rv. Co. v. Schwvhart, 227 U.S. 184, 193-194 (1913).

5

and remand the case to state court."[25] The plaintiff need not have a "winning case" against the allegedly fraudulent defendant.[26] Rather, the Plaintiff need only have "a possibility of stating a valid cause of action in order for the joinder to be legitimate."[27] Conversely, the burden on Wyeth to establish fraudulent joinder is a heavy one to bear.[28]

"While the proceeding [...] for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under F. R. Civ. P. 56(b), the jurisdictional inquiry must not subsume substantive determination."[29] Accordingly, to determine whether a case should be remanded, the court "must evaluate the factual allegations in the light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in favor of the plaintiff."[30] These determinations are based on the plaintiff's pleadings at the time of removal, and on the affidavits and deposition transcripts submitted by the parties.[31] However, in considering a motion to remand, a federal court must not "weigh the

---

[25] *Id. See Also* Tillman v. R.J. Reynolds Tobacco, 340 F. 3d 1277, 1279 (11th Cir. 2003).

[26] Triggs at 1287.

[27] *Id.*

[28] Crowe v. Coleman, 113 F. 3d 1536, 1538 (11th Cir. 1997) *Citing* B. Inc. v. Miller Brewing Co., 663 F. 2d 545, 549 (5th Cir. Unit A 1981).

[29] *Id.*

[30] *Id.*

[31] Crowe at 1538. *See also* Coker at 1440 (Both parties may submit affidavits and deposition transcripts to support their positions with respect to a motion to remand.)

6

merits of a plaintiff's claim beyond determining whether it is an arguable one under
state law,"[32]

### III. DISCUSSION

#### A. Fraud

Relying upon *Albertson v. Richardson-Merrell, Inc.*[33] Plaintiff argues that
Florida law recognizes a cause of action in fraud against pharmaceutical sales
representatives. In *Albertson*, Florida's Fourth District Court of Appeal reversed the
trial court's dismissal of a fraud claim against a pharmaceutical sales representative.
The *Albertson* court recognized that a plaintiff who ingested a drug prescribed by
her doctor could maintain a cause of action for fraud directly against the sales
representative where the sales representative was alleged to have misrepresented
material facts concerning the safety of the drug at issue "well-knowing that the
safety *vel non* of [the drug] was not as he represented."[34]  Because *Albertson* was
an appeal from an order granting a motion to dismiss there was no reason to
discuss the facts supporting the fraud claim. Here, in contrast, and consistent with
the standards for determining whether remand is appropriate the Court is required
to go beyond the bare allegations in the complaint and consider the affidavits and
other matters on file in determining whether there is a "reasonable basis for
predicting that [Florida] law might impose liability on the facts involved."

---

[32] *Id.*

[33] 441 So. 2d 1146 (Fla. Dist. Ct. App. 1983).

[34] *Id.* at 1149-1150.

7

As Plaintiff points out, several judges in this district have relied upon *Albertson* in remanding diet drug cases in which Wyeth sales representatives have been named as defendants in similar counts alleging fraud.[35] However, the remand orders in most of these cases,[36] were based on the fact that Wyeth had failed to establish on the facts in those cases that the plaintiffs had no reasonable possibility of stating a valid cause of action against the sales representative. Indeed, in one case, *Little v. Wyeth Laboratories*, the court observed that Wyeth "presented nothing more to this Court than an allegation that the non-diverse individual Defendants were fraudulently joined by Plaintiff."[37]

Here, in contrast to those diet drug cases - and consistent with a number of similar diet drug cases in which courts have refused to remand cases[38] - Wyeth has provided affidavits and other materials, which directly attack the substance of

---

[35] *See, e.g.* Little v. Wyeth Laboratories, Inc. et al, Case No. 99-2244-Civ-T-17F (M.D. Fla. 1999); Hrencich v. Wyeth, Case No. 2:03-cv-659-FTM-29SPC (M.D. Fla. 2004); Parent v. Wyeth, Case No. 2:03-cv-626-FTM-29SPC(M.D. Fla. 2003); Wrigely v. Wyeth-Averst Laboratories, Inc. et al, Case No. 99-2246-Civ-T-26C (M.D. Fla. 1999); Morris v. Wyeth Laboratories Inc. et al, Case No. 99-2391-Civ-T-26C (M.D. Fla. 1999); Martin v. Wyeth Laboratories, Inc. et al, Case No. 99-2464-Civ-T-26A (M.D. Fla. 1999); Snell v. Wyeth Laboratories, Inc., et al, Case No. 99-2453-Civ-T-26A (M.D. Fla. 1999); Klausner v. Wyeth Laboratories, Inc. et al, Case No. 99-2254-CIV-T-24E (M.D. Fla. 1999); and Vale v. Wyeth Laboratories, Inc. et al, Case No. 99-2238-CIV-T-25E (M.D. Fla. 1999).

[36] Klausner was remanded because one of the named defendants neither signed the notice of removal nor explicitly stated its consent to removal on the record. The Wrigely opinion partly relied on Klausner. As Plaintiff does not argue about the issue of consent to removal, neither of the cases squarely apply to this matter.

[37] Little at p. 6.

[38] *See, e.g.* Kearney v. Wyeth, et al., Case No. 6:03-cv-288-Orl-31 KRS (M.D. Fla. 2003); Long v. Wyeth, et al., Case No. 6:03-cv-421-Orl-31JGG (M.D. Fla. 2003); Campana v. American Home Products Corp., Case No. 1:99cv260 MMP (N.D. Fla. 2000); Lewis v. Wyeth, et al., Case No. 3:04-cv-81 MCR (N.D. Fla. 2004).

5-18-04: 3:28PM;                                    :4074286343          # 12/ 22

Plaintiff's allegations regarding the representations made by the named sales representatives and when the misrepresentations were allegedly made. Although, the Plaintiff has filed her own affidavits, her evidence does not refute the evidence in Wyeth's affidavits and thus in deciding the motion to remand the Court does not need to resolve factual disputes.

In order to properly establish a claim for fraud, a plaintiff must allege: (1) a misrepresentation of material fact; (2)(a) knowledge of the representor of the misrepresentation, or (b) representations made by the representor with knowledge as to either their truth or falsity, or (c) representations made under circumstances in which the representor ought to have known, if he did not know, of the falsity thereof; (3) an intention that the representor induce the other to act on it; and (4) resulting injury to the party acting in justifiable reliance on the representation.[39]

While the Plaintiff has set forth in the Complaint[40] conclusory allegations against the sales representatives that track these elements, when these allegations are pierced by the affidavits filed by the parties, it is evident that even if Plaintiff's allegations are deemed true, they are insufficient to establish claims under Florida law against the sales representatives for fraud.

Plaintiff relies upon the affidavit of Dr. Scott A. Rodger - the physician who allegedly prescribed Redux to Plaintiff - to support her claim that the named sales

─────────────────

[39] Albertson at 1149-1150.

[40] Doc. 2 at p. 56.

9

representatives can be held liable for fraud based on the representations made to
Plaintiff's physician.[41] In addition to the affidavit of Dr. Rodger, Plaintiff has also
filed various records from Dr. Rodger's office, select pages from the 1998 edition
of the Physicians' Desk Reference ("PDR"), and detailing notes logged by the
defendant sales representatives in 1996 and 1997.[42]

In his affidavit, Dr. Rodger stated that "[d]uring the course of prescribing
Redux, Wyeth drug salespeople told me to not worry about the bad press that
Redux was getting and continued to encourage me to keep writing prescriptions
[...] If I was aware of the dangers that Redux posed to the health of my patients as
reflected in the 'black box'[43] warning contained in the 1998 PDR, I would never
have prescribed Redux. The warnings contained in the black box warning were not
communicated to me at the time of prescribing Redux to Ms. Sobkowski in
1996."[44]

Although, Dr. Rodder's affidavit fails to identify by name the "Wyeth
salespeople," who allegedly made the representations, the Court will assume that

[41] Doc. 9, Plaintiff's Memorandum, Attached Exhibit.

[42] Id. Presumably, this is all the material that Plaintiff could possibly offer this Court in her
effort to defeat Wyeth's claim of fraudulent joinder in this case. As Plaintiff herself stated in her
Motion for Remand, "liability depositions relevant to this case have been taken long ago. Experts
have been chosen by the lawyers on both sides and deposed multiple times. All that remains is to
depose treating physicians and a few other fact witnesses." See Doc. 9 at p.5.

[43] According to Plaintiff, the FDA recommends pharmaceutical companies to provide a "black
box" warning to emphasize the risks that might be associated with the use of a given drug. See Doc.
2 at ¶¶130-141. This black box warning appears near to the description of the drug in the PDR.
Based on the materials offered by Plaintiff, the first PDR black box warning was published in 1998.

[44] Id.

10

the allegations in Dr. Rodger's affidavit refers to the sales representatives named in this case. However, even with this assumption, the facts alleged in Dr. Rodger's affidavit fail to support Plaintiff's claims against the sales representatives for fraud for several reasons.

First, nothing in Dr. Rodger's affidavit or the other information filed by Plaintiff suggests that the sales representatives had special knowledge about Redux, which they withheld from Dr. Rodger. Rather, Dr. Rodger avers that the sales representatives told him not to worry about the bad press, as one would expect of anyone who sells a product that has received less than favorable treatment from news media.

Second, Dr. Rodger does not affirmatively allege the month or even the year he was told by the sales representatives to disregard the "bad press." The omission in Dr. Rodger's affidavit of the dates and year in which the representations were made by sales representatives is notable in view of the fact that according to the "detailing statement," attached to Dr. Rodger's affidavit, the sales representatives actually visited with Dr. Rodger, *after* he had prescribed Redux to Plaintiff. These detailing statements evidence that the sales representatives' marketing interactions with Dr. Rodger - in which they told Dr. Rodger to ignore the "bad press" - first occurred on July 22, 1997, more than one year after Dr. Rodger prescribed Redux to Plaintiff.[45]

---

[45] The Amended Complaint reveals that Mr. Sobkowski was prescribed Redux on June 21,
(continued...)

11

Finally, the "black box" warnings, attached to Dr. Rodger's affidavit, are in the 1998 PDR, which was not in existence in 1996, the year Plaintiff ingested Redux for approximately a three-month period.

Wyeth, on the other hand, has provided the Court with the affidavits of all three sales representatives to support its position that Plaintiff has no possibility of stating a single cause of action against these non-diverse defendants.

In each of these affidavits, the sales representatives have sworn that: (1) they never sold Redux; (2) they never intentionally misrepresented the safety or efficacy of Redux to any physician; (3) Wyeth was their only source of knowledge and information with respect to Redux; (4) they have no specialized medical or pharmacological  training with which they independently may have evaluated the safety and efficacy of Redux; and (5) Wyeth provided them with the FDA-approved package inserts and other information which were used by the sales representatives in the course of their employment with Wyeth.[46]

Accordingly, considering all of the evidence disclosed in the affidavits, it is evident that the sales representatives did not sell or distribute Redux to any physicians, including Dr. Rodger, and that any representations that were made by the sales representatives to Dr. Rodger were made *after* Dr. Rodger had prescribed Redux and *after* Plaintiff had stopped taking Redux. Therefore, the alleged

---

[45](...continued)
1996 and that she ingested Redux for about ninety (90) days. See Doc. 2 at ¶¶5-6.

[46] *See* Wyeth's Memorandum in Opposition to Plaintiff's Motion to Remand, Declarations of Potier, Richards, and Troy, Doc. 20, Exhibits 10, 11, and 12.

12

5-18-04;  3:28PM;                                  ;4074286343                 #  16/ 22

misrepresentations by the sales representatives to ignore the "bad press," even if considered to be sufficient to constitute a misrepresentation, cannot be actionable under a fraud theory in view of the fact that Plaintiff could not have relied on the misrepresentation through the information provided by the sales representatives to Plaintiff's physician, Dr. Rodger after the fact. The Court therefore concludes that even drawing all reasonable inferences in favor of the Plaintiff, there is no reasonable basis for predicting that Florida law might impose liability on the sales representatives for fraud.

### B. Negligence

Similarly, there is no possibility that Plaintiff can prove a negligence claim against the sales representatives. Under the negligence count in her Amended Complaint, Plaintiff repeats the same allegations presented in the fraud count, but adds that the sales representatives owed a duty to Plaintiff "not to exaggerate the efficacy or minimize the risks of the drug they were promoting, distributing, and selling."[47] She also claims that the sales representative "knew or should have known the risks of PPH associated with Redux," and that they "misrepresented [...] the dangers of [...] Redux."[48]

---

[47] Complaint, Doc. 2 at ¶300.

[48] Id. at ¶¶301-302.

13

5-18-04; 3:28PM;                                    ;4074286343                # 17/ 22

Relying upon *Bouie v. American General Life and Accident Insurance*[49] and

several Florida cases,[50] Plaintiff argues that the sales representatives may be liable

under Florida law for their negligent acts even if those acts are committed in the

scope of their employment. In *Bouie*, insurance sales agents who sold policies

directly to the plaintiff were accused of committing fraud by failing to disclose

racial disparities in premiums and benefits. The court held that if the sales agents

"were aware of the disparity and intentionally did not disclose it, then [...] plaintiff

is equally entitled to recover against the individual defendants as against the

insurer."[51]

However, none of the cases cited by Plaintiff nor *Bouie* are instructive

because each of these cases was grounded on the supposition that the defendants

*knew or should have known* of the risks caused by their "sale" of a given product.

Here, in contrast, the affidavits supplied by both parties demonstrate that the

sales representatives did not act in their individual capacities and had no special

knowledge of any alleged risks that Redux presented. According to the affidavits of

all three sales representatives, they promoted Redux based on information provided

---

[49] 199 F. Supp 2d 1259 (N.D. Fla. 2002).

[50] Plaintiff cites Greenberg v. Post, 19 So. 2d 714, 717 (1944)("It is well settled that an employee may be held personally liable at the suit of a third person for positive negligent acts committed by him even though his employer may likewise be liable for the servant's negligent conduct when exercised within the scope of the employment."); and White-Wilson Medical Center v. Davis Consultants, Inc. 486 So. 2d 659, 661 (Fla. Dist. Ct. App. 1986)("Individual officers and agents of a corporation are personally liable where they have committed a tort even if such acts are performed within the scope of their employment [...] This is so even if no argument is advanced that the corporate form should be disregarded.")

[51] *Id.* at 1263.

14

by Wyeth, and they did not have any independent knowledge of the danger which Redux allegedly presented at the time they promoted the drug to Dr. Rodger.

This evidence is uncontroverted. Indeed, Dr. Rodger's affidavit and the "detailing statement" attached thereto, actually *confirm* that the sales representatives did not have knowledge of any purported risks presented by Redux while they promoted the product. Without such knowledge and without any suggestion that the sales representatives acted in their individual capacities in promoting the drug, Plaintiff's negligence claim against them has no basis in fact.

In light of the foregoing, there is no possibility that Plaintiff could prove a claim in negligence against the sales representatives based on the facts involved in this case.

C. **Civil Conspiracy**

Plaintiff also has no possibility under Florida law of proving a claim for civil conspiracy against the sales representatives. "A civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy."[62] Under Florida law, it is well settled that neither an agent nor an employee can conspire with his or her corporate principal or employer,[63] unless the

---

[62] Lipsig v. Ramlawi, 760 So. 2d 170, 180 -181 (Fla. Dist. Ct. App. 2000) *Citing* Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App.) *rev. denied* 717 So. 2d 531 (Fla. 1998).

[63] *See* Richard Bertram, Inc. v. Sterling Bank & Trust, 820 So. 2d 963, 965 (Fla. Dist. Ct. (continued...)

15

employee has a personal stake "that is separate and distinct from the corporation's interests."[54]

There are no allegations in the Amended Complaint nor averments in the affidavits filed by Plaintiff that even remotely suggest that the sales representatives had a personal stake in their promotion of Redux "separate and distinct" from the interests of Wyeth. Rather, all of the allegations following the conspiracy count in the Amended Complaint reveal that the sales representatives and Wyeth acted with one common goal in mind - to sell Redux.[55] Therefore, because the sales representatives were employees of Wyeth during the time that the alleged conspiracy took place, as a matter of law, they could not have conspired with Wyeth.

D. **Misrepresentation by Seller of Chattel**

Plaintiff alleges that she is entitled to relief for "Misrepresentation by Seller of Chattel, Restatement of Torts (Second) §402B or Restatement of Torts (Third): Product Liability §9."[56] Plaintiff cannot possibly prevail on either type of claim under Florida law for the following reasons.

---

[53](...continued)
App. 2002)("It is well settled that neither an agent nor an employee can conspire with his or her corporate principal or employer.") *Accord* Leisure Founders, Inc. v. CUC International Inc., 833 F. Supp. 1562, 1574 (S.D. Fla. 1993)("It is axiomatic [...] that a corporation cannot conspire with its agents or employees.)

[54] Lipsig at 180-181.

[55] Doc. 2. at ¶¶273-285.

[56] *Id.* at p. 52.

16

First, no Florida court has ever adopted Restatement (Second) of Torts §402B.[67] Under the *Erie*[68] doctrine, a federal court sitting in diversity must apply the substantive law of the forum state. The Supreme Court has held that in a diversity case, a federal court is "not free to engraft onto those state rules exceptions or modifications which may command themselves to the federal court, but which have not commended themselves to the state in which the federal court in which the federal court sits."[69] Accordingly, the Court declines to allow Plaintiff to assert liability on a theory never before recognized under Florida law.

Second, even if Florida courts were to apply §402B, the rule applies only to sellers of chattel. Here, although Plaintiff alleges that the sales representatives sold Redux,[60] each of the representatives aver in their sworn declaration that they never sold Redux. These sworn allegations have not been controverted by Plaintiff. Moreover, Dr. Rodger's affidavit and the "detailing statement" attached thereto, reflect that the sales representatives merely encouraged Dr. Rodgers to write prescriptions of the drug.

Further, §402B only applies to sellers "who make public a misrepresentation of material fact." Under the rule, the misrepresentation is made public when the seller announces it to the public at large in order to induce purchase of the

[67] *See* Stevens v. Danek Medical, Inc., 1999 WL 33217282 (S.D. Fla. 1999).

[68] Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).

[69] Day & Zimmerman, Inc. v. Challoner, 423 U.S. 3, 4 (1975).

[60] Doc. 2, Complaint at ¶¶286-292.

17

chattels.[61] Here, it is merely alleged that the misrepresentations by the sales representatives were made directly to Dr. Rodger, and not to the public.[62]

Finally, Plaintiff's purported claims under Restatement of Torts (Second) § 402B and Restatement of Torts (Third), Product Liability §9 fail because they sound in strict liability. Consistent with these provisions of the Restatement, Florida law applies strict liability only to manufacturers of products[63] rather than to promoters. Because it is undisputed that the sales representatives in this case were not in the business of manufacturing Redux, under Florida law, they cannot be held strictly liable for the harm that allegedly resulted from Plaintiff's ingestion of the drug.

E.  Breach of Warranty

Lastly, Plaintiff also has no possibility of proving a claim for breach of implied or express warranty against the sales representatives. Under Florida law, each of these claims requires Plaintiff to demonstrate privity of contract between herself and the sales representatives.[64] Plaintiff does not allege that such privity exists[65] and there has been no evidence submitted by the parties which would suggest that

---

[61] Rest. 2d Torts §402B, comment h.

[62] Complaint, Doc. 2 at ¶¶286-292

[63] See West v. Caterpillar Tractor Company, Inc., 336 So. 2d 80, 87 (Fla. 1976).

[64] See Edgar v. Danek Med., Inc., 1999 WL 1054864 (M.D. Fla. 1999) Citing Kramer v. Piper Aircraft Corp., 520 So. 2d 37, 39 (Fla. 1988); T.W.M. v. American Med. Sys., Inc., 886 F. Supp 842, 844 (N.D. Fla. 1995)("A plaintiff who purchases a product, but does not buy it directly from the defendant, is not in privity with that defendant.") See Also Baker v. Danek Medical, 35 F. Supp. 2d 875, 878 ("Florida courts have required privity between the manufacturer and the consumer of the product in order for the consumer to assert an implied warranty claim.")

[65] Complaint, Doc. 2 ¶¶318-330.

18

privity exists between Plaintiff and the defendant sales representatives.

Accordingly, there is no possibility that Plaintiff could state a claim against the

sales representatives under Florida law for breach of warranty.

   In sum, because there is no reasonable basis in the record for predicting that

Florida law might impose liability under any of the purported causes of action raised

by Plaintiff against the sales representatives based on the facts involved in this

case, the Court concludes that for purposes of diversity the sales representatives

should be considered fraudulently joined and therefore may be ignored for purposes

of establishing diversity of citizenship. Therefore, Wyeth's removal of this case was

proper and Plaintiff's Motion to Remand (Doc. 9) is due to be DENIED.

## IV.  RECOMMENDATION

   In view of the foregoing, it is respectfully RECOMMENDED that Plaintiff's

Motion to Remand (Doc. 9) be DENIED.

   IN CHAMBERS in Ocala, Florida, on this 17th day of May, 2004.


                                    _____
                                    GARY R. JONES
                                    United States Magistrate Judge



Copies to:
       Honorable Wm. Terrell Hodges
       Senior United States District Judge

       Counsel of Record


                          19

5-18-04; 3:28PM;                                   ;4074256343          # 2/ 22

)                                    )                    FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

LORI SOBKOWSKI,

        Plaintiff,

v.                                              Case No. 5:04-cv-96-Oc-10GRJ

WYETH, INC. f/k/a American Home Products
Corporation, WYETH-AYERST
LABORATORIES, INC., WYETH
PHARMACEUTICALS, INC., INDEVUS
PHARMACEUTICALS, INC. f/k/a Interneuron
Pharmaceuticals, Inc., PAUL W. PORTER,
ANGELA KIRBY, M. ALYSEN TROY,

        Defendants.
_____

## ORDER

Pending before the Court is Plaintiff's Motion for Enlargement of Time (Doc. 22), to which Defendants have filed a response. (Doc. 23.) Plaintiff requests an enlargement of time to respond to Defendants' Motion to Set Aside Entry of Default until ten (10) days after the Court enters its order addressing Plaintiff's Motion to Remand.

On March 15, 2004, upon Plaintiff's motion, the Clerk of the Circuit Court of the Fifth Judicial Circuit in and for Lake County, Florida, entered a default against Defendants. (*See* Doc. 9, Ex. 1 & Doc. 16, Ex. A.) Defendants removed the case to this Court on the same day. (Doc. 1.)

27

On March 22, 2004, Plaintiff filed an Emergency Motion for Remand (Doc. 9), to which Defendants have filed a response. (Doc. 22.) On May 17, 2004, the Court issued its report and recommendation denying Plaintiff's Motion to Remand.

In view of the fact that the Court has recommended that Plaintiff's Motion To Remand be denied, it is appropriate for the Court to consider Defendant's Motion To Set Aside Clerk's Default. Accordingly, Plaintiff's Motion for Enlargement of Time (Doc. 22) is **GRANTED** and Plaintiff is directed to file her response to Defendants' Motion to Set Aside Default (Doc. 16) within ten **(10)** days of the date of this Order.

IT IS SO ORDERED.

DONE AND ORDERED in Ocala, Florida, on this 17th day of May, 2004.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel

2

# EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

| | | |
|---|---|---|
| In re: | : | **MDL Docket No. 4:03CV1507-WRW** |
| | : | **4:05CV01695** |
| **PREMPRO PRODUCTS LIABILITY** | : | |
| **LITIGATION** | : | |
| | : | |
| | : | |
| **CAROLE J. ANDRADE** | : | **PLAINTIFF** |
| | : | |
| **v.** | : | |
| | : | |
| **WYETH, INC., et al.** | : | **DEFENDANTS** |

## ORDER

    Pending is Plaintiff's Motion to Remand (Doc. No. 6). In the Motion, Plaintiff, a Florida resident, asserts that remand is appropriate because there is not complete diversity since Defendants Natalie Fosser and Sally Berthiaume, both Wyeth sales representatives, are Florida residents. At the time of removal, these sales representatives were the only non-diverse parties.

    This case is much like another Florida case, *Sobkowski v. Wyeth*.[1] Other than the fact that the drugs are different, the allegations, arguments, and legal support concerning the remand issue are virtually the same. After reviewing the May 17, 2004 Report and Recommendation in *Sobkowski*[2] and the Honorable Wm. Terrell Hodges's June 24, 2004 Order adopting these Recommendations,[3] I believe the reasoning directly on-point, and I adopt it in full.

    Accordingly, Pending is Plaintiff's Motion to Remand (Doc. No. 6) is DENIED.

    IT IS SO ORDERED this 21st day of December, 2005.

s/ Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE

---

    [1]5:04-CV-96-Oc-10GRJ (M.D. Fla. 2004).

    [2]*Sobkowski v. Wyeth*, 5:04-CV-96-Oc-10GRJ, 2004 WL 3569704 (M.D. Fla. May 17, 2004) (Attached as Ex. A).

    [3]*Sobkowski v. Wyeth*, 5:04-CV-96-Oc-10GRJ, 2004 WL 3581799 (M.D. Fla. June 24, 2004) (Attached as Ex. B).

*19892-2*

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 2 7 2005

JAMES W. McCORMACK, CLERK
By: _____ DEP. CLERK

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

In re:                          :    MDL Docket No. 4:03CV1507-WRW
                                :            4:05CV00462
PREMPRO PRODUCTS LIABILITY      :
LITIGATION                      :
                                :
                                :
SHERRON B. CHRISTIANSEN         :                    PLAINTIFF
                                :
v.                              :
                                :
WYETH, INC., et. al.            :                    DEFENDANTS

<u>ORDER</u>

Pending are Plaintiff's Motion for Leave to Amend Complaint to Add Bill Blount and

Walt Williams (Doc. No. 3), Motion for Leave to Amend Complaint to Add Charles Payne and

Bill Richards (Doc. No. 4), and Motion to Remand (Doc. No. 5). Defendants have responded to

the motions and oral arguments were heard on June 24, 2005 at the MDL Status Conference.

Also pending is Defendant Pfizer, Inc's Motion to Stay (Doc. No. 6).

     A.   **Motion for Remand**

     Remand to state court is proper if the district court lacks subject matter jurisdiction over

the asserted claims.[1] In reviewing a motion to remand, I must resolve all doubts in favor of a

remand to state court, and the party opposing remand has the burden of establishing federal

jurisdiction by a preponderance of the evidence.[2]

---

[1] 28 U.S.C. § 1447(c).

[2] *In re Business Men's Assurance Co. of America*, 992 F.2d 181, 193 (8th Cir.
1983)(citing *Steel Valley Auth. v. Union Switch and Signal Div.*, 809 F.2d 1006, 1010 (3d Cir.
1987) *cert. dismissed* 484 U.S. 1021 (1988)).

**15**

If the plaintiff "has joined a non-diverse party as a defendant in its state case, the [defendant] may avoid remand - in the absence of a substantial-federal question - only by demonstrating that the non-diverse party was fraudulently joined."[3]  If there is "a 'colorable' cause of action - that is, if the state law *might* impose liability on the resident defendant under the facts alleged - then there is no fraudulent joinder."[4]  However, in cases where "the sufficiency of the complaint against the non-diverse defendant is questionable, 'the better practice is for the federal court not to decide the doubtful question in connection with a motion to remand but simply to remand the case and leave the question for the state courts to decide.'"[5]

In the Motion to Remand, Plaintiff, an Alabama resident, asserts that remand is appropriate because there is not complete diversity since Defendants Rite Aid, Harco, Inc., Norman Bridge Drug Company, and CVS, Inc are all Alabama corporations.  At the time of removal, these pharmacies were the only non-diverse parties.

Defendants insist that Plaintiff can't chin the pole set by *Triggs v. John Crump Toyota, Inc.*[6] and its progeny.  I agree.  In *Walls v. Alpharma USPD, Inc,*[7] the Alabama Supreme Court held that, under the learned intermediary doctrine, the duty to determine whether the medication

---

[3]*Filla v. Norfolk Southern Ry. Co.*, 336 F.3d 806, 809 (8th Cir. 2003).

[4]*Id.* at 810.

[5]*Id.* at 811 (quoting *Iowa Public Service Co. v. Medicine Bow Coal, Co.*, 556 F.2d 400 (8th Cir. 1977).

[6]154 F.3d 1284 (11th Cir. 1998).

[7]887 So.2d 881 (Ala. 2004).

2

as prescribed was dangerously defective was not owed by the pharmacist filling the prescription, but by the prescribing physician.[8]  Considering this, Plaintiff's Motion to Remand is DENIED.

## 2.  Motion to Amend

Both of Plaintiff's Motions to Amend request to add Wyeth sales representatives as Defendants.  Under Civil Procedure Rule 15(a) leave to amend a complaint will be "freely given when justice so requires."[9]  However, Defendants assert that, after a case is lodged in federal court, the court should scrutinize a motion to amend and remand with a more jaundiced eye than it would a straight out motion to remand.  If filed after removal to a federal court, "when an amendment to the complaint would destroy diversity jurisdiction, a district court has the authority to deny the plaintiff's right to amend."[10]  Professor Wright tells us that: "Once a case has been removed . . . a pleading amendment that has the effect of ousting the federal court of its subject matter jurisdiction normally will not be permitted."[11]

It appears that Plaintiff could not maintain a cause of action against these Defendants under Alabama law.[12]  In view of *In re Rezulin*, one would think Plaintiff's Motions to Amend are bottomed upon the primary (if not sole) notion of defeating federal diversity jurisdiction.  Therefore, Plaintiff's Motions to Amend are DENIED.

---

[8]*See id.* at 886.

[9]Fed. R. Civ. Pro. 15(a).

[10]*Beverls v. American States Ins. Co.*, 100 F. Supp.2d 1309, 1312 (M.D. Ala. 2000).  *See also*

[11]14C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, *FEDERAL PRACTICE AND PROCEDURE* § 3738 (3d 1998).

[12]*See In re Rezulin Products Liability Litigation*, 133 F. Supp.2d 272, 286-288 (S.D.N.Y 2001).

## CONCLUSION

I sympathize with the desire of Plaintiff and Plaintiff's counsel to return to their native soil; but, during oral argument, Plaintiff's counsel was unable to furnish me with any sufficient reason to believe that Plaintiff will be significantly prejudiced by remaining in the Eastern District of Arkansas.

Based on the findings of fact and conclusions of law made during oral arguments, in the motions, and in this Order, Plaintiff's Motions for Leave to Amend Complaint (Doc. Nos. 3 and 4) and Motion to Remand (Doc. No. 5) are DENIED. Defendant Pfizer, Inc's Motion to Stay (Doc. No. 6) is DENIED as MOOT.

IT IS SO ORDERED this 27th day of June, 2005.

WM R. Wilson

UNITED STATES DISTRICT JUDGE
WM. R. WILSON, JR.

THIS DOCUMENT ENTERED ON
DOCKET SHEET IN COMPLIANCE
WITH RULE 58 AND/OR 79(a) FRCP
ON 6/27/05 BY

4

# EXHIBIT 9

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND FOR
ORANGE COUNTY, FLORIDA

SANDRA GEIRAS,                                    CASE NO. CI 01-10866

       Plaintiff,

AMERICAN HOME PRODUCTS CORPORATION,
et al.,

       Defendants.

## ORDER DENYING PLAINTIFF'S MOTION FOR REHEARING

This case came before the Court without a hearing on plaintiff's motion for rehearing directed to this Court's order dated January 22, 2003. The Court has considered the motion, the written response of the defendants and the legal authorities cited.

In the order to which plaintiff's motion was directed, this Court dismissed with prejudice plaintiff's Count V (strict liability – design defect) and Count VI (strict liability – failure to warn) of plaintiff's second amended complaint against four defendants which plaintiff referred to as the sales representative defendants, but left the door open by offering two options. The first option was for plaintiff to move for rehearing with supporting authority. The intent of this option was that if plaintiff would cite authority showing the allegations these two counts were sufficient to state a cause of action, the Court would vacate its order and allow them to stand. The second option was to move to amend with supporting authority. The intent of this option was that if plaintiff decided these two counts were insufficiently alleged, but cited authority showing she could amend by supplying the deficiencies, the Court would vacate its order and allow a fourth attempt.

Plaintiff chose the first option and elected to stand on her second amended counts V and VI. The Court finds that all of the cases cited by plaintiff are distinguishable and do not support her position, and concludes that her motion for rehearing is without merit.

In it's earlier order, this Court concluded that to recover under either theory of strict liability, a plaintiff must allege and prove that the defendant is directly in the chain of distribution of the specific item which injured the plaintiff[1]. Since the entry of that order, the Court has found three cases which on analogous facts refused to hold strictly liable individual persons who were merely non-exclusive sales representatives for their manufacturer corporations. *See Sabessy Energy and Automation* v. *Meding* 719 So.2d (Fla. 3d DCA 1998); *DeCosta* v. *Novartis AG*, 2002 WL 31357434 (D.Or.), and *Memphis Bank & Trust Co.* v. *Water Services, Inc.*, 758 S.W.2d 525 (Tenn. 1988). In *Meding* the Florida Third District Court of Appeal held that a manufacturer's representative who was neither a distributor or

_____

[1] In that order, the Court noted that (1) the allegations of the second amended counts were not sufficient to show that the four defendants were in the chain of distribution of the Norplant; plaintiff allegedly imported, and (2) the four defendants were lumped together in one count without any allegations that they aided and abetted one another or acted in concert. The Court here also notes, as additional pleading defects, that there would in the second amended counts V and VI of defective, negligent, medical and/or protection nor found manifestation, complained by common of ultimate facts, and therefore insufficient, see *Ashlay* v. *Hallam*, 738 So.2d (Fla. 3dDCA 1997), and that the use of "and/or" is a pleading standard to question, see *Health Clubs, Inc.* v. *State*, 364 So.2d 125 A.2235 (Fla. 4thDCA 1993).

Page 2 of 2)

retailer, but at most acted as a broker serving as a conduit for information between manufacturer and buyer whose employee was injured by the product was not in the chain of distribution and therefore could not be strictly liable. In *DeCoste* The court dismissed with prejudice a strict liability - failure to warn claim against one Weaver, a pharmaceutical sales representative, based in part upon it's finding that Weaver was "merely an employee of Novartis, the seller of the product and, therefore, is not strictly liable for the drugs that he promotes to physicians..." 2002 WL at 31957426. Finally, in *Marquis Bank* it was held that a Mr. Imboden, a sales representative for the corporate manufacturer defendant, who was paid commissions and was not a stockholder, officer or director of the corporation, could not be held strictly liable for damage done by the manufacturer's product.

I, like the federal district judge in *DeCoste*, am not convinced that an individual person who is an employee of a pharmaceutical manufacturer, as these individuals were alleged to be, can be held liable on either strict liability. There are no public policy reasons I can see to hold such individuals strictly liable since I doubt they have any input whatsoever in the design of a prescription drug or the drafting of warnings. If such a cause of action exists, it will have to be declared by an appellate court of this state.

Accordingly, it is

ORDERED that plaintiff's motion for rehearing is denied, and the Court's order of January 22, 2003 dismissing Counts V and VI with prejudice shall stand.

Orlando, Florida this 18th day of March, 2003.

                                        /s/ ROM W. POWELL
                                        _____
                                        Senior Judge

Copies furnished to: David M. Peterson, Esq.
                     Mitch L. Burgess, Esq.
                     Patrick J. Mulligan, Esq.
                     Darrell F. Carpenter, Esq.
                     William E. Lawton, Esq.

# EXHIBIT 10

APR 02 2004  16:54      US DISTRICT COURT EDPA                    P.05/24

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS (Phentermine/ Fenfluramine/Dexfenfluramine) PRODUCTS LIABILITY LITIGATION | : : : | MDL DOCKET NO. 1203 |
| THIS DOCUMENT RELATES TO: | : : | FILED: APR 02 2004 |
| BOBBIE AMIKER, et al. v. WYETH, et al. | : : : | CIVIL ACTION NO. 03-20343 |
| CAROLYN BREWER, et al. v. WYETH, et al. | : : : | CIVIL ACTION NO. 03-20279 |

MEMORANDUM AND PRETRIAL ORDER NO. 3391

Bartle, J.                                      April 2, 2004

          Before the court are the motions of thirty class

members in two separate actions to remand to the appropriate

Mississippi state courts their actions against defendants Wyeth,[1]

the Mississippi physicians who have prescribed Wyeth's diet drugs

Pondimin and/or Redux for them, one physician practice group,

five named sales representatives, and John Does 1-9 -- who appear

to be anonymous Mississippi sales representatives.  The state

court actions were captioned Bobbie Amiker, et al. v. Wyeth, et

al. (Miss. Cir. Ct. Bolivar County filed Dec. 30, 2002) and

Carolyn Brewer, et al. v. Wyeth, et al. (Miss. Cir. Ct. Jones

ENTERED

_____

1.   Wyeth was previously known as American Home Products
Corporation ("AHP").

APR 02 2004

CLERK OF COURT

County filed Dec. 30, 2002). The plaintiffs in these actions are all represented by the same counsel.

Plaintiffs originally filed their complaints in Mississippi circuit courts in December, 2002, more than five years after Pondimin and Redux were withdrawn from the market in September, 1997. The Mississippi federal courts deferred ruling on plaintiffs' motions, and the cases were then transferred to this court as part of MDL 1203, the mass tort litigation involving Wyeth's diet drugs. No federal claim for relief is alleged.

I.

In brief summary, plaintiffs, all of whom are citizens of Mississippi, filed suits for injuries sustained as a result of their use of Pondimin and/or Redux. The defendant Wyeth, the manufacturer of these diet drugs, is a party of diverse citizenship from the plaintiffs. The defendant physicians who prescribed Pondimin and/or Redux to plaintiffs, and the defendant sales representatives who purportedly promoted these drugs are alleged to be citizens of Mississippi.

The plaintiffs maintain that remand is appropriate because complete diversity does not exist as required under 28 U.S.C. § 1332(a). Wyeth counters that the non-diverse physicians in these matters were fraudulently joined because the applicable two-year statute of limitations bars plaintiffs'

-2-

claims against them.[2]  See MISS. CODE ANN. § 15-1-36 (West 2003).
Plaintiffs respond that the statute of limitations has not
expired against the in-state physicians because plaintiffs
discovered their injuries less than two years prior to filing
their claims.  As for the claims against the in-state sales
representatives, Wyeth maintains that these claims are precluded
as a matter of law in Mississippi.  In response, plaintiffs
assert that the sales representatives are liable under the
learned intermediary doctrine.

                              II.

        This court addressed many of the same issues presented
by plaintiffs' remand motions in Pretrial Order ("PTO") No. 3281
in French, et al. v. Wyeth, et al., CIV.A. No. 03-20353 (E.D. Pa.
Feb. 18, 2004), which is also part of the nationwide diet drug
litigation.  In French, we explained in detail the standards for
removal based on diversity jurisdiction and fraudulent joinder.
See PTO No. 3281 at 2-4.  Because we examined the same legal
issues as they applied to nearly identical facts in French, we
need not revisit them here.

_____

2.  The statute of limitations is not an issue in plaintiffs'
claims against Wyeth, which has waived its right to assert this
defense in return for the plaintiffs' giving up their right to
sue Wyeth for "punitive, exemplary, and multiple damages."
Settlement Agreement § IV.D.3.c; see PTO No. 2625 and PTO No.
2680.

                            -3-

III.

We first turn to the issue of whether the prescribing physicians, all purportedly Mississippi citizens, and Mission Primary Care Clinic,[3] the one named physician practice group located in Mississippi, were fraudulently joined as defendants for the purpose of destroying diversity of citizenship and preventing removal. Plaintiffs have brought claims for medical negligence against these non-diverse defendants.

Wyeth argues that plaintiffs' complaints do not state colorable claims against these defendants because plaintiffs' claims are barred by the Mississippi statute of limitations. The statute provides in relevant part:

> For any claim accruing on or before June 30, 1998, and except as otherwise provided in this section, no claim in tort may be brought against a licensed physician, osteopath, dentist, hospital, institution for the aged or infirm, nurse, pharmacist, podiatrist, optometrist or chiropractor for injuries or wrongful death arising out of the course of medical, surgical or other professional services unless it is filed <u>within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered.</u>

---

3. Mission Primary Care Clinic appears to be the practice group for Dr. Roe's 1-3, the unidentified prescribing physicians for plaintiff Sharon Manning. Dr. Roe's 1-3 are believed to be Mississippi residents. For the reasons stated <u>infra</u>, we need not address the claims against Dr. Roe's 1-3.

-4-

MISS. CODE ANN. § 15-1-36(1) (emphasis added). For any claim
accruing on or after July 1, 1998, the statute of limitations is
the same for all relevant purposes.[4]

In French, we set forth the standard for when an action
"accrues" under Mississippi law. See PTO No. 3281 at 6. In
short, an action accrues when a patient can reasonably be held to
have knowledge of the injury itself, cause of injury, and the
conduct of the medical practitioner. Fortenberry v. Mem'l Hosp.
at Gulfport, Inc., 676 So.2d 252, 255 (Miss. 1996); see also
First Trust Nat'l Ass'n v. First Nat'l Bank of Commerce, 220 F.3d
331, 336-37 (5th Cir. 2000); In re Catfish Antitrust Litig., 826
F. Supp. 1019, 1031 (N.D. Miss. 1993).

Plaintiffs contend that they brought their actions
within two years "from the date the alleged act ... with
reasonable diligence might have been first known or discovered."
MISS. CODE. ANN. § 15-1-36(1). According to plaintiffs, they could
not have reasonably discovered their purported injuries until
their alleged heart problems were diagnosed after reviewing their
echocardiograms. Plaintiffs assert that their diagnoses occurred
less than two years prior to filing their complaints. Wyeth
counters that plaintiffs should have been on notice of their
stated injuries as a result of the widespread publicity

--------

4. The statute of limitations for claims accruing after July 1,
1998 adds tolling provisions for fraudulent concealment and
instances when a foreign object is left in a patient's body. See
MISS. CODE. ANN. § 15-1-36(2)(a),(b). Both provisions require a
plaintiff to bring an action within two years of the time when
the alleged injury or fraud should have been discovered, and no
later than seven years after the alleged act of neglect. See id.

-5-

accompanying the withdrawal of the diet drugs from the market in September, 1997. Wyeth further contends that plaintiffs should have known about their alleged injuries at the very latest in March, 2000, after Wyeth's extensive publicity campaign.

As set forth in greater detail in French, there was massive publicity, both locally and nationally, from September, 1997 through March, 2000 concerning Wyeth's diet drugs and their connection to valvular heart disease. In light of this massive publicity, plaintiffs, if they had acted with reasonable diligence, should have had knowledge of their alleged injuries by the end of March, 2000. We thus find that plaintiffs' actions accrued under the Mississippi statute of limitations no later than this time. See e.g., Fortenberry, 676 So.2d at 255. Since plaintiffs did not file their actions until December, 2002, their claims of negligence against the in-state physicians and Mission Primary Care Clinic are time barred.

IV.

Plaintiffs also maintain that the statute of limitations is tolled against the physician defendants because the physicians have fraudulently concealed facts which would alert plaintiffs about the dangers associated with the use of diet drugs. We previously addressed this issue in PTO No. 3350 in Cockrell, et al. v. Wyeth, et al., CIV.A. No. 03-20626 (E.D. Pa. Mar. 9, 2004). In short, where fraud or concealment of tortious conduct is alleged, Mississippi law specifies that, "the cause of action shall be deemed to have first accrued at, and not

-6-

before, the time at which such fraud shall be, or with reasonable diligence should have been, first known or discovered." MISS. CODE. ANN. § 15-1-36 (b). Mississippi law requires that plaintiffs plead with specificity "some act or conduct of an affirmative nature designed to prevent and which does prevent discovery of a claim." Reich v. Jesco, Inc., 526 So.2d 550, 552 (Miss. 1998).

Plaintiffs' complaints are devoid of anything that would suggest that the physician defendants acted to conceal the plaintiffs' alleged injuries. Thus, as we determined in Cockrell, there is "no reasonable basis in fact or colorable ground" supporting plaintiffs' contention that the statute of limitations should be tolled under Mississippi law because of fraudulent concealment. Bover v. Snap-on Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990); see also Reich, 526 So.2d at 552.

V.

Plaintiffs also assert that the statute of limitations defense is not applicable to the physician defendants under the Settlement Agreement. We disagree. Section IV.D.3.c of the Settlement Agreement states in relevant part:

> With respect to each Class Member who timely and properly exercises the Intermediate Opt-Out right and who initiates a lawsuit against any of the Released Parties within one year from the date on which the Intermediate Opt-Out right is exercised, the AHP Released Parties shall not assert any defense based on any statute of limitations or repose .... A Class Member timely and properly exercising an Intermediate Opt-Out right may not seek punitive, exemplary, or any multiple damages against the AHP Released Parties or the Non-

-7-

AHP Released Parties; provided however, as consideration for being a Non-AHP Released Party and for receiving the benefit of this waiver of punitive, exemplary, and multiple damages, the Non-AHP Released Party must agree in writing not to assert any defense based on any statute of limitations or repose ... and provided further that if the Non-AHP Released Party so agrees, then the Class Member may not recover more than the total amount of compensatory damages he or she is entitled to from all persons or entities in connection with any claimed injury arising from his/her use of Diet Drugs, except where such limitation is inconsistent with applicable law.

The language of § IV.D.3.c of the Settlement Agreement is clear in its instruction that any non-AHP released party retains the benefit of the statute of limitations provided that the party has not affirmatively waived the benefit in writing. The physician defendants in this action are clearly non-AHP released parties.[5] Plaintiffs fail to contend or provide

---

5.   Non-AHP Released Parties include, *inter alia*:

All physicians who prescribed, and all pharmacists and pharmacies who dispensed, Pondimin and/or Redux to the extent that liability against such physicians, pharmacists or pharmacies is based on:

(1)  the prescription or dispensing of Pondimin and/or Redux in a manner consistent with the product labeling; and/or

(2)  the prescription or dispensing of Pondimin for any period longer than a "few weeks"; and/or

(3)  the prescription or dispensing of Pondimin and/or Redux for concomitant use with Phentermine hydrochloride or Phentermine resin; and/or

(4)  a claim that the physician's or pharmacist's liability stems solely from having prescribed or dispensed Pondimin and/or Redux; and/or

(continued...)

-8-

information that any of these physicians has agreed in writing to waive the statute of limitations. As such, the in-state physician defendants in these matters retain the benefit of the statute of limitations defense.

## VI.

In a further attempt to establish that their claims against their respective physicians and Mission Primary Care Clinic are not time barred, plaintiffs argue that the filing of various class action complaints throughout the country tolled the running of the statute of limitations. In support of their position, plaintiffs cite Am. Pipe & Constr. Co. v. Utah, 414 U.S. 556 (1974), which held that the filing of a putative class action tolls the running of the statute of limitations on behalf of putative class members against the defendant until a class motion is denied or plaintiffs opt out of the class. Id. at 561. This argument is totally without merit. The physician defendants here were not defendants in any identified putative class actions.

---

5. (...continued)

    (5)  a claim that the physician's or pharmacist's liability stems solely from the prescription or dispensing of a defective or unreasonably dangerous product.

    Physicians, pharmacists and pharmacies are not Released Parties with respect to any claim based on their independent negligence or culpable conduct, not consisting of conduct described in paragraphs (1)-(5) of this Subsection I.48.e.

Settlement Agreement § I.48.e.

Finally, plaintiffs contend that the court's approval of the National Settlement Agreement and PTO No. 1415 tolled the statute of limitations. The court is unaware of any language in either of these documents that supports plaintiffs' position in this regard.

Thus, there is no basis for tolling the statute of limitations as to the physician defendants or Mission Primary Care Clinic.

## VII.

Plaintiffs also bring claims in negligence and strict liability against Wyeth's in-state sales representatives. Wyeth argues that these defendants are fraudulently joined. We note first that there is no indication in either complaint that any of the plaintiffs, or any of the plaintiffs' physicians, received any drugs from these sales representative defendants. Further, any allegations of misrepresentation or fraud fall short of what is required under both federal and Mississippi law. See Fed. R. Civ. P. 9(b); Miss. R. Civ. P. 9(b); Allen v. Mac Tools Inc., 671 So.2d 636, 642 (Miss. 1996); Brabham v. Brabham, 483 So.2d 341, 342 (Miss. 1986).

Plaintiffs cite Swan v. I.P., Inc., 613 So.2d 846, 855-56 (Miss. 1993) to support their contention that the duty to warn extends to the sales representatives through the learned intermediary doctrine. We disagree. The learned intermediary doctrine provides that "a manufacturer's duty to warn may be discharged by providing information to a third person upon whom

-10-

it can reasonably rely to communicate the information to the
ultimate users of the product or those who will be exposed to its
hazardous effects." Id. at 851 (citations omitted). In Swan,
the court found that there was a material issue of fact as to
whether a polyurethane foam manufacturer was relieved of its duty
to warn because the manufacturer reasonably relied on the
contractor who used its polyurethane foam to warn the person
ultimately exposed to the hazardous effects of the product. In
the prescription drug context, however, Mississippi courts have
clearly decided that the duty to warn does not extend to sales
representatives. See e.g., Johnson v. Parke-Davis, 114 F. Supp.
2d 522, 524-25 (S.D. Miss. 2000). Thus, plaintiffs' contention
that the sales representative defendants breached their duty to
warn is without substance.

Furthermore, under Mississippi law, sales
representatives are not "sellers," but rather, employees of the
businesses which are the sellers. McCurtis v. Dolgencorp, Inc.,
968 F. Supp. 1158, 1160-61 (S.D. Miss. 1997). As such, the
employees are not liable for failure to warn. See id.
Accordingly, there is "no reasonable basis in fact or colorable
ground supporting the claim against" the sales representative
defendants. Boyer, 913 F.2d at 111; see also Johnson, 114 F.
Supp. 2d at 524-25; In re Rezulin, 133 F. Supp. 2d 272, 288-90
(S.D.N.Y. 2001).

-11-

## VIII.

Finally, plaintiffs bring claims against John Does 1-9, "Dr. Roes" 1-3, and John Doe Woods, M.D., who appear to be either anonymous in-state sales representatives of Wyeth or prescribing physicians whom plaintiffs believe to be citizens of Mississippi. Plaintiffs purportedly name these unidentified defendants in an effort to defeat diversity. However, the removal statute provides that "the citizenship of defendants sued under fictitious names shall be disregarded." 28 U.S.C. § 1441(a). Thus, for the purposes of determining whether complete diversity exists so that these actions may remain in federal court, the citizenship of these unidentified defendants is irrelevant.

## IX.

For many of the same reasons articulated in French, as well as the reasons detailed herein, Wyeth has met its heavy burden of showing that the above defendants are fraudulently joined. Accordingly, we will deny the motions of the plaintiffs to remand these actions to the Mississippi state courts and will dismiss the complaints as to these physicians and sales representatives.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS (Phentermine/   :
Fenfluramine/Dexfenfluramine)   :   MDL DOCKET NO. 1203
PRODUCTS LIABILITY LITIGATION   :
  :
THIS DOCUMENT RELATES TO:   :
------------------------------:
BOBBIE AMIKER, et al   :   CIVIL ACTION NO. 03-20343
      v.   :
WYETH, et al.   :
  :
CAROLYN BREWER, et al.   :   CIVIL ACTION NO. 03-20279
      v.   :
WYETH, et al.   :
------------------------------:

PRETRIAL ORDER NO. 3391

AND NOW, this 2nd day of April, 2004, for the reasons
set forth in the accompanying Memorandum, it is hereby ORDERED
that:

(1)  the motion of plaintiffs in Bobbie Amiker, et al.
v. Wyeth, et al., CIV.A. No. 03-20343 (E.D. Pa.) to remand to the
Circuit Court of Bolivar County, Mississippi, is DENIED;

(2)  all claims in Amiker against Forrest Bailey, Susan
King, James Pittman, Jewell Norman, Amy Williams, and Gayle
Harrell are DISMISSED;

(3)  the motion of plaintiffs in Carolyn Brewer, et al.
v. Wyeth, et al., CIV.A. No. 03-20279 (E.D. Pa.) to remand to the
Circuit Court of Jones County, Mississippi, is DENIED; and

(4)  all claims in Brewer against defendants Forrest
Bailey, Susan King, James Pittman, Jewell Norman, Amy Williams,

Bruce Pruett, M.D., Guy Farmer, M.D., Jacob Edward Ulmer, M.D.,

Dan Overbeck, Susan Moulder, Charles T. Hull, M.D., and Mission

Primary Care Clinic are DISMISSED.

BY THE COURT:

_____
                      J.

-2-

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS (Phentermine/ Fenfluramine/Dexfenfluramine) PRODUCTS LIABILITY LITIGATION | : : : | MDL DOCKET NO. 1203 |
| THIS DOCUMENT RELATES TO: | : | |
| WILLIE CHAMBLISS, et al. v. Dr. J. TODD, et al. | : : : : | CIVIL ACTION NO. 03-20288 |
| JACQUELINE BURGE, et al. v. DENNIS SIMS, M.D., et al. | : : : | CIVIL ACTION NO. 03-20299 |

MEMORANDUM AND PRETRIAL ORDER NO. 3533

Bartle, J.                                           May 17, 2004

Before the court are the motions of twelve class members in two separate actions to remand to the appropriate Mississippi state courts their claims against defendants: (1) Wyeth[1]; (2) in-state physicians who have prescribed Wyeth's diet drugs Pondimin and/or Redux for plaintiffs; (3) Indevus Pharmaceuticals, a manufacturer of dexfenfluramine; (4) two named sales representative defendants; and (5) John Does 1-25, who appear to be anonymous Mississippi resident sales representatives. The state court actions were captioned Willie Chambliss, et al. v. Dr J. Todd, et al. (Miss. Cir. Ct. Jefferson County, filed Dec. 27, 2002); and Jacqueline Burge, et al. v.

---

1. Wyeth was previously known as American Home Products Corporation ("AHP").

Dennis Sims, M.D., et al. (Miss. Cir. Ct. Sunflower County, filed Dec. 27, 2002).

Plaintiffs in these actions have exercised their right of intermediate or back-end opt-out under the Nationwide Class Action Settlement Agreement ("Settlement Agreement") in Brown v. American Home Products Corporation, CIV. A. No. 99-20593 (E.D. Pa. Aug. 28, 2000) (Pretrial Order ("PTO") No. 1415), which encompassed persons who ingested Wyeth's diet drugs Pondimin and Redux. See e.g., Settlement Agreement at § IV(A), (B), and (D)(4). Under the Settlement Agreement, those who have exercised an intermediate or back-end opt-out may sue Wyeth for compensatory damages in the tort system rather than obtain benefits from the AHP Settlement Trust.

Plaintiffs filed their complaints in the Circuit Court of Sunflower County and Jefferson County, Mississippi, respectively, on December 27, 2002. Wyeth timely removed these actions to the United States District Court for the Southern District of Mississippi, asserting that plaintiffs fraudulently joined the in-state physician and in-state sales representative defendants in an attempt to defeat federal diversity. Thereafter, plaintiffs moved to remand these actions under 28 U.S.C. § 1447(c). The Mississippi federal courts deferred ruling on plaintiffs' motions, and the cases were then transferred to this court as part of MDL 1203, the mass tort litigation involving the diet drugs Pondimin and Redux. No federal claims for relief are alleged.

-2-

I.

In brief summary, plaintiffs, all of whom are citizens of Mississippi, filed suits for injuries sustained as a result of their use of the diet drugs known as Pondimin and/or Redux. The defendant Wyeth, the manufacturer of Pondimin and Redux, and Indevus Pharmaceuticals are parties of diverse citizenship from the plaintiffs. The defendant physicians who prescribed Pondimin and/or Redux to plaintiffs in these matters, and the defendant sales representatives who allegedly promoted Pondimin and Redux are purportedly citizens of Mississippi.

Plaintiffs maintain that remand is appropriate because complete diversity does not exist as required under 28 U.S.C. § 1332(a). Wyeth counters that the non-diverse physicians in these matters were fraudulently joined because the applicable two-year statute of limitations bars plaintiffs' claims against these non-diverse defendants.[2] See MISS. CODE ANN. § 15-1-36 (West 2003). As to the claims against the in-state sales representative defendants, Wyeth asserts that plaintiffs' strict liability and negligence claims fail because sales representatives are not actually "sellers" of goods, but merely agents of Wyeth. In addition, Wyeth argues that pursuant to the learned intermediary doctrine, the sales representatives were

---

2.   The statute of limitations is not an issue in plaintiffs' claims against Wyeth, which has waived its right to assert the statute of limitations defense in return for the plaintiffs giving up their right to sue Wyeth for "punitive, exemplary, or multiple damages." Settlement Agreement § IV.D.3.c; see PTO No. 2625 and PTO No. 2680.

-3-

under no duty to warn plaintiffs about the risks associated with
the ingestion of diet drugs. Thus, Wyeth maintains, plaintiffs'
claims against these non-diverse defendants should be disregarded
for purposes of determining diversity of citizenship of the
parties. Plaintiffs respond that the statute of limitations has
not expired against the in-state physicians because they
discovered their injuries less than two years prior to filing
their claims. With regard to the claims against the in-state
sales representative defendants, plaintiffs assert that the sales
representative defendants are proper parties in these matters
because they acted as agents of Wyeth and distributed diet drugs
with knowledge of their dangerous propensities.

II.

This court addressed many of the same issues presented
by plaintiffs' remand motions in PTO No. 3281, in <u>French, et al.
v. Wyeth, et al.</u>, CIV. A. No. 03-20353 (E.D. Pa. Feb. 18, 2004),
which is also part of the nationwide diet drug litigation. In
<u>French</u>, we laid out in detail the standards for removal based on
diversity jurisdiction and fraudulent joinder. <u>See</u> PTO No. 3281
at 2-4. Because we examined the same legal issues as they
applied to nearly identical facts in <u>French</u>, we need not revisit
them here.

III.

With regard to the physician defendants in these
actions, the key issue is whether they have been fraudulently
joined solely for the purpose of destroying diversity of

-4-

citizenship and preventing removal.  For the same reasons set forth in French, we find "no reasonable basis in fact or colorable ground" supporting plaintiffs' claims against the in-state physicians.  Boyer v. Snap-on Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990).

As discussed in greater detail in French, plaintiffs' claims against the in-state physicians are time barred because their complaints were clearly filed outside the two year statute of limitations.  See MISS. CODE ANN. § 15-1-36.  In short, the statute began running, "when the plaintiff[s] should have reasonably known of some negligent conduct, even if the plaintiff[s did] not know with absolute certainty that the conduct was legally negligent."  Sarris v. Smith, 782 So. 2d 721, 725 (Miss. 2001).  As we found in French, the publicity surrounding the withdrawal of diet drugs put plaintiffs on inquiry notice of their claims in September, 1997 or, at the very latest by March, 2000, at the height of Wyeth's extensive media campaign.

In light of the massive publicity concerning the health risks associated with the use of diet drugs and the determination by this court after a full hearing that diet drug injuries are not latent, we find that plaintiffs in the exercise of reasonable diligence should have discovered their injuries at the very latest by March, 2000.  Thus, they would have needed to file their complaints by March, 2002.  Because they did not do so

-5-

until December, 2002, their claims against the in-state physicians are clearly time barred.

IV.

Plaintiffs also assert that the statute of limitations is tolled against the physician defendants because the physicians have fraudulently concealed facts which would have alerted plaintiffs to the dangers associated with the use of diet drugs. We previously addressed this same issue in <u>Cockrell, et al. v. Wyeth, et al.</u> (E.D. Pa. Mar. 9, 2004). In short, where fraud or concealment of tortious conduct is alleged, Mississippi law specifies that, "the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence should have been, first known or discovered." MISS. CODE ANN. § 15-1-36(2)(b).

As in <u>Cockrell</u>, we find that plaintiffs' complaints are devoid of facts, allegations, or information which would suggest that an affirmative act of concealment was perpetrated by the physician defendants to conceal the plaintiffs alleged injuries. Thus, there is "no reasonable basis in fact or colorable ground" on which plaintiffs can invoke the fraudulent concealment saving provision to toll the statute of limitations because plaintiffs have failed to set forth the conduct that constitutes fraudulent concealment under Mississippi law. <u>Boyer</u>, 913 F.2d at 111; <u>see</u>

-6-

<u>also</u> <u>Reich v. Jesco, Inc.</u>, 526 So.2d 550, 552 (Miss. 1998)
(citations omitted).[3]

Accordingly, we find that Wyeth has met its heavy
burden of showing that the in-state physician defendants are
fraudulently joined.

V.

Plaintiffs also assert that the statute of limitations
defense is not applicable to the physician defendants under the
Settlement Agreement. We addressed this issue in PTO No. 3391,
in <u>Bobbie Amiker, et al. v. Wyeth, et al.</u>, CIV. A. No. 03-20343
(E.D. Pa. April 2, 2004). For the same reasons stated in <u>Amiker</u>,
the in-state physician defendants retain the benefit of the
statute of limitations defense pursuant to § IV.D.3.c of the
Nationwide Settlement Agreement. <u>See</u> PTO 3391, at 7-9.

VI.

Plaintiffs also bring claims in negligence and strict
liability against Wyeth's in-state sales representatives Forest
Bratley and Susan Bodney. Wyeth argues that these defendants are
fraudulently joined. We note first that there is no indication
in plaintiffs' complaints that any of the plaintiffs, or any of

---

3. Plaintiffs assert that this court should remand their
respective actions because their fraud claims are governed by the
three year statute of limitations codified in Miss. Code Ann. § 15-
1-49. We disagree. This statute provides a three year
limitations period for "[a]ll actions for which no other period
of limitation is prescribed." Miss. Code Ann. § 15-1-49. As noted
above, plaintiffs have failed to establish a cause of action in
fraud. Plaintiffs' claims against the physicians are clearly
governed by the two-year statute of limitations codified in Miss.
Code Ann. § 15-1-36.

the plaintiffs' doctors, received any drugs from these sales representative defendants.  Further, any allegations of misrepresentation or fraud fall short of what is required under both federal and Mississippi law.  See Fed. R. Civ. P. 9(b); Miss. R. Civ. P. 9(b); Allen v. Mac Tools Inc., 671 So.2d 636, 642 (Miss. 1996); Brabham v. Brabham, 483 So. 2d 341, 342 (Miss. 1986).

The Mississippi courts have clearly decided in the prescription drug context that the duty to warn does not extend to sales representatives.  See e.g., Johnson v. Parke-Davis, 114 F. Supp. 2d 522, 524-25 (S.D. Miss. 2000).  In addition, under Mississippi law, sales representatives are not "sellers," but rather, employees of the business which are the sellers. McCurtis v. Dolgencorp, Inc., 968 F. Supp. 1158, 1160-61 (S.D. Miss. 1997).  As such, the employees are not liable for failure to warn.  See id.  There is "no reasonable basis in fact or colorable ground supporting the claim against" the sales representative defendants.  Boyer, 913 F.2d at 111; see also Johnson, 114 F. Supp. 2d at 524-25; In re Rezulin Prods. Liab. Litig., 133 F. Supp. 2d 272, 288-90 (S.D.N.Y. 2001).

VII.

Finally, plaintiffs bring claims against John Does 1-25, who appear to be anonymous in-state sales representatives of Wyeth.  Plaintiffs purportedly name these unidentified defendants in an effort to defeat diversity.  However, the removal statute provides that "the citizenship of defendants sued under

-8-

fictitious names shall be disregarded." 28 U.S.C. § 1441(a).
Thus, for the purposes of determining whether complete diversity
exists so that these actions may remain in federal court, the
citizenship of unidentified defendants is irrelevant.

## VIII.

Wyeth has clearly met its heavy burden of showing that
these defendants are fraudulently joined.  Accordingly, we will
deny the motions of the plaintiffs to remand these actions to the
Mississippi state courts and will dismiss the complaints as to the
in-state physicians and sales representative defendants.[4]

---

4.  We are only dismissing the claims against those defendant
physicians who appear on the MDL 1203 docket in these actions.
The plaintiffs' original complaints filed in the several
Mississippi state courts named as defendants additional
physicians who are not before this court.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS (Phentermine/ Penfluramine/Dexfenfluramine) PRODUCTS LIABILITY LITIGATION | : : : | MDL DOCKET NO. 1203 |
| THIS DOCUMENT RELATES TO: | : : | |
| WILLIE CHAMBLISS, et al. v. Dr. J. TODD, et al. | : : : | CIVIL ACTION NO. 03-20288 |
| JACQUELINE BURGE, et al. v. DENNIS SIMS, M.D., et al. | : : : : | CIVIL ACTION NO. 03-20299 |

PRETRIAL ORDER NO. 3533

AND NOW, this 17th day of May, 2004, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1)  the motion of plaintiffs in <u>Willie Chambliss, et al. v. Dr. J. Todd, et al.</u>, CIV. A. No. 03-20288 (E.D. Pa.) to remand to the Circuit Court of Jefferson County, Mississippi is DENIED;

(2)  all claims in <u>Chambliss</u> against Unknown Todd, M.D., Charles Tyler, M.D., Forest Bratley, and Susan Bodney are DISMISSED;

(3)  the motion of plaintiffs in <u>Jacqueline Burge, et al. v. Dennis Sims, M.D., et al.</u>, CIV. A. No. 03-20299 (E.D. Pa.) to remand to the Circuit Court of Sunflower County, Mississippi, is DENIED; and

(4) all claims in _Burge_ against defendants Dennis Sims, M.D., Robert L. Jordan, M.D., William L. Pace, M.D., Arthur Deceased, Sr., Subbu Rayudu, M.D., L.G. Hopkins, M.D., Dr. Mirdioc, Dr. Henson, David Bullock, M.D., Sydney Kellton Pace, M.D., Forest Bratley, and Susan Bodney are DISMISSED.

BY THE COURT:

_____ J.

-2-

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS (Phentermine/ | : | |
| Fenfluramine/Dexfenfluramine) | : | MDL DOCKET NO. 1203 |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| ----------------------------------- | : | |
| LISA BISHOP, et al., | : | CIVIL ACTION NO. 03-20601 |
| v. | : | |
| TERRY LOWE, MD., et al., | : | |
| | : | |
| KAREN BATES, et al. | : | CIVIL ACTION NO. 03-20630 |
| v. | : | |
| DWALIA SOUTH, et al. | : | |
| | : | |
| GAITHER BELL, et al | : | CIVIL ACTION NO. 03-20584 |
| v. | : | |
| DONALD BLACKWOOD, M.D., et al., | : | |
| | : | |
| PAM HARKINS, et al. | : | CIVIL ACTION NO. 03-20588 |
| v. | : | |
| PATRICK MCLAIN, M.D., et al. | : | |

FILED MAY 18 2004

PRETRIAL ORDER NO. 3536

AND NOW, this 18th day of May, 2004, for the reasons
set forth in the accompanying Memorandum, it is hereby ORDERED
that:

(1)   the motion of plaintiffs in Lisa Bishop, et al. v.
Terry Lowe, M.D., et al., CIV. A. No. 03-20601 (E.D. Pa.) to
remand to the Circuit Court of Jones County, Mississippi is
DENIED;

(2)   all claims in Bishop against Terry R. Lowe, Bruce
Pruett, Antonio Janchuck, Vance Z. Baucum, Jr., Adron Keith Lay,

Phillip Rogers, Laurence L. Dennis, David Greenshaw, Jay McDuffy,
Unknown Patel, Thomas Pitt, Van De Castle, D.R. Patel, Unknown
Alexander, Robert Tate, Robert L. Ray, Unknown Lambert, Ernest
Reeves, Herbert E. Hicks, Forest Bratley, and Susan Bodney are
DISMISSED;

(3)   the motion of plaintiffs in Karen Bates, et al. v.
Wyeth, et al., CIV. A. No. 03-20630 (E.D. Pa.) to remand to the
Circuit Court of Lincoln County, Mississippi, is DENIED;

(4)   all claims in Bates against defendants, Dwalia S.
South, Louis Owens, Burton Friedman, F. Lee Neal, Jr., J.J.
Purdy, James Leak, Forest Bratley, and Susan Bodney are
DISMISSED;

(5)   the motion of plaintiffs in Gaither Bell, et al.
v. Donald Blackwood, M.D., et al, CIV. A. No. 03-20584 (E.D. Pa.)
to remand to the Circuit Court of Sunflower County, Mississippi,
is DENIED;

(6)   all claims in Bell against defendants, Donald J.
Blackwood, M.D., Victor Anazia, M.D., Dr. "Unknown" Moore, Mark
Allen, M.D., Jasper D. Moore, M.D., James Riser, M.D., David
Moody, M.D., W.H. Rose, M.D., Charles A. Ozborn, M.D., D.L.
Bolton, M.D., Steve Morris, M.D., Patrick G. McLain, M.D., Forest
Bratley, and Susan Bodney are DISMISSED;

(7)   the motion of plaintiffs in Pam Harkins, et al. v.
Patrick McLain, M.D., et al., CIV. A. No. 03-20588 (E.D. Pa.) to

remand to the Circuit Court of Bolivar County, Mississippi, is

DENIED; and

(8)   all claims in Harkins against defendants, Billy

Sollie, for the Estate of Patrick McLain, M.D., Manoj Rawal,

M.D., Forest Bratley, and Susan Bodney are DISMISSED.

BY THE COURT:

ENTERED

MAY 1 8 2004

CLERK OF COURT

-3-

TOTAL P.15

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS (Phentermine/ Fenfluramine/Dexfenfluramine) PRODUCTS LIABILITY LITIGATION | : : : | MDL DOCKET NO. 1203 |
| THIS DOCUMENT RELATES TO: | : : | |
| -------------------------------- | : | |
| LISA BISHOP, et al. v. TERRY LOWE, MD., et al. | : : : | CIVIL ACTION NO. 03-20601 |
| KAREN BATES, et al. v. DWALIA SOUTH, et al. | : : : | CIVIL ACTION NO. 03-20630 |
| GAITHER BELL, et al. v. DONALD BLACKWOOD, M.D., et al. | : : : | CIVIL ACTION NO. 03-20584 |
| PAM HARKINS, et al. v. PATRICK MCLAIN, M.D., et al. | : : : | CIVIL ACTION NO. 03-20588 |

FILED MAY 18 2004

MEMORANDUM AND PRETRIAL ORDER NO. 3536

Bartle, J.                                          May 18, 2004

Before the court are the motions of numerous class
members in four separate actions to remand to the appropriate
Mississippi state courts their claims against:  (1) Wyeth[1]; (2)
in-state physicians who have prescribed Wyeth's diet drugs
Pondimin and/or Redux for plaintiffs; (3) Indevus
Pharmaceuticals, a manufacturer of dexfenfluramine; (4) two named

----

1.  Wyeth was previously known as American Home Products
Corporation ("AHP").

sales representative defendants; and (5) John Does 1-25, who appear to be anonymous Mississippi resident sales representatives of Wyeth.  The state court actions were captioned <u>Lisa Bishop, et al. v. Terry Lowe, M.D., et al.</u> (Miss. Cir. Ct. Jones County, filed Dec. 27, 2002); <u>Karen Bates, et al. v. Dwalia South, et al.</u> (Miss. Cir. Ct. Lincoln County, filed Dec. 30, 2002); <u>Gaither Bell, et al. v. Donald Blackwood, M.D., et al.</u> (Miss. Cir. Ct. Sunflower County, filed Dec. 27, 2002); and <u>Pam Harkins, et al. v. Patrick McLain, M.D., et al.</u> (Miss. Cir. Ct. Bolivar County, filed Dec. 23, 2002).

Plaintiffs in these actions, with the exceptions of Pam Harkins, Sandra Naramore, and Peggy Brooks, have exercised their right of intermediate or back-end opt-out under the Nationwide Class Action Settlement Agreement ("Settlement Agreement") in <u>Brown v. American Home Products Corporation</u>, CIV. A. No. 99-20593 (E.D. Pa. Aug. 28, 2000) (Pretrial Order ("PTO") No. 1415), which encompassed persons who ingested Wyeth's diet drugs Pondimin and Redux.  <u>See e.g.,</u> Settlement Agreement at § IV(A), (B), and (D)(4).[2]  Under the Settlement Agreement, those who have exercised an intermediate or back-end opt-out may sue Wyeth for

---

2.  Wyeth alleges that plaintiffs Pam Harkins and Sandra Naramore exercised initial opt-out rights and that plaintiff Peggy Brooks exercised the accelerated implementation option under the Settlement Agreement.  Plaintiffs' differing opt-out status has no bearing on our decision regarding these plaintiffs' respective motions to remand as detailed throughout this order.

-2-

compensatory damages in the tort system rather than obtain benefits from the AHP Settlement Trust.

Plaintiffs filed their complaints in the Circuit Court of Jones County, Lincoln County, Sunflower County and Bolivar County, Mississippi respectively, in December, 2002. Wyeth timely removed these actions to the United States District Court for the Southern District of Mississippi, asserting that plaintiffs fraudulently joined the in-state physician and in-state sales representative defendants in an attempt to defeat federal diversity. Thereafter, plaintiffs moved to remand these actions under 28 U.S.C. § 1447(c). The Mississippi federal courts deferred ruling on plaintiffs' motions, and the cases were then transferred to this court as part of MDL 1203, the mass tort litigation involving Wyeth's diet drugs. No federal claims for relief are alleged.

I.

In brief summary, plaintiffs, all of whom are citizens of Mississippi, filed suits for injuries sustained as a result of their use of the diet drugs Pondimin and/or Redux. The defendant Wyeth, the manufacturer of Pondimin and Redux, and Indevus Pharmaceuticals are parties of diverse citizenship from the plaintiffs. The defendant physicians who prescribed Pondimin and/or Redux to plaintiffs in these matters and the defendant

-3-

sales representatives who allegedly promoted Pondimin and Redux are purportedly citizens of Mississippi.

Plaintiffs maintain that remand is appropriate because complete diversity does not exist as required under 28 U.S.C. § 1332(a). Wyeth counters that the non-diverse physicians in these matters were fraudulently joined because the applicable two-year statute of limitations bars plaintiffs' claims against these non-diverse defendants.[3] See MISS. CODE ANN. § 15-1-36 (West 2003). As to the claims against the in-state sales representative defendants, Wyeth asserts that plaintiffs' strict liability and negligence claims fail because sales representatives are not actually "sellers" of goods but merely agents of Wyeth. In addition, Wyeth argues that pursuant to the learned intermediary doctrine, the sales representatives were under no duty to warn plaintiffs about the risks associated with the ingestion of diet drugs. Thus, Wyeth maintains, plaintiffs' claims against these non-diverse defendants should be disregarded for purposes of determining diversity of citizenship of the parties. Plaintiffs respond that the statute of limitations has not expired against the in-state physicians because they

─────────────────────

3. The statute of limitations is not an issue in plaintiffs' claims against Wyeth, which has waived its right to assert the statute of limitations defense in return for the plaintiffs giving up their right to sue Wyeth for "punitive, exemplary, or multiple damages." Settlement Agreement § IV.D.3.c; see PTO No. 2625 and PTO No. 2680.

-4-

discovered their injuries less than two years prior to filing
their claims. With regard to the claims against the in-state
sales representative defendants, plaintiffs assert that the sales
representative defendants are proper parties in these matters
because they acted as agents of Wyeth and distributed diet drugs
with knowledge of their dangerous propensities.

### II.

This court addressed many of the same issues presented
by plaintiffs' remand motions in PTO No. 3281 in French, et al.
v. Wyeth, et al., CIV. A. No. 03-20353 (E.D. Pa. Feb. 18, 2004),
which is also part of the nationwide diet drug litigation. In
French, we laid out in detail the standards for removal based on
diversity jurisdiction and fraudulent joinder. See PTO No. 3281
at 2-4. Because we examined the same legal issues as they
applied to nearly identical facts in French, we need not revisit
them here.

### III.

With regard to the physician defendants in these
actions, the key issue is whether they have been fraudulently
joined solely for the purpose of destroying diversity of
citizenship and preventing removal. For the same reasons set
forth in French, we find "no reasonable basis in fact or
colorable ground" supporting plaintiffs' claims against the in-

state physicians.  Boyer v. Snap-on Tools Corp., 913 F.2d 108,
111 (3d Cir. 1990).

As discussed in greater detail in French, plaintiffs'
claims against the in-state physicians are time barred because
their complaints were clearly filed outside the two year statute
of limitations.  See Miss. Code. Ann. § 15-1-36.  The statute began
running, "when the plaintiff[s] should have reasonably known of
some negligent conduct, even if the plaintiff[s did] not know
with absolute certainty that the conduct was legally negligent."
Sarris v. Smith, 782 So. 2d 721, 725 (Miss. 2001).  As we found
in French, the publicity surrounding the withdrawal of diet drugs
put plaintiffs on inquiry notice of their claims in September,
1997 or, at the very latest by March, 2000, at the height of
Wyeth's extensive media campaign.

In light of the massive publicity concerning the health
risks associated with the use of diet drugs and the determination
by this court after a full hearing that diet drug injuries are
not latent, we find that plaintiffs in the exercise of reasonable
diligence should have discovered their injuries at the very
latest by March, 2000.  Thus, they needed to have filed their
complaints by March, 2002.  Because they did not do so until
December, 2002, their claims against the in-state physicians are
clearly time-barred.

-6-

In support of her contention that her claims are not
time barred, Sandra Naramore, a party in Harkins, et al., relies
on the results of her December, 2002 echocardiogram, which
allegedly revealed that she has valvular heart injury.  Ms.
Naramore, however, does concede that the latest point in time she
could have ingested diet drugs was in 1997 when they were removed
from the market.  Further, she does not dispute that the results
of her August, 2000 echocardiogram indicate that she had no heart
valve injury at that time.  Accordingly, the only logical basis
for her position is that her injuries were latent.

This court also addressed the issue of latency in
French.  There, we referred to this court's determination in PTO
No. 1415 that Pondimin and Redux did not cause latent heart valve
injuries but rather that any injury occurred at or near the time
of last use.  This decision was made after receiving extensive
evidence on the latency issue at the fairness hearing in
connection to the Settlement Agreement.  In the August 28, 2000
Order approving the Settlement Agreement, Judge Bechtle stated:
"[t]he absence of a latency period between the ingestion of [the
diet drug] and the development of clinically detectable [heart
disease] is ... confirmed by a number of studies ... , [each of
which finds] that there was no emergence of new disease after
some latency period."  PTO No. 1415 at 46.

-7-

Accordingly, for the same reasons set forth in <u>French</u>, we find that the plaintiff Sandra Naramore is collaterally estopped from re-litigating the issue of latency.

### IV.

Plaintiffs also assert that the statute of limitations is tolled against the physician defendants because the physicians have fraudulently concealed facts which would have alerted plaintiffs to the dangers associated with the use of diet drugs. We previously addressed this same issue in <u>Cockrell, et al. v. Wyeth, et al.</u> (E.D. Pa. Mar. 9, 2004). Where fraud or concealment of tortious conduct is alleged, Mississippi law specifies that "the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence should have been, first known or discovered." MISS. CODE ANN. § 15-1-36(2)(b).

As in <u>Cockrell</u>, we find that plaintiffs' complaints are devoid of facts, allegations, or information which would suggest that an affirmative act of concealment was perpetrated by the physician defendants to conceal the plaintiffs' alleged injuries. Thus, there is "no reasonable basis in fact or colorable ground" on which plaintiffs can invoke the fraudulent concealment saving provision to toll the statute of limitations because plaintiffs have failed to set forth the conduct that constitutes fraudulent concealment under Mississippi law. <u>Bover</u>, 913 F.2d at 111; <u>see</u>

-8-

also Reich v. Jesco, Inc., 526 So.2d 550, 552 (Miss. 1998)
(citations omitted).[4]

Accordingly, we find that Wyeth has met its heavy
burden of showing that the in-state physician defendants are
fraudulently joined.

### V.

Plaintiffs also assert that the statute of limitations
defense is not applicable to the physician defendants under the
Settlement Agreement.  We addressed this issue in PTO No. 3391,
in Bobbie Amiker, et al. v. Wyeth, et al., CIV. A. No. 03-20343
(E.D. Pa. Apr. 2, 2004).  For the same reasons stated in Amiker,
these defendants retain the benefit of the statute of limitations
defense pursuant to § IV.D.3.c of the nationwide Settlement
Agreement.  See PTO No. 3391, at 7-9.

### VI.

Plaintiffs also bring claims in negligence and strict
liability against Wyeth's in-state sales representatives Forest
Bratley and Susan Bodney.  Wyeth argues that these defendants are

---

4.  Plaintiffs assert that this court should remand their
respective actions because their fraud claims are governed by the
three year statute of limitations codified in MISS. CODE ANN. § 15-
1-49.  We disagree.  This statute provides a three year
limitations period for "[a]ll actions for which no other period
of limitation is prescribed." MISS. CODE ANN. § 15-1-49.  As noted
above, plaintiffs have failed to establish a cause of action in
fraud.  Plaintiffs' claims against the physicians are clearly
governed by the two-year statute of limitations codified in MISS.
CODE ANN, § 15-1-36.

-9-

fraudulently joined. We note first that there is no indication in plaintiffs' complaints that any of the plaintiffs, or any of the plaintiffs' doctors, received any drugs from these sales representative defendants. Further, any allegations of misrepresentation or fraud fall short of what is required under both federal and Mississippi law. See Fed. R. Civ. P. 9(b); Miss. R. Civ. P. 9(b); Allen v. Mac Tools Inc., 671 So.2d 636, 642 (Miss. 1996); Brabham v. Brabham, 483 So. 2d 341, 342 (Miss. 1986).

The Mississippi courts have clearly decided in the prescription drug context that the duty to warn does not extend to sales representatives. See e.g., Johnson v. Parke-Davis, 114 F. Supp. 2d 522, 524-25 (S.D. Miss. 2000). In addition, under Mississippi law, sales representatives are not "sellers," but rather employees of the businesses which are the sellers. McCurtis v. Dolgencorp, Inc., 968 F. Supp. 1158, 1160-61 (S.D. Miss. 1997). As such, the employees are not liable for failure to warn. See id. There is "no reasonable basis in fact or colorable ground supporting the claim against" the sales representative defendants. Boyer, 913 F.2d at 111; see also Johnson, 114 F. Supp. 2d at 524-25; In re Rezulin Prods. Liab. Litig., 133 F. Supp. 2d 272, 288-90 (S.D.N.Y. 2001).

-10-

## VII.

Finally, plaintiffs bring claims against John Does 1-25, who appear to be anonymous in-state sales representatives of Wyeth. Plaintiffs purportedly name these unidentified defendants in an effort to defeat diversity. However, the removal statute provides that "the citizenship of defendants sued under fictitious names shall be disregarded." 28 U.S.C. § 1441(a). Thus, for the purposes of determining whether complete diversity exists so that these actions may remain in federal court, the citizenship of unidentified defendants is irrelevant.

## VIII.

Wyeth has clearly met its heavy burden of showing that these defendants are fraudulently joined. Accordingly, we will deny the motions of the plaintiffs to remand these actions to the Mississippi state courts and will dismiss the complaints as to the in-state physicians and sales representative defendants.[5]

-------------------------

5. We are only dismissing the claims against those defendant physicians who appear on the MDL 1203 docket in these actions.

-11-

# EXHIBIT 13

## DECLARATION OF BRIDGET COMEAUX

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1.      My name is BRIDGET COMEAUX, and I hereby declare as follows:

2.      I am employed by Wyeth as a field sales representative, also known as a "detailer." I have detailed prescription hormone therapy products (i.e., Prempro, Premarin, and Premphase) for Wyeth.

3.      My "detail" work consists of visiting physicians' to provide them with information contained in FDA-approved package inserts and other FDA-approved information about Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, so that the physicians can consider whether to prescribe them for particular patients.   Typically, my visits with a physician last around five minutes, assuming the physician would meet with detailers.  Some physicians, as a general business policy, would not meet personally with me or other sales representatives.

4.      All package inserts and Wyeth product literature that I provided to physicians about the drugs I detail, including Wyeth's prescription hormone therapy products, are provided to me by Wyeth. I have nothing to do with the development or preparation of such materials and I have no control over what is said in the written warnings that accompanied the drugs I detail. Wyeth instructs me what to say about the drugs I detail, and if a physician asks a question requiring an answer beyond the scope of the materials approved and provided by Wyeth, I am supposed to refer the question to Wyeth. In sum, I act as a conduit of information between Wyeth and physicians.

5.     I do not, and am not expected to, conduct independent research regarding the drugs that I detail, including Wyeth's prescription hormone therapy products. I am not expected to, and do not, review independent scientific studies published in journals unless they are supplied to me by Wyeth. Nor do I independently evaluate the accuracy of the FDA-approved product information that accompanied Wyeth's prescription hormone therapy products. My knowledge of hormone therapy products comes exclusively from the education provided to me by Wyeth and from publicly available articles on topics related to those drugs.

6.     When discussing the safety or efficacy of Wyeth's prescription hormone therapy products in the course of my employment as a detailer, I disclose all the risks that I know about. I have never intentionally misrepresented the safety or efficacy of Wyeth's prescription hormone therapy products to any physician or hormone therapy product user.

7.     I have not tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, labeled, packaged, advertised for sale, prescribed, or placed into the stream of commerce any of Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase.

8.     I did not sell (or contract with any physician regarding the sale of) Wyeth's prescription hormone therapy drugs, including Prempro, Premarin, and Premphase, or other prescription drugs. I have no ownership interest in the mediations sold by Wyeth.

9.     To the best of my knowledge, I have had no interaction with the plaintiff in this lawsuit. At no time have I ever provided Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, or other information concerning the

2

medications directly to the plaintiff. I have never made any representations or warranties to the plaintiff regarding any of Wyeth's hormone therapy medications.

10.    I have never made any representations regarding Wyeth's hormone therapy drugs, including Prempro, Premarin, and Premphase, whether by way of promotion or advertising or otherwise, to the general public. .

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: May 19 , 2006

BRIDGET COMEAUX

3

# EXHIBIT 14

# DECLARATION OF KIMBERLY TUCKIS

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1.     My name is Kimberly Tuckis, and I hereby declare as follows:

2.     I was employed by Wyeth as a field sales representative, also known as a "detailer." I have detailed prescription hormone therapy products (i.e. Prempro, Premarin, and Premphase) for Wyeth.

3.     My "detail" work consisted of visiting physicians to provide them with information contained in FDA-approved package inserts and other FDA-approved information about Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, so that the physicians could consider whether to prescribe them for their particular patients. Typically, my visits with a physician lasted around five minutes, assuming the physician would meet with detailers. Some physicians, as a general business policy, would not meet personally with me or other sales representatives.

4.     All package inserts and Wyeth product literature that I provided to physicians about the drugs I detailed, including Wyeth's prescription hormone therapy products, were provided to me by Wyeth. I had nothing to do with the development or preparation of such materials and I had no control over what was said in the written warnings that accompanied the drugs I detailed. Wyeth instructed me what to say about the drugs I detailed, and if a physician asked a question requiring an answer beyond the scope of the materials approved and provided by Wyeth, I was supposed to refer the question to Wyeth. In sum, I acted as a conduit of information between Wyeth and physicians.

5.     I did not, and was not expected to, conduct independent research regarding the drugs that I detailed, including Wyeth's prescription hormone therapy products. I was not expected to, and did not, review independent scientific studies published in journals unless they were supplied to me by Wyeth. Nor did I independently evaluate the accuracy of the FDA-approved product information that accompanied Wyeth's prescription hormone therapy products. My knowledge of hormone therapy products came exclusively from the education provided to me by Wyeth and from publicly available articles on topics related to those drugs.

6.     When discussing the safety or efficacy of Wyeth's prescription hormone therapy products in the course of my employment as a detailer, I disclosed all the risks that I knew about. I have never intentionally misrepresented the safety or efficacy of Wyeth's prescription hormone therapy products to any physician or hormone therapy product user.

7.     I have not tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected,

1

labeled, packaged, advertised for sale, prescribed, or placed into the stream of commerce any of Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase.

8.    I did not sell (or contract with any physician regarding the sale of) Wyeth's prescription hormone therapy drugs, including Prempro, Premarin, and Premphase, or other prescription drugs. I have no ownership interest in the medications sold by Wyeth.

9.    To the best of my knowledge, I have had no interaction with the plaintiff in this lawsuit. At no time have I ever provided Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, or other information concerning these medications, directly to the plaintiff. I have never made any representations or warranties to the plaintiff regarding any of Wyeth's hormone therapy medications.

10.    I never have made any representations regarding Wyeth's prescription hormone therapy drugs, including Prempro, Premarin, and Premphase, whether by way of promotion or advertising or otherwise, to the general public.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: March 10  2006

KIMBERLY ZICKIS

2

# EXHIBIT 15

### DECLARATION OF MARI WILLIAMS

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1.    My name is Mari Williams, and I hereby declare as follows:

2.    I am employed by Wyeth as a field sales representative, also known as a "detailer." I have detailed prescription hormone therapy products (i.e., Prempro, Premarin, and Premphase) for Wyeth.

3    My "detail" work consists of visiting physicians' to provide them with information contained in FDA-approved package inserts and other FDA-approved information about Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, so that the physicians can consider whether to prescribe them for particular patients.   Typically, my visits with a physician last around five minutes, assuming the physician would meet with detailers.   Some physicians, as a general business policy, would not meet personally with me or other sales representatives.

4.    All package inserts and Wyeth product literature that I provided to physicians about the drugs I detail, including Wyeth's prescription hormone therapy products, are provided to me by Wyeth.  I have nothing to do with the development or preparation of such materials and I have no control over what is said in the written warnings that accompanied the drugs I detail. Wyeth instructs me what to say about the drugs I detail, and if a physician asks a question requiring an answer beyond the scope of the materials approved and provided by Wyeth, I am supposed to refer the question to Wyeth.  In sum, I act as a conduit of information between Wyeth and physicians.

1

5.     I do not, and am not expected to, conduct independent research regarding the drugs that I detail, including Wyeth's prescription hormone therapy products. I am not expected to, and do not, review independent scientific studies published in journals unless they are supplied to me by Wyeth. Nor do I independently evaluate the accuracy of the FDA-approved product information that accompanied Wyeth's prescription hormone therapy products. My knowledge of hormone therapy products comes exclusively from the education provided to me by Wyeth and from publicly available articles on topics related to those drugs.

6.     When discussing the safety or efficacy of Wyeth's prescription hormone therapy products in the course of my employment as a detailer, I disclose all the risks that I know about. I have never intentionally misrepresented the safety or efficacy of Wyeth's prescription hormone therapy products to any physician or hormone therapy product user.

7.     I have not tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, labeled, packaged, advertised for sale, prescribed, or placed into the stream of commerce any of Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase.

8.     I did not sell (or contract with any physician regarding the sale of) Wyeth's prescription hormone therapy drugs, including Prempro, Premarin, and Premphase, or other prescription drugs. I have no ownership interest in the mediations sold by Wyeth. *medications MSW*

9.     To the best of my knowledge, I have had no interaction with the plaintiff in this lawsuit. At no time have I ever provided Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, or other information concerning the

2

medications directly to the plaintiff. I have never made any representations or warranties to the plaintiff regarding any of Wyeth's hormone therapy medications.

10.   I have never made any representations regarding Wyeth's hormone therapy drugs, including Prempro, Premarin, and Premphase, whether by way of promotion or advertising or otherwise, to the general public. .

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: *15ᵗʰ et May*, 2006

*Mari Williams*
**MARI WILLIAMS**

3

# EXHIBIT 16

## DECLARATION OF KATHRYN L. VEZIN

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1.      My name is KATHRYN L. VEZIN and I hereby declare as follows:

2.      I am employed by Wyeth as a field sales representative, also known as a "detailer." I have detailed prescription hormone therapy products (i.e., Prempro, Premarin, and Premphase) for Wyeth.

3.      My "detail" work consists of visiting physicians' to provide them with information contained in FDA-approved package inserts and other FDA-approved information about Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, so that the physicians can consider whether to prescribe them for particular patients.   Typically, my visits with a physician last around five minutes, assuming the physician would meet with detailers.  Some physicians, as a general business policy, would not meet personally with me or other sales representatives.

4.      All package inserts and Wyeth product literature that I provided to physicians about the drugs I detail, including Wyeth's prescription hormone therapy products, are provided to me by Wyeth. I have nothing to do with the development or preparation of such materials and I have no control over what is said in the written warnings that accompanied the drugs I detail. Wyeth instructs me what to say about the drugs I detail, and if a physician asks a question requiring an answer beyond the scope of the materials approved and provided by Wyeth, I am supposed to refer the question to Wyeth. In sum, I act as a conduit of information between Wyeth and physicians.

1

5.      I do not, and am not expected to, conduct independent research regarding the drugs that I detail, including Wyeth's prescription hormone therapy products. I am not expected to, and do not, review independent scientific studies published in journals unless they are supplied to me by Wyeth. Nor do I independently evaluate the accuracy of the FDA-approved product information that accompanied Wyeth's prescription hormone therapy products. My knowledge of hormone therapy products comes exclusively from the education provided to me by Wyeth and from publicly available articles on topics related to those drugs.

6.      When discussing the safety or efficacy of Wyeth's prescription hormone therapy products in the course of my employment as a detailer, I disclose all the risks that I know about. I have never intentionally misrepresented the safety or efficacy of Wyeth's prescription hormone therapy products to any physician or hormone therapy product user.

7.      I have not tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, labeled, packaged, advertised for sale, prescribed, or placed into the stream of commerce any of Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase.

8.      I did not sell (or contract with any physician regarding the sale of) Wyeth's prescription hormone therapy drugs, including Prempro, Premarin, and Premphase, or other prescription drugs. I have no ownership interest in the mediations sold by Wyeth.

9.      To the best of my knowledge, I have had no interaction with the plaintiff in this lawsuit. At no time have I ever provided Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, or other information concerning the

2

medications directly to the plaintiff. I have never made any representations or warranties to the plaintiff regarding any of Wyeth's hormone therapy medications.

10.    I have never made any representations regarding Wyeth's hormone therapy drugs, including Prempro, Premarin, and Premphase, whether by way of promotion or advertising or otherwise, to the general public.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: May 22, 2006

KATHRYN L. VEZIN

3

# EXHIBIT 17

## DECLARATION OF CLIFFORD BLOM

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1.      My name is Clifford Blom, and I hereby declare as follows:

2.      I an employed by Wyeth as a field sales representative, also known as a "detailer." I have detailed prescription hormone therapy products (i.e., Prempro, Premarin, and Premphase) for Wyeth.

3.      My "detail" work consists of visiting physicians' to provide them with information contained in FDA-approved package inserts and other FDA-approved information about Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, so that the physicians can consider whether to prescribe them for particular patients.   Typically, my visits with a physician last around five minutes, assuming the physician would meet with detailers.  Some physicians, as a general business policy, would not meet personally with me or other sales representatives.

4.      All package inserts and Wyeth product literature that I provided to physicians about the drugs I detail, including Wyeth's prescription hormone therapy products, are provided to me by Wyeth. I have nothing to do with the development or preparation of such materials and I have no control over what is said in the written warnings that accompanied the drugs I detail. Wyeth instructs me what to say about the drugs I detail, and if a physician asks a question requiring an answer beyond the scope of the materials approved and provided by Wyeth, I am supposed to refer the question to Wyeth. In sum, I act as a conduit of information between Wyeth and physicians.

1

5.     I do not, and am not expected to, conduct independent research regarding the drugs that I detail, including Wyeth's prescription hormone therapy products. I am not expected to, and do not, review independent scientific studies published in journals unless they are supplied to me by Wyeth. Nor do I independently evaluate the accuracy of the FDA-approved product information that accompanied Wyeth's prescription hormone therapy products. My knowledge of hormone therapy products comes exclusively from the education provided to me by Wyeth and from publicly available articles on topics related to those drugs.

6.     When discussing the safety or efficacy of Wyeth's prescription hormone therapy products in the course of my employment as a detailer, I disclose all the risks that I know about. I have never intentionally misrepresented the safety or efficacy of Wyeth's prescription hormone therapy products to any physician or hormone therapy product user.

7.     I have not tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, labeled, packaged, advertised for sale, prescribed, or placed into the stream of commerce any of Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase.

8.     I did not sell (or contract with any physician regarding the sale of) Wyeth's prescription hormone therapy drugs, including Prempro, Premarin, and Premphase, or other prescription drugs. I have no ownership interest in the mediations sold by Wyeth.

9.     To the best of my knowledge, I have had no interaction with the plaintiff in this lawsuit. At no time have I ever provided Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, or other information concerning the

2

medications directly to the plaintiff. I have never made any representations or warranties to the plaintiff regarding any of Wyeth's hormone therapy medications.

10.    I have never made any representations regarding Wyeth's hormone therapy drugs, including Prempro, Premarin, and Premphase, whether by way of promotion or advertising or otherwise, to the general public. .

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 15 , 2006

CLIFFORD BLOM

# EXHIBIT 18

## DECLARATION OF TIMOTHY HICKEY

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1.      My name is Timothy Hickey and I hereby declare as follows:

2.      I worked for Wyeth as a field sales representative, also known as a "detailer."  I have detailed prescription hormone therapy products (i.e., Prempro, Premarin, and Premphase) for Wyeth.

3.      My "detail" work consisted of visiting physicians' to provide them with information contained in FDA-approved package inserts and other FDA-approved information about Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, so that the physicians could consider whether to prescribe them for particular patients.  Typically, my visits with a physician lasted around five minutes, assuming the physician would meet with detailers.  Some physicians, as a general business policy, would not meet personally with me or other sales representatives.

4.      All package inserts and Wyeth product literature that I provided to physicians about the drugs I detailed, including Wyeth's prescription hormone therapy products, were provided to me by Wyeth. I had nothing to do with the development or preparation of such materials and I had no control over what was said in the written warnings that accompanied the drugs I detailed. Wyeth instructed me what to say about the drugs I detailed, and if a physician asked a question requiring an answer beyond the scope of the materials approved and provided by Wyeth, I was supposed to refer the question to Wyeth. In sum, I acted as a conduit of information between Wyeth and physicians.

5.      I am neither a medical doctor nor a pharmacist, nor did I hold myself out as one.  I have no specialized medical or pharmacological education except that which I received from

Wyeth. I did not, and was not expected to, conduct independent research regarding the drugs that I detailed, including Wyeth's prescription hormone therapy products. I was not expected to, and did not, review independent scientific studies published in journals unless they were supplied to me by Wyeth. Nor did I independently evaluate the accuracy of the FDA-approved product information that accompanied Wyeth's prescription hormone therapy products. My knowledge of hormone therapy products came exclusively from the education provided to me by Wyeth and from publicly available articles on topics related to those drugs.

6.     When discussing the safety or efficacy of Wyeth's prescription hormone therapy products in the course of my employment as a detailer, I disclosed all the risks that I knew about. I never intentionally misrepresented the safety or efficacy of Wyeth's prescription hormone therapy products to any physician or hormone therapy product user.

7.     I have not tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, labeled, packaged, advertised for sale, prescribed, or placed into the stream of commerce any of Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase.

8.     I did not sell (or contract with any physician regarding the sale of) Wyeth's prescription hormone therapy drugs, including Prempro, Premarin, and Premphase, or other prescription drugs. I have no ownership interest in the mediations sold by Wyeth.

9.     To the best of my knowledge, I have had no interaction with the plaintiff in this lawsuit. At no time did I ever provide Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, or other information concerning the medications directly to the plaintiff. I never made any representations or warranties to the plaintiff regarding any of Wyeth's hormone therapy medications.

10.     I never made any representations regarding Wyeth's hormone therapy drugs, including Prempro, Premarin, and Premphase, whether by way of promotion or advertising or otherwise, to the general public. .

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: _May   10___, 2006

_Timothy G. Hickey_
TIMOTHY HICKEY

# EXHIBIT 19

## DECLARATION OF DONNA MOORES

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1.      My name is DONNA MOORES, and I hereby declare as follows.

2.      I am employed by Wyeth as a field sales representative, also known as a "detailer." I have detailed prescription hormone therapy products (i.e., Prempro, Premarin, and Premphase) for Wyeth

3.      My "detail" work consists of visiting physicians' to provide them with information contained in FDA-approved package inserts and other FDA-approved information about Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, so that the physicians can consider whether to prescribe them for particular patients.    Typically, my visits with a physician last around five minutes, assuming the physician would meet with detailers.  Some physicians, as a general business policy, would not meet personally with me or other sales representatives.

4.      All package inserts and Wyeth product literature that I provided to physicians about the drugs I detail, including Wyeth's prescription hormone therapy products, are provided to me by Wyeth. I have nothing to do with the development or preparation of such materials and I have no control over what is said in the written warnings that accompanied the drugs I detail. Wyeth instructs me what to say about the drugs I detail, and if a physician asks a question requiring an answer beyond the scope of the materials approved and provided by Wyeth, I am supposed to refer the question to Wyeth. In sum, I act as a conduit of information between Wyeth and physicians.

1

5.     I do not, and am not expected to, conduct independent research regarding the drugs that I detail, including Wyeth's prescription hormone therapy products. I am not expected to, and do not, review independent scientific studies published in journals unless they are supplied to me by Wyeth. Nor do I independently evaluate the accuracy of the FDA-approved product information that accompanied Wyeth's prescription hormone therapy products. My knowledge of hormone therapy products comes exclusively from the education provided to me by Wyeth and from publicly available articles on topics related to those drugs.

6.     When discussing the safety or efficacy of Wyeth's prescription hormone therapy products in the course of my employment as a detailer, I disclose all the risks that I know about. I have never intentionally misrepresented the safety or efficacy of Wyeth's prescription hormone therapy products to any physician or hormone therapy product user.

7.     I have not tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, labeled, packaged, advertised for sale, prescribed, or placed into the stream of commerce any of Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase.

8.     I did not sell (or contract with any physician regarding the sale of) Wyeth's prescription hormone therapy drugs, including Prempro, Premarin, and Premphase, or other prescription drugs. I have no ownership interest in the mediations sold by Wyeth.

9.     To the best of my knowledge, I have had no interaction with the plaintiff in this lawsuit. At no time have I ever provided Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, or other information concerning the

2

medications directly to the plaintiff. I have never made any representations or warranties to the plaintiff regarding any of Wyeth's hormone therapy medications.

10.    I have never made any representations regarding Wyeth's hormone therapy drugs, including Prempro, Premarin, and Premphase, whether by way of promotion or advertising or otherwise, to the general public. .

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: 5/17/____, 2006

DONNA MOORES

3

# EXHIBIT 20

# DECLARATION OF LISA GRAHAM

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1.    My name is LISA GRAHAM, and I hereby declare as follows:

2.    I am employed by Wyeth as a field sales representative, also known as a "detailer." I have detailed prescription hormone therapy products (i.e., Prempro, Premarin, and Premphase) for Wyeth.

3.    My "detail" work consists of visiting physicians' to provide them with information contained in FDA-approved package inserts and other FDA-approved information about Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, so that the physicians can consider whether to prescribe them for particular patients.    Typically, my visits with a physician last around five minutes, assuming the physician would meet with detailers.  Some physicians, as a general business policy, would not meet personally with me or other sales representatives.

4.    All package inserts and Wyeth product literature that I provided to physicians about the drugs I detail, including Wyeth's prescription hormone therapy products, are provided to me by Wyeth. I have nothing to do with the development or preparation of such materials and I have no control over what is said in the written warnings that accompanied the drugs I detail. Wyeth instructs me what to say about the drugs I detail, and if a physician asks a question requiring an answer beyond the scope of the materials approved and provided by Wyeth, I am supposed to refer the question to Wyeth. In sum, I act as a conduit of information between Wyeth and physicians.

5.      I do not, and am not expected to, conduct independent research regarding the drugs that I detail, including Wyeth's prescription hormone therapy products. I am not expected to, and do not, review independent scientific studies published in journals unless they are supplied to me by Wyeth. Nor do I independently evaluate the accuracy of the FDA-approved product information that accompanied Wyeth's prescription hormone therapy products. My knowledge of hormone therapy products comes exclusively from the education provided to me by Wyeth and from publicly available articles on topics related to those drugs.

6.      When discussing the safety or efficacy of Wyeth's prescription hormone therapy products in the course of my employment as a detailer, I disclose all the risks that I know about. I have never intentionally misrepresented the safety or efficacy of Wyeth's prescription hormone therapy products to any physician or hormone therapy product user.

7.      I have not tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, labeled, packaged, advertised for sale, prescribed, or placed into the stream of commerce any of Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase.

8.      I did not sell (or contract with any physician regarding the sale of) Wyeth's prescription hormone therapy drugs, including Prempro, Premarin, and Premphase, or other prescription drugs. I have no ownership interest in the mediations sold by Wyeth.

9.      To the best of my knowledge, I have had no interaction with the plaintiff in this lawsuit. At no time have I ever provided Wyeth's prescription hormone therapy products, including Prempro, Premarin, and Premphase, or other information concerning the

medications directly to the plaintiff. I have never made any representations or warranties to the plaintiff regarding any of Wyeth's hormone therapy medications.

10     I have never made any representations regarding Wyeth's hormone therapy drugs, including Prempro, Premarin, and Premphase, whether by way of promotion or advertising or otherwise, to the general public. .

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: May 18 , 2006

LISA GRAHAM

3

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

06 - 14137

CIV - GRAHAM

**I. (a) PLAINTIFF**
MARIA IPPOLITO

**DEFENDANTS**
WYETH, INC.; WYETH PHARMACEUTICALS, INC.; WYETH PHARMACIA & UPJOHN COMPANY, LLC; PHARMACIA & UPJOHN LLC; PHARMACIA CORPORATION; BRIDGET COMEAUX; KIMBERLY TUCKS; MARI WILLIAMS; KATHERINE VEZIN; MICHAEL SULLIVAN; CLIFFORD BLOM; TIMOTHY HICKEY; DONNA MOORES; and LISA GRAHAM.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF - ST. LUCIE
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   NON - FLORIDA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

MAGISTRATE JUDGE

2:06 CV 14137 DLG/SSL

**(c)** ATTORNEY (FIRM NAME, ADDRESS AND TELEPHONE NUMBER) Brenda S. Fulmer, Esquire, Alley, Clark, Greiwe & Fulmer, 701 East Washington Street Post Office Box 3127, Tampa, FL 33601-3127; Joyce & Reyes, 307 Hyde Park Ave., Tampa, FL 33606-2233.

ATTORNEYS (IF KNOWN) Warren R. Kwavnick, Esq., Bonner & Matson, et al., 1600 W. Commercial Blvd., Suite 200, Ft. Lauderdale, FL 33309; (954) 568-6669; Facsimile: (954) 568-0085

**(d)** CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)   AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen of Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

NIGHT BOX
FILED

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1. Original Proceeding
- ☒ 2. Removed from State Court
- ☐ 3. Remanded from Appellate Court
- ☐ 4. Reinstated or Reopened
- ☐ 5. Transferred from another district (specify)
- ☐ 6. Multidistrict Litigation
- ☐ 7. Appeal to District Judge from Magistrate Judgment

MAY 23 2006

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | B☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Med. Malpractice | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☒ 365 Personal Injury Product Liability | ☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **B SOCIAL SECURITY** | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (406(g)) | ☐ 892 Economic Stabilization Act |
| | | | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| | | | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | A☐ 870 Taxes (U.S. Plaintiff Or Defendant) | ☐ 900 Appeal of Fee Determination under Equal Access to Justice |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEUS CORPUS:** | A☐ 791 Empl. Ret. Inc. | A☐ 871 IRS Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B☐ 530 General | Security Act 884 | | ☐ 890 Other Statutory Actions |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | | | A OR B |
| ☐ 245 Tort Product Liability | ☐ 446 Other Civil Rights | B☐ 540 Mandamus & Other | | | |
| ☐ 290 All other Real Property | | B☐ 550 Civil Rights | | | |
| | | B☐ 555 Prison Condition | | | |

**VI. CAUSE OF ACTION**   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

LENGTH OF TRIAL:
Via ___ day estimated (for both sides to try entire case)   DIVERSITY

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
JURY DEMANDED:   ☒ YES   ☐ NO

**VIII. RELATED CASE(S)** (See instructions):
IF ANY

DATE
5/23/06

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # 537191   AMOUNT 350.00   APPLYING IFP ___   JUDGE ___   MAG. JUDGE ___